**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| **ISABEL ZELAYA, GERONIMO GUERRERO, CAROLINA ROMULO MENDOZA, LUIS BAUTISTA MARTÍNEZ, MARTHA PULIDO**, **CATARINO ZAPOTE HERNÁNDEZ, and MARIA DEL PILAR GONZALEZ CRUZ,** individually and on behalf of all others similarly situated, | Civil Action No. _____ |
| | |
| *Plaintiffs,* | **CLASS ACTION** |
| v. | **JURY DEMAND** |
| **JERE MILES,** Special Agent in Charge, Homeland Security Investigations ("HSI"); **ROBERT HAMMER,** Assistant Special Agent in Charge, HSI; **DAVID VICENTE,** Agent, Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO"); **FRANCISCO AYALA,** Agent, ICE ERO; **BILLY RIGGINS**, Special Agent, ICE; **WILLIAM HINKLE**, Deportation Officer, ICE; **ANTHONY MARTIN**, Deportation Officer, ICE; **M. GROOMS**, Deportation Officer, ICE; **SCOTT PA**, Special Agent, ICE; **DOES #1-30, Agents of U.S. Immigration & Customs Enforcement;** in their individual capacities, | |
| *Defendants.* | |

# INTRODUCTION

1. In April 2018, officers from U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Operations ("HSI"), Enforcement and Removal Operations ("ERO"),[1] and the Tennessee Highway Patrol ("THP") descended on the Southeastern Provision meatpacking plant ("Plant") in Bean Station, Tennessee, a small town in the far eastern corner of the state. Heavily armed, the officers formed a perimeter around the plant and blocked every exit. They used official vehicles to seal off the one public road to the Plant. Law enforcement helicopters flew above the Plant, securing and surveilling the premises. In the Plant's parking lot, several vans and large bags of plastic "zip tie" handcuffs waited to be used. Moments later, dozens of armed officers in bullet-proof vests rushed into the Plant. They quickly fanned out, many with their firearms drawn, and screamed at the workers inside to stop moving. The workers, terrified and confused, feared the commotion was a terrorist attack, a mass shooting, or a fire.

2. The officers were not searching for terrorists, armed criminals, or violent felons. Rather, the officers were assisting with the execution of an Internal Revenue Service ("IRS") search warrant for financial documents related to the alleged crimes of the plant's owner, James Brantley. However, the officers' goal that day was far more extensive than what the search warrant authorized: They planned to detain and arrest every worker in the plant who was or appeared to be Latino.

3. Prior to the raid, ICE enlisted Tennessee state resources – Tennessee Highway Patrol troopers – to accomplish this goal. ICE also secured the Tennessee National Guard's armory to use as a location to process individuals who were arrested that day. Then, with only an IRS

---

[1] HSI and ERO are two of three directorates within ICE. HSI, ERO, and ICE fall under the U.S. Department of Homeland Security ("DHS"). Throughout the Complaint HSI, ERO, and ICE officers are referred to as the "federal officers" or "Defendants."

2

search warrant for documents in hand, the officers executed the largest workplace immigration raid in nearly a decade. They forcefully seized and arrested approximately 100 Latino workers. In the process, the officers berated the workers with racial slurs, punched one worker in the face, and shoved firearms in the faces of many others. Meanwhile, the officers did not detain the Plant's white workers or subject them to the same intrusive and aggressive treatment and prolonged detention that the Latino workers experienced.

4. Many of the Latino workers were long-term employees of the Plant who had spent years performing the dangerous work endemic to slaughterhouses, often in unsafe conditions and without receiving legally-mandated overtime pay. The workers and their families are long-time members of the local community, attending school, church, and other local events alongside their neighbors. The day after the raid, nearly 600 children in the community did not show up for school.

5. Prior to the raid, the federal officers did not know the identities or the immigration status of any worker in the Plant. They knew only that many of the workers were "Hispanic." Only after detaining the Latino workers – and, in many instances, not until after transporting the workers to an offsite location – did the federal officers question the workers about their identity or immigration status. Ultimately, only eleven of the approximately 100 workers arrested were charged with any crime, and of those, none were charged with a violent crime.

6. The U.S. Constitution protects individuals from this kind of law enforcement overreach. The law is clear that seizures based entirely on race or ethnicity, arrests without probable cause, and the use of excessive force are prohibited by the Fourth and Fifth Amendments. The federal officers conspired to plan and execute the forceful and prolonged seizure of the Plant's Latino workforce solely on the basis of their actual or apparent race or ethnicity. The federal officers

made arrests without a valid arrest warrant, probable cause that each worker had violated U.S. immigration or criminal laws, or any exigent circumstances. In executing some of these arrests, the federal officers used brutal and excessive force without any provocation.

7. Plaintiffs are Latinos who were working in the Plant the day of the raid.[2] They bring this action, individually and on behalf of themselves and a class of similarly situated workers, to vindicate their rights under the Fourth and Fifth Amendments to the U.S. Constitution. Plaintiffs seek declaratory and monetary relief against the individual Defendants for violations of their clearly established constitutional rights the day of the raid.

## JURISDICTION AND VENUE

8. The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 2201-02.

9. Venue is proper in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and because at least one of the Plaintiffs resides in this district. 28 U.S.C. §§ 1391(b), (e).

10. The Court has personal jurisdiction over the Defendants because Defendants' acts and omissions giving rise to this lawsuit took place in in the Eastern District of Tennessee.

## PARTIES

### Plaintiffs

11. Plaintiff **Isabel Zelaya** ("Plaintiff Zelaya") was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, he had been working at the Plant for approximately two years. He is Latino.

---

[2] This Complaint uses "race" and "ethnicity" interchangeably in relation to Latino individuals. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017).

4

12. Plaintiff **Geronimo Guerrero** ("Plaintiff Guerrero") was employed as a supervisor at the Plant. He was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, he had been working at the Plant for approximately eighteen years. He is Latino.

13. Plaintiff **Carolina Romulo Mendoza** ("Plaintiff Romulo Mendoza") was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, she had been working at the Plant for approximately three years. She is Latina.

14. Plaintiff **Luis Bautista Martínez** ("Plaintiff Bautista Martínez") was working at the Plant the morning of April 5, 2018 inside the loading dock. At the time of the raid, he had been working at the Plant for approximately two years. He is Latino.

15. Plaintiff **Martha Pulido** ("Plaintiff Pulido") was working at the Plant the morning of April 5, 2018 in the kill floor area. At the time of the raid, she had been working at the Plant for approximately one year. She is Latina.

16. Plaintiff **Maria del Pilar Gonzalez Cruz** ("Plaintiff Gonzalez Cruz") was working at the Plant the morning of April 5, 2018 constructing boxes near the processing area. At the time of the raid, she had worked in the Plant for approximately two years. She is Latina.

17. Plaintiff **Catarino Zapote Hernández** ("Plaintiff Zapote Hernández") was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, he had been working at the Plant for approximately ten years. He is Latino.

## Defendants

18. Defendant **Jere Miles** ("Defendant Miles") was at all times relevant to this action the Special Agent in Charge with HSI New Orleans. He oversaw the Southeastern Provision raid. Defendant Miles is sued in his individual capacity.

5

19. Defendant **Robert Hammer** ("Defendant Hammer") was at all times relevant to this action an Assistant Special Agent in Charge with HSI. He oversaw the Southeastern Provision raid. Defendant Hammer is sued in his individual capacity.

20. Defendant **David Vicente** ("Defendant Vicente") was at all times relevant to this action an Agent of ICE ERO Knoxville. He participated in the planning and execution of the Southeastern Provision raid. Defendant Vicente is sued in his individual capacity.

21. Defendant **Francisco Ayala** ("Defendant Ayala") was at all times relevant to this action an Agent of ICE ERO. He participated in the planning and execution of the Southeastern Provision raid. Defendant Ayala is sued in his individual capacity.

22. Defendant **Billy Riggins** ("Defendant Riggins") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Riggins is sued in his individual capacity.

23. Defendant **William Hinkle** ("Defendant Hinkle") was at all times relevant to this action a Deportation Officer of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Hinkle is sued in his individual capacity.

24. Defendant **Anthony Martin** ("Defendant Martin") was at all times relevant to this action a Deportation Officer of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Martin is sued in his individual capacity.

25. Defendant **M. Grooms** ("Defendant Grooms") was at all times relevant to this action a Deportation Officer of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Grooms is sued in his individual capacity.

26. Defendant **Scott Pa** ("Defendant Pa") was at all time relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Pa is sued in his individual capacity.

27. The identities and capacities of Defendants Does 1 through 30 are presently unknown to Plaintiffs, and on this basis, they sue these defendants by fictitious names. Plaintiffs will amend the Complaint to substitute the true names and capacities of the Doe Defendants when they are ascertained. Plaintiffs are informed, believe, and thereon allege that Does 1 through 30 are, and were at all times relevant to this action, employees and/or agents of ICE, HSI, and/or ERO and are responsible for the acts and omissions complained of herein including, but not limited to, their unlawful seizure and arrest, and violation of their Fourth and Fifth Amendment rights.

## CLASS ACTION ALLEGATIONS

28. Plaintiffs Maria del Pilar Gonzalez Cruz and Catarino Zapote Hernández ("Class Representative Plaintiffs") seek to bring this class action against the Defendants on behalf of themselves and all other similarly situated Latino workers in the Plant on April 5, 2018 who were targeted by the Defendants' conspiracy to detain every worker in the Plant solely on the basis of their actual or apparent Latino race or ethnicity.

29. The Class Representative Plaintiffs seek to bring as a class action the claim set forth in Count I ("Equal Protection Class Claim") under Federal Rules of Civil Procedure 23(a) and (b)(3), for their requests for damages. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

30. Plaintiffs Gonzalez Cruz and Zapote Hernández seek to certify the following Class:

All individuals who are or appeared to be of Latino race or ethnicity who were working at the Plant the morning of April 5, 2018.[3]

31. The Class Representative Plaintiffs' proposed Class meets the prerequisites of Rule 23(a):

1. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. The Class Representative Plaintiffs believe that the Class consists of approximately 100 individuals. Membership in the Class is readily ascertainable from Defendants' arrest records from the day of the raid and Defendants' public statements regarding the raid.[4]

2. **Commonality**: There are numerous questions of law or fact common to the Class, and those issues predominate over any question affecting only individual Class Members. The common legal and factual issues include, but are not limited to, the following:

(a) Whether the Defendants' conduct set out in paragraphs 48-100 and Count I violated the Fifth Amendment to the U.S. Constitution.

(b) Whether the Defendants conspired to violate the rights of the Class under the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution in violation of 42 U.S.C. §§ 1985(3) and 1986.

(c) Whether the Defendants' plan to seize, search, detain, and interrogate only the Latino workers in the Plant was lawful.

---

[3]     Plaintiffs reserve the right to revise the class definition based upon information learned after the filing of this action.

[4]     *ICE Worksite Enforcement Surge FY18*, https://www.ice.gov/news/releases/ice-worksite-enforcement-investigations-fy18-surge (Dec. 11, 2018) (stating that HSI arrested 104 people at the April 5, 2018 raid).

(d)     Whether the IRS Search Warrant for documents authorized the Defendants to detain every Latino worker on the premises.

(e)     Whether the Class Representative Plaintiffs and the Class Members are entitled to damages and other monetary relief and declaratory relief.

3.     **Typicality**:  The claims asserted by Class Representative Plaintiffs are typical of the claims of the Class, in that the Plaintiffs Gonzalez Cruz and Zapote Hernández, like all Class Members, (a) are Latino and (b) were targeted by the Defendants' conspiracy to detain and practice of detaining all the Latino workers solely based on their actual or apparent ethnicity or race. Further, Plaintiff Gonzalez Cruz and Plaintiffs Zapote Hernández, and each member of the proposed Class have been similarly injured by Defendants' misconduct.

4.     **Adequacy**: The Class Representative Plaintiffs will fairly and adequately protect the interests of the Class.  The Class Representative Plaintiffs have retained attorneys experienced in class actions and complex litigation, including litigation arising under violations of constitutional rights.  The Plaintiffs and their counsel will vigorously prosecute this litigation. Neither the Plaintiffs nor their counsel have interests that conflict with the interests of the other Class Members.

32. Plaintiffs' proposed Class meets the requirements of certification under Rule 23(b)(3):

5.     **Predominance of Common Questions:**  The questions of law or fact common to the Class, identified above in paragraph 31(2), predominate over any questions affecting only individual members, including the legality of the Defendants' conspiracy to detain and practice of detaining all the Latino workers solely based on their actual or apparent ethnicity or race, which ensnared all Plaintiffs and Class Members.

6.      **Superiority:**  The Class Representative Plaintiffs and Class Members have all suffered damages as a result of Defendants' wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many members of the proposed Class who could not individually afford to litigate a claim such as is asserted in this Complaint.  Additionally, a class action is superior because the Class is comprised of many individuals who are low-income, do not speak English as their native language, and are geographically dispersed.  Finally, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

## STATEMENT OF FACTS

### Southeastern Provision Meatpacking Plant

33. The Southeastern Provision meatpacking plant ("Plant") is located at 1617 Helton Road, Bean Station, Tennessee, in Grainger County, just north of Morristown.  Its primary business at all times relevant to this action was the processing and packaging of beef.

34. Bean Station is a quiet community with a population of just over 3,000 people.

35. The Plant sits on top of a hill in a sparse, remote area of Bean Station.  Access to the Plant is achieved by way of Helton Road, a windy, two-lane country road off Highway 11 West.

36. The Plant consists of a collection of smaller structures resembling storage sheds, connected to a large, two-story warehouse.

37. Inside the Plant there are three offices, a locker room, bathrooms, several large freezer sections, a processing area, and a "kill floor." Some of the areas are not separated by solid doors or walls, but rather are completely open or separated by clear, heavy curtains.

38. The workers stored personal items in the locker area and would retrieve their uniforms there at the beginning of their shift.

39. The processing area was one of two main work areas in the Plant. In the processing area, workers prepared and packaged cuts of meat to be distributed for sale.

40. Approximately fifty workers were working in the processing area on April 5, 2018.

41. The second main work area at the Plant was the "kill floor," which is where workers butchered and cut apart the cows to be processed into meat.

42. Approximately forty workers were working on the "kill floor" on April 5, 2018.

43. The Plant's physical and electronic documents were stored in offices and a locked storage room in the Plant. They are not accessible to the workers employed on the processing and kill floor areas.

44. Most people working at the Plant arrived sometime before 7 a.m. each day, five or six days each week, to put on their uniforms and "clock-in" before the morning shift began at 7 a.m.

45. The work was grueling and physically demanding as well as hazardous. The Plant lacked first aid providers, guardrails for high platforms, and protective equipment and wash stations to protect workers against cuts, chemical burns, and temperature extremes.

46. Many of the workers had been working at the Plant for many years, some over a decade.

47. The workers began their shift at 7 a.m. and worked until 9:30 a.m., when they received their first break. The break lasted for 15 minutes, during which time workers were permitted to use the bathroom, exit the building, and/or make phone calls.

11

**The Internal Revenue Service Search Warrant**

48. The federal investigation into the Plant began as an investigation by the IRS into the owner of the plant, Mr. James Brantley ("Brantley"), related to various alleged tax and immigration law violations.

49. As part of that investigation, the IRS obtained a search warrant authorizing the search for and seizure of an enumerated list of items. *See In re the Search of: 1617 Helton Road, Bean Station, TN 37708* (E.D. Tenn. Apr. 2, 2018) (attached hereto as Exhibit 1) ("IRS Search Warrant"); Affidavit in Support of a Search Warrant, at Attachment B (attached hereto as Exhibit 2).

50. The items to be seized pursuant to the IRS Search Warrant were, among other things, all "records, documents and materials…related to the financial activities of James Brantley." *See* Ex. 1, at 5.

51. The IRS Search Warrant did not authorize the detention or arrest of any individual(s).

52. The Affidavit submitted with the IRS Search Warrant relies in part on information from a Confidential Informant ("CI"). The only information provided in the Affidavit about the CI is that he or she was "working with law enforcement." The Affidavit provides no other indicia of the CI's reliability. Ex. 2, at 7-10.

53. The Affidavit does not state or imply any potential safety concerns involved in the execution of the IRS Search Warrant. *See generally id.*

54. The Affidavit states that Plant's employees are "Hispanic" on five separate occasions. *See id.* at 7-10.

55. The Affidavit notes the CI observed that many of the Plant's workers are "Hispanic," and that the CI believes many are "exploited" and without "legal recourse for workplace mistreatment." *Id.* at 10.

56. The Affidavit states that "personnel" at Brantley's bank said, during a tour of the Plant, "they were told [by the owner's wife] that the employees were Hispanic and were paid weekly with cash." *Id.* at 7.

57. According to the Affidavit, HSI and THP had already been participating in the IRS investigation of Brantley before the search warrant was obtained. *Id.* at 6.

58. The presence of Defendants at the Plant on the morning of April 5th was pursuant to the IRS Search Warrant.

59. The Defendants did not obtain a separate criminal or administrative warrant related to their presence and activities in the Plant that day.

**The Raid**

60. The morning of April 5 began like most other mornings at the Plant.

61. Plaintiffs and Class Members arrived sometime before 7 a.m. to prepare for their shift, which began promptly at 7 a.m.

62. Once the shift began, Plaintiffs and Class Members were all working at their respective stations in the Plant.

63. None of the Plaintiffs or the Class Members worked in the Plant's offices.

64. At around 9 a.m., near the morning break time, when the workers were anticipating the opportunity to take a break from their work to attend to personal needs, such as using the restroom, the raid began.

65. Officers from ICE, HSI, and THP formed a perimeter around the plant. Multiple armed agents secured every Plant exit.

66. The THP officers sealed off the one public road to the Plant with official vehicles.

67. THP helicopters surveilled and secured the Plant from above.

68. Dozens of officers from ICE burst, unannounced, into the Plant. They poured through the Plant's multiple doors and quickly fanned out throughout the interior of the Plant.

69. The federal officers wore black uniforms with bullet-proof vests, and they were armed. Some of the officers had their firearms on display or drawn.

70. The federal officers did not wear nametags or identify themselves by name to the workers. Most officers did not verbally identify themselves by agency.

71. The federal officers were yelling and loudly ordering the Plaintiffs and the Latino workers to freeze and to stop working.

72. The commotion caused by the federal officers' sudden and forcible entry into the Plant terrorized the Plaintiffs and the Class Members. In the first minutes of the raid, many workers were confused and uncertain about who the officers were or what was the purpose of their presence inside of the Plant.

73. Some federal officers ordered individuals to put their hands in the air.

74. Some federal officers pointed guns at workers while they ordered them to stop working.

75. Individuals who had work equipment on their person were ordered to take off any equipment. Others were ordered to put down any tools they were holding.

76. None of the Latino workers were permitted to continue working.

77. Plaintiffs and the Latino workers were not permitted to use the restroom or otherwise move freely about the Plant as they would have done on their break time.

14

78. The federal officers then ordered the Plaintiffs and the Latino workers to walk from their work station into a line up.

79. Many of the workers were restrained during the Plant seizure with plastic zip ties, including Plaintiffs Gonzalez Cruz, Zapote Hernández, Zelaya, Pulido, Bautista Martínez, and Guerrero. Other workers witnessed the federal agents handcuff their coworkers and were fearful that they too might be handcuffed.

80. After forcing the workers to line up, the federal officers ordered the Plaintiffs and the other Latino workers of the Class to walk outside of the Plant and told them to remain in line outside.

81. When they went outside the Plant, Plaintiffs saw that the THP officers had secured the perimeter, the parking lot, and the public road leading to the Plant. Plaintiffs saw and heard two helicopters circling overhead.

82. Some of the THP officers outside stood behind large machine guns which were pointed at the Plant and the workers.

83. Plaintiffs and the Class Members, seeing the number of officers, the firearms, the helicopters, and the police cars, felt terrified.

84. While detained outside the Plant, the workers were not allowed to move freely or talk. When a worker attempted to speak, officers ordered them to shut up.

85. As a result of the actions of the Defendants, Plaintiffs and the Class Members were not free to leave.

86. Under these highly coercive conditions, the Defendants interrogated some of the workers about their immigration status at the Plant.

87. Eventually, Plaintiffs and all the Latino workers were loaded into vans and transported to a National Guard Armory ("Armory") located at 5255 E. Andrew Jackson Highway, Russellville, Tennessee 37860, where they were interrogated and fingerprinted.

88. The Defendants did not tell the workers where they were being taken.

89. The Armory is an approximately twenty- to thirty-minute drive from the Plant.

90. Some workers were not questioned about their identity or immigration status until after they were transported from the Plant to the Armory, including Plaintiffs Zelaya, Romulo Mendoza, Bautista Martínez, Guerrero, and Pulido.

91. Throughout the raid, various Defendants berated the workers with racial slurs.

92. During his detention, Plaintiff Zapote Hernández heard an ICE Officer who was Latino make fun of Mexicans. The officer addressed a dog that was on the premises and said, "I suppose you are from Mexico, too."

93. Plaintiff Guerrero saw Defendant Vicente yell angrily at a worker. Defendant Vicente shouted at this worker, stating that the problem with them (the workers) was that they lived in the United States but did not speak English. Plaintiff Guerrero observed this worker shaking as Defendant Vicente yelled at him. The worker had asked Defendant Vicente not to put the handcuffs on so tight. Defendant Vicente's only response was that the worker could not tell Defendant Vicente what to do. Plaintiff Guerrero was upset upon seeing this treatment.

94. Throughout the raid, the Defendants did not treat the white workers in the Plant in the same intrusive and aggressive manner nor subjected them to the prolonged detention that the Latino workers experienced.

95. The white workers were not restrained and were not handcuffed.  They did not have guns pointed at them.  Many were standing outside smoking while the Latinos were seized and detained.

96. The white workers were not interrogated.

97. The white workers were not loaded into vans and taken to the Armory.

98. The Defendants planned and executed a course of action that lead to the seizure, interrogation, and detention of Plaintiffs and every Latino worker in the Plant solely on the basis of their actual or apparent race or ethnicity.

99. The Defendants executed the raid based on invidious animus against the workers who were of actual or apparent Latino race and ethnicity, in violation of the Fifth Amendment.

100. As a result of the Defendants' actions, the Plaintiffs and the Class Members have suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

**The Claims of Named Plaintiff Isabel Zelaya**

101. Plaintiff Zelaya was working in the processing area of the Plant the morning of the raid when he saw two Defendants approach his work station with their hands on their firearms.  One officer was a brunette male.  The other officer was a brunette female.  He then saw many more officers approach.  He was shocked and scared when he saw the armed officers approach.

102. He observed the Defendants treat the Latino workers in his work area aggressively.  These two federal officers pointed their guns at the workers and shoved some to the ground.  Plaintiff Zelaya also observed armed officers blocking the exits from the Plant.

103. Plaintiff Zelaya was terrified by the aggressive treatment of his coworkers he observed. He feared that these two Defendants would point a firearm at him or throw him to the ground as well.

104. The same two Defendants ordered Plaintiff Zelaya to throw his apron and work tools on the ground. He immediately complied.

105. During this time, Plaintiff Zelaya saw these officers point a firearm at his son because he did not take off his tool belt fast enough. Plaintiff Zelaya feared for his son's safety.

106. The same two Defendants then forced him and the other Latino workers in his work area to gather in a central area of the Plant.

107. Plaintiff Zelaya is legally authorized to live and work in the United States.

108. While gathered with the other workers, Plaintiff Zelaya told a Latino ICE officer who spoke Spanish that he had legal status and offered to show him documents as proof. He took out his Employment Authorization Card and handed it to the officer. The ICE officer grabbed the card from him and told him in Spanish that they needed to "investigate" him. The officer then proceeded to handcuff Plaintiff Zelaya.

109. Once gathered, the federal officers, including the Latino officer, walked Plaintiff Zelaya and the other workers outside the Plant.

110. The officers then transported Plaintiff Zelaya in a van to the Armory.

111. The ICE officers at the Armory interrogated Plaintiff Zelaya. Finally, after establishing proof of his legal status, Plaintiff Zelaya was released.

112. Plaintiff Zelaya was detained for approximately two hours.

113. Plaintiff Zelaya was not questioned about his identity, work authorization, or immigration status prior to being detained at the Plant and transported to the Armory. Plaintiff

Zelaya was not permitted an opportunity to demonstrate his legal authorization to live and work in the United States prior to being arrested.

**The Claims of Named Plaintiff Carolina Romulo Mendoza**

114. Plaintiff Romulo Mendoza was working in the processing area of the Plant the morning of the raid. When the raid began, she was walking back to her work station from the restroom.

115. When Plaintiff Romulo Mendoza exited the restroom, she observed several armed officers inside the Plant.

116. Two officers ordered her not to leave or to resist. Both officers were male. One officer was Latino and the other appeared to be of South Asian descent. The two officers told her to be quiet and to put her hands on her head. Then they ordered her into a line up. She was afraid the officers would physically harm her if she did not comply, as the officers had firearms. She complied with their orders.

117. Defendants then walked Plaintiff Romulo Mendoza outside. Outside, she saw that the THP officers had blocked the exits to the Plant. She also saw patrol cars blocking the public road to the Plant. She saw at least one law enforcement helicopter was flying above.

118. Plaintiff Romulo Mendoza was terrified and could only think of her family.

119. Defendants, including one officer who was an African-American woman, eventually loaded Plaintiff Romulo Mendoza and approximately fifteen other Latino workers into vans. Defendants did not tell Plaintiff Romulo Mendoza or the other workers in the van with her where they were going.

120. The van transported Plaintiff Romulo Mendoza to the Armory. At the Armory, Plaintiff Romulo Mendoza was patted down, and her belongings were taken from her. The ICE officers interrogated and fingerprinted Plaintiff Romulo Mendoza.

19

121. Plaintiff Romulo Mendoza was detained for approximately ten hours.

122. Plaintiff Romulo Mendoza was not questioned about her identity, work authorization, or immigration status prior to being detained at the Plant and transported to the Armory.

**The Claims of Named Plaintiff Martha Pulido**

123. Plaintiff Pulido was working on the kill floor area of the Plant the morning of the raid.

124. She suddenly heard officers ordering workers to put their hands up. The Plant quickly became a chaotic scene filled with armed officers shouting. She observed an officer point a firearm at a woman who had tripped and fallen and another tall, white, male officer pushing another female worker. She also observed another male officer punch Plaintiff Guerrero.

125. As a result of the Defendants' actions, Plaintiff Pulido feared that the officers would physically harm her if she did not comply with their orders. She was terrified. She complied with their orders.

126. Defendants ordered Plaintiff Pulido and other workers to exit the Plant. Once Plaintiff Pulido was outside the Plant, officers handcuffed her wrists with zip ties.

127. During this time, Plaintiff Pulido was not free to move around or even to talk. When a worker attempted to speak, officers ordered them to shut up. She was extremely humiliated by this treatment. She felt like she was being treated like a dangerous criminal.

128. Plaintiff Pulido observed that white workers were outside the Plant. Those workers were allowed to walk around freely, were not handcuffed, and were allowed to smoke. None of the Defendants interrogated the white workers.

129. Eventually, Plaintiff Pulido and other Latino workers were transported to the Armory.

130. Upon arrival at the Armory, her personal items were confiscated. Plaintiff Pulido was interrogated and fingerprinted. She was restrained in zip ties until she was fingerprinted.

131. Plaintiff Pulido was detained for approximately fourteen hours.

132. Plaintiff Pulido was not questioned about her identity, work authorization, or immigration status prior to being detained at the Plant and transported to the Armory.

**The Claims of Named Plaintiff Geronimo Guerrero**

133. Plaintiff Guerrero, a long-term employee and supervisor at the Plant, was in the processing area the morning of the raid.

134. From his location, Plaintiff Guerrero observed numerous officers with firearms inside the Plant.

135. A short, white, male officer ("Defendant Doe 1"), who was armed, approached Plaintiff Guerrero and shouted at him to come towards him. Defendant Doe 1 simultaneously made a fist and intentionally struck Plaintiff Guerrero in the face.

136. Immediately after Defendant Doe 1 punched Plaintiff Guerrero, a second male officer who was tall and of Asian descent arrived and grabbed Plaintiff Guerrero by the arm. Defendant Doe 1 and the other officer pushed Plaintiff Guerrero against the wall and patted him down.

137. Plaintiff Guerrero asked the officers why he had been struck, but he did not receive a response. Plaintiff Guerrero was extremely fearful because he did not know who the officers were. The officers never identified themselves nor provided him any information about their presence in the Plant.

138. He was confused and scared because there were many officers with firearms, and he had just been punched in the face for no apparent reason. He thought that the officers were coming to kill him and the rest of the workers.

139. After the officers patted down Plaintiff Guerrero, an officer handcuffed him with zip ties, and officers ordered him to sit down just outside one of the Plant's offices. Plaintiff

21

Guerrero remained handcuffed just outside the office entrance with other Latino workers who had also been handcuffed and required to remain there. The Plant's general supervisor, Carl Kinser, who is white, was outside the office. He was permitted to move freely and was not handcuffed.

140. Plaintiff Guerrero remained handcuffed and was required to remain seated at the office entrance area for about an hour. While detained in this area, Plaintiff Guerrero was in a complete state of shock and fear. Other officers patrolled this area closely, watching over the workers and ordering them not to move.

141. Eventually the officers escorted Plaintiff Guerrero outside the Plant, where he continued to be detained.

142. He was eventually taken to the Armory with the other Latino workers, where he was interrogated and fingerprinted.

143. At the Armory, Plaintiff Guerrero continued to be restrained by plastic zip ties.

144. Plaintiff Guerrero was detained for approximately twelve hours.

145. Plaintiff Guerrero was not questioned about his identity, work authorization, or immigration status prior to being detained at the Plant and transported to the Armory.

**The Claims of Named Plaintiff Luis Bautista Martínez**

146. Plaintiff Bautista Martínez was working inside the loading dock of the Plant the morning of the raid.

147. Once the raid began, three white male officers approached him with their firearms pointed at him. Plaintiff Bautista Martínez thought they were terrorists and were going to kill him. He stopped working and put his hands up in the air.

148. A tall, white, male officer grabbed Plaintiff Bautista Martínez by the shirt to walk him outside.

149. Outside, Plaintiff Bautista Martínez saw many federal and THP officers surrounding the Plant and blocking the exits.  He saw patrol cars and a helicopter flying above.

150. One of Plaintiff Bautista Martínez's coworkers fell on the ground, and officers immediately ran toward him.  One officer put his foot on the coworker's head and pointed a gun at him.  Two other officers handcuffed the worker.

151. Seeing this, Plaintiff Bautista Martínez feared that the officers would treat him with the same level of aggression.

152. Plaintiff Bautista Martínez and other workers were lined up outside the Plant. Officers handcuffed him while he was standing outside. Plaintiff Bautista Martínez and some of his coworkers were left standing handcuffed outside of the plant for about two hours.

153. During this time, Plaintiff Bautista Martínez asked Defendant Ayala if a pregnant coworker could sit down.  Defendant Ayala refused and told Plaintiff Bautista Martínez to "Shut [his] f--king mouth."

154. Plaintiff Bautista Martínez asked several times for permission to use the restroom himself.  Defendant Ayala refused and cursed at Plaintiff Bautista Martínez, saying to him "You don't have rights here" and calling him "Mexican sh-t."

155. Eventually, after Plaintiff Bautista Martínez said that he urgently needed to use the bathroom, a white, male ICE officer ("Defendant Doe 2") grabbed him by the shoulder and led him to an outside area behind a trailer.  Defendant Doe 2 held a firearm to Plaintiff Bautista Martínez's head and told him to relieve himself right there, in plain sight of the other officers

outside. Then Defendant Doe 2 laughed and cursed at him. Plaintiff Bautista Martínez felt extremely humiliated by this treatment.

156. Approximately two hours after Plaintiff Bautista Martínez was moved outside the Plant, an officer grabbed him by his clothes and pushed him into a van along with the other Latino workers. The van transported Plaintiff Bautista Martínez to the Armory. No white workers were transported to the Armory in the van with Plaintiff Bautista Martínez.

157. While in the van, a male officer, who was tall, overweight, white, and had long blond hair down to his waist, took out his phone and took a picture of himself with the Latino workers in the van, yelling "selfie!" while he snapped the shot.

158. At the Armory, Plaintiff Bautista Martínez continued to be handcuffed with plastic zip ties.

159. During this time, Defendant Ayala berated Plaintiff Bautista Martínez and the other workers. He told them in Spanish to "shut [their] f--king mouths" and yelled that they were "going back to [their] damned s--t country."

160. Eventually, Plaintiff Bautista Martínez was interrogated and fingerprinted at the Armory.

161. Plaintiff Bautista Martínez was detained for approximately twelve hours.

162. Plaintiff Bautista Martínez was not questioned about his identity, work authorization, or immigration status prior to being detained at the Plant and transported to the Armory.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Equal Protection in Violation of Fifth Amendment
### *On Behalf of the Class*
### (Bivens *claim against All Defendants*)

163. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-162 as if fully set forth herein.

164. The Defendants stopped, detained, searched, seized, and/or arrested Plaintiffs and the Class solely on the basis of Plaintiffs' and Class Members' actual or apparent race and ethnicity, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

165. The Defendants did not seize, detain, search, and/or arrest the similarly situated white workers in the Plant on the day of the raid.

166. The Defendants' actions were motivated by discriminatory intent and racial animus toward Plaintiffs and the Class.

167. The actions of the Defendants were intentional, malicious, and reckless and reflect a callous disregard or indifference to the civil rights of Plaintiffs and the Class.

168. The Defendants violated the Plaintiffs' and the Class Members' clearly established rights under the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution

169. As a result of Defendants' actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1985: Conspiracy to Violate Civil Rights
*On Behalf of the Class*
(**Bivens** *claim against All Defendants*)

170. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-169 as if fully set forth herein.

171. By agreeing to stop, detain, search, seize, and/or arrest Plaintiffs and the Class solely on the basis of their actual or apparent race and ethnicity, Defendants conspired to deprive Plaintiffs and the Class of the equal protection of the law of the United States, in violation of 42 U.S.C. § 1985(3).

172. As a result of Defendants' actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1986: Failure to Prevent Violation of Civil Rights
*On Behalf of the Class*
(**Bivens** *claim against All Defendants*)

173. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-172 as if fully set forth herein.

174. Defendants, having knowledge of the conspiracy to violate Plaintiffs' and the Class' civil rights as specified in Count 2 above, willfully or negligently failed to prevent the wrongful acts complained of herein, in violation of 42 U.S.C. § 1986.

175. As a result of Defendants' actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

## FOURTH CAUSE OF ACTION
**Unreasonable Seizures and/or Arrests in Violation of the Fourth Amendment**
*On Behalf of Plaintiffs Isabel Zelaya, Geronimo Guerrero, Carolina Romulo Mendoza,*
*Luis Bautista Martínez, and Martha Pulido*
(**Bivens** *claim against All Defendants*)

176. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-175 as if fully set forth herein.

177. The Defendants seized the Plaintiffs when dozens of armed agents in bullet-proof vests surrounded the plant, blocked the one public road to the plant with numerous law enforcement vehicles, controlled the perimeter of the Plant from above with helicopters, secured the Plant's exits and entrances, aggressively burst into the Plant, loudly ordered them to cease moving, and detained them.

178. The Defendants conducted the seizures without a warrant authorizing the seizure of each individual; reasonable, articulable suspicion that each Plaintiff had violated U.S. immigration laws or any other U.S. criminal laws; or exigent circumstances.

179. The IRS Search Warrant did not authorize the Defendants' prolonged, intrusive, and forceful seizure of the Plaintiffs.

180. The IRS search warrant was not supported by probable cause.

181. The Defendants violated the clearly established Fourth Amendment rights of the Plaintiffs to be free from unreasonable searches and seizures.

182. The Defendants unlawfully arrested the Plaintiffs when they detained them at the Plant and transported them to the Armory without asking them a single question about their identity, work authorization, or immigration status.

183. The Defendants arrested the Plaintiffs without an arrest warrant, probable cause that they had violated U.S. immigration or criminal laws, or exigent circumstances in violation of their Fourth Amendment rights.

184. The right to be free from seizures and arrests that are not supported by a warrant, probable cause, or exigent circumstances is clearly established.

185. As a result of the Defendants' conduct, the Plaintiffs have suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

**FIFTH CAUSE OF ACTION**
**Excessive Force in Violation of Fourth Amendment**
***On Behalf of Plaintiff Geronimo Guerrero***
**(Bivens *claim against Defendant Doe 1*)**

186. Plaintiff Guerrero realleges and incorporates by reference each and every allegation contained in paragraphs 1-185 as if fully set forth herein.

187. The Defendants engaged in unreasonable, excessive force when effectuating the seizure and arrest of Plaintiff Guerrero in violation of his Fourth Amendment rights.

188. Defendant Doe 1 violated Plaintiff Guerrero's clearly established right to be free from excessive force under the Fourth Amendment.

189. Defendant Doe 1 brutally and without provocation punched Plaintiff Guerrero in the face when he approached Plaintiff Guerrero at his work area in the Plant the day of the raid.

190. Plaintiff Guerrero did not present a safety threat to Defendant Doe 1. When Defendant Doe 1 approached Plaintiff Guerrero, he was in his work area and was unarmed.

191. Plaintiff Guerrero was attempting to comply with Defendant Doe 1's orders when the officer approached. Plaintiff Guerrero was not attempting to flee.

192. Defendant Doe 1 lacked any particularized suspicion that Plaintiff Guerrero had violated U.S. immigration laws or committed a crime.

28

193. The right to be free from the use of excessive force is clearly established.

194. As a result of Defendant Doe 1's actions, Plaintiff Guerrero has suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

## SIXTH CAUSE OF ACTION
### Excessive Force in Violation of Fourth Amendment
### *On Behalf of Plaintiff Luis Bautista Martínez*
### (Bivens *claim against Defendant Doe 2*)

195. Plaintiff Bautista Martínez realleges and incorporates by reference each and every allegation contained in paragraphs 1-194 as if fully set forth herein.

196. The Defendants engaged in unreasonable, excessive force when effectuating the seizure and arrest of Plaintiff Bautista Martínez in violation of his Fourth Amendment rights.

197. Defendant Doe 2 violated Plaintiff Bautista Martínez's clearly established right to be free from excessive force under the Fourth Amendment.

198. Defendant Doe 2 brutally and without provocation held a gun to Plaintiff Bautista Martínez's head while insisting that Plaintiff Bautista Martínez urinate in front of his coworkers.

199. Plaintiff Bautista Martínez did not present a safety threat to Defendant Doe 2, as he remained handcuffed, and Defendant Doe 2 held him by the shoulder as Plaintiff Bautista Martínez urinated. Moreover, Plaintiff Bautista Martínez had attempted to comply with all orders and was not attempting to flee.

200. Defendant Doe 2's use of excessive force against Plaintiff Bautista Martínez occurred well after the federal officers had restrained the Plant's Latino workforce.

201. Defendant Doe 2 lacked any particularized suspicion that Plaintiff Bautista Martínez had violated U.S. immigration laws or committed a crime.

202. The right to be free from the use of excessive force is clearly established.

29

203. As a result of Defendant Doe 2's actions, Plaintiff Bautista Martínez has suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members request that the Court enter a judgment against Defendants and award the following:

a. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' seizure, detention, search, and questioning of Plaintiffs and the Class Members were a clear violation of Plaintiffs' and the Class Members' Fifth Amendment rights;

b. An order awarding Plaintiffs and the Class Members nominal damages for the clear violation of their Fifth Amendment Rights;

c. An order awarding Plaintiffs and the Class Members compensatory damages in an amount to be proven at trial;

d. An order holding Defendants jointly and severally liable for compensatory damages in an amount to be proven at trial;

e. An order awarding Plaintiffs punitive damages against each Defendant in an amount to be proven at trial;

f. A determination that Plaintiffs' First Cause of Action may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

g. A determination that Plaintiffs' Second Cause of Action may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

h.   A determination that Plaintiffs' Third Cause of Action may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

i.   An order finding that Plaintiffs Gonzalez Cruz and Zapote Hernández are proper representatives of the Class Members, and appoint the undersigned as Class Counsel.

j.   An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law; and

k.   Such other and further relief as the Court deems equitable, just and proper.

Dated: February 21, 2019

Respectfully Submitted,

*/s/ John L. Farringer*
William L. Harbison (No. 7012)*
Phillip F. Cramer (No. 20697)*
John L. Farringer IV (No. 22783)
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Telephone: (615) 742-4200
bharbison@srvhlaw.com
pcramer@srvhlaw.com
jfarringer@srvhlaw.com

*Pro hac vice motions pending*

Meredith B. Stewart*
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
meredith.stewart@splcenter.org

Julia Solórzano*
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
julia.solorzano@splcenter.org

Melissa S. Keaney*
Nora A. Preciado*
Araceli Martínez-Olguín*
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108 – 62
Los Angeles, CA 90010
Telephone: (213) 639-3900
Facsimile: (213) 639-3911
keaney@nilc.org
preciado@nilc.org
martinez-olguin@nilc.org

Trudy S. Rebert*
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
Telephone: (646) 867-8793
rebert@nilc.org

31

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date the foregoing and accompanying documents were filed through the Court's CM/ECF filing system, and will be served on the defendants listed below with the summons. When service is complete a Proof of Service form will be filed with the Court, which Proof of Service will list the date, method, and documents served.

Jere Miles, Special Agent in Charge, HSI
669 Silverthorne Lane
Covington, LA 70433-7823

Robert Hammer, Assistant Special Agent in Charge, HSI
3841 Cannondale Drive
Clarksville, TN 37042-1507

David Vicente, Agent, ICE, ERO
1105 Mercer Drive
Maryville, TN 37801-9320

Francisco Ayala, Agent, ICE ERO
608 Belle Oak Lane
Brandon, MS 39042-8101

Billy Riggins, Special Agent, ICE
Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

William Hinkle, Deportation Officer, ICE
6704 35th Street
Lubbock, TX 79407-1810

Anthony Martin, Deportation Officer, ICE
Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

M. Grooms, Deportation Officer, ICE
Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

Scott Pa, Special Agent, ICE
Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20016

United States Attorney, Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, Tennessee 37902

United States Attorney General
950 Pennsylvania Avenue, NW
Washington, D.C. 20530


Dated:  February 21, 2019                    */s/ John L. Farringer*