# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | |
|---|---|
| **ISABEL ZELAYA, GERONIMO GUERRERO, CAROLINA ROMULO MENDOZA, LUIS ROBERTO BAUTISTA MARTÍNEZ, MARTHA PULIDO, CATARINO ZAPOTE HERNÁNDEZ, and MARIA DEL PILAR GONZALEZ CRUZ,** individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br>v.<br><br>**JERE MILES,** Special Agent in Charge, Homeland Security Investigations ("HSI"); **ROBERT HAMMER,** Assistant Special Agent in Charge, HSI; **DAVID VICENTE PENA,** Agent, Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO"); **FRANCISCO AYALA,** Agent, ICE, ERO; **BILLY RIGGINS**, Special Agent, ICE; **ANTHONY MARTIN**, Deportation Officer, ICE, ERO; **MATTHEW GROOMS**, Deportation Officer, ICE; **JERROL SCOTT PARTIN**, Special Agent, ICE; **THEODORE FRANCISCO**, Special Agent, HSI; **TRAVIS CARRIER**, Special Agent, ICE; **TREVOR CHRISTENSEN**, Special Agent, ICE; **GLEN BLACHE**, Agent, ICE; **BRENDA DICKSON**, Agent, ICE; **GEORGE NALLEY**, Agent, ICE; **CLINT CANTRELL**, Special Agent, ICE; **RICKY THORNBURGH**, Agent, ICE; **JONATHAN HENDRIX**, Special Agent, HSI; **RYAN HUBBARD**; Special Agent, ICE; **WAYNE DICKEY**, Special Agent, HSI; **JAMES LILES**, Special Agent, HSI; **MICHAEL PEREZ**, Special Agent, HSI; **KEITH HALE**, Special Agent, ICE; **DENNIS FETTING**, Special Agent, ICE; **DENI BUKVIC**, Agent, | Civil Action No.  3:19-cv-00062-PLR-HBG<br><br><br>**CLASS ACTION**<br><br><br>**SECOND AMENDEND COMPLAINT** |

ICE; **KASHIF CHOWHAN**, Deportation
Officer, ICE, ERO; **BLAKE DIAMOND**,
Agent, ICE; **PAUL CRISWELL**, Agent, ICE;
**JEFFERY KLINKO**, Agent, ICE; **JEFFREY
SCHRODER**, Agent, ICE; **DAVID LODGE**,
Deportation Officer, ICE, ERO; **WAYNE
HINKLE**, Deportation Officer, ICE, ERO;
**CONNIE STEPHENS**, Agent, ICE;
**TOMMY PANNELL**, Agent, ICE;
**SHANNON HOPE**, Agent, ICE; **TROY
MCCARTER**, Agent, ICE; **BRADLEY
HARRIS**, Agent, ICE; **JOSHUA
MCCREADY**, Agent, ICE; **RONALD
APPEL**, Resident Agent in Charge, ICE;
**BOBBY SMITH**, Agent, ICE; **ROBERT
WHITED**, Agent, ICE; **TREY LUND**,
Deputy Field Office Director, ICE; **JOHN
WITSELL**, Agent, ICE; **MICHELLE
EVANS**, Agent, ICE; **WESLEY ANTHONY**,
Agent, ICE; **STEVEN LEDGERWOOD**,
Agent, ICE; **FRANCIS COKER**, Agent, ICE;
**CHRISTOPHER CANNON**, Deportation
Officer, ICE, ERO; **JOHN HEISHMAN**,
Chief, Customs and Border Protection
("CBP"); **AUNRAE NAVARRE**, Agent,
CBP; **RICKY SMITH**, Agent, CBP;
**MATTHEW MOON**, Agent, CBP; **JASON
MILLER**, Agent, CBP; **JEFF BEDNAR**, Port
Director, CBP; **AUSTIN WILLIAMS**, Port
Director, CBP; **NICHOLAS R. WORSHAM**,
Special Agent, IRS; **DOES #1-10, Agents of
ICE and Agents of U.S. Customs and
Border Protection;** in their individual
capacities,

Defendants.

## **INTRODUCTION**

1. In April 2018, officers from U.S. Immigration and Customs Enforcement ("ICE"),

Homeland Security Operations ("HSI"), Enforcement and Removal Operations ("ERO"),

2

Customs and Border Protection ("CBP"),[1] and the Tennessee Highway Patrol ("THP") descended on the Southeastern Provision meatpacking plant ("Plant") in Bean Station, Tennessee, a small town in the far eastern corner of the state. Heavily armed, the officers formed a perimeter around the Plant and blocked every exit. They used official vehicles to seal off the one public road to the Plant. Law enforcement helicopters flew above the Plant, securing and surveilling the premises. In the Plant's parking lot, several vans and large bags of plastic "zip tie" handcuffs waited to be used. Moments later, dozens of armed officers in bullet-proof vests rushed into the Plant. They quickly fanned out, many with their firearms drawn, and screamed at the workers inside to stop moving. The workers, terrified and confused, feared the commotion was a terrorist attack, a mass shooting, or a fire.

2. The officers were not searching for terrorists, armed criminals, or violent felons. Rather, the officers were assisting with the execution of an Internal Revenue Service ("IRS") search warrant for financial documents related to the alleged crimes of the Plant's owner, James Brantley. However, the officers' goal that day was far more extensive than the IRS agent revealed in his application for the warrant to the court and what the search warrant ultimately authorized: The officers planned to detain and arrest every worker in the Plant who was Latino.

3. Prior to the raid, the DHS Officers enlisted Tennessee state resources – Tennessee Highway Patrol troopers – to accomplish this goal. The officers also secured the Tennessee National Guard's armory to use as a location to process individuals who they intended to arrest that day. Then, with only an IRS search warrant for documents in hand, the officers executed the largest workplace immigration raid in nearly a decade. They forcefully seized and arrested

---

[1] HSI and ERO are two of three directorates within ICE. HSI, ERO, ICE and CBP fall under the U.S. Department of Homeland Security ("DHS"). Throughout the Second Amended Complaint, HSI, ERO, ICE and CBP officers are referred to as the "DHS Officers" or the "DHS Defendants."

3

approximately 100 Latino workers. In the process, the officers berated workers with racial slurs, punched one worker in the face, and shoved firearms in the faces of many others. Meanwhile, the officers did not detain the Plant's white workers or subject them to the same aggressive treatment and unreasonable and prolonged detention that the Latino workers experienced.

4. Many of the Latino workers were long-term employees of the Plant who had spent years performing the dangerous work endemic to slaughterhouses, often in unsafe conditions and without receiving legally-mandated overtime pay. The workers and their families are long-time members of the local community, attending school, church, and other local events alongside their neighbors. The day after the raid, nearly 600 children in the community did not show up for school.

5. Prior to the raid, the DHS Officers did not know the identities or the immigration status of any worker in the Plant. They knew only that many of the workers were "Hispanic." Only after detaining the Latino workers – and, in many instances, not until after transporting the workers they detained to an offsite location – did the DHS Officers question the workers about their identity or immigration status. Ultimately, only eleven of the approximately 100 workers arrested were charged with any crime, and of those, none were charged with a violent crime.

6. The U.S. Constitution protects individuals from this kind of law enforcement overreach. The law is clear that seizures based entirely on race or ethnicity; seizures that are overly intrusive, without authority, or prolonged; arrests without probable cause; and the use of excessive force are prohibited by the Fourth and Fifth Amendments. Officers of IRS, ICE, HSI, ERO, CBP, and THP conspired to plan and execute the forceful, prolonged, and unlawful seizure of the Plant's Latino workforce solely on the basis of their race or ethnicity, and without reasonable suspicion, probable cause, or other lawful authority. The DHS Defendants prolonged

the detention of Plaintiffs without any reasonable suspicion, probable cause, or other lawful authority. The DHS Defendants made arrests without a valid arrest warrant or probable cause that each worker had violated U.S. immigration or criminal laws, or other lawful authority. They used unreasonable force to effect detentions or arrests of Plaintiffs. In executing some of these detentions or arrests, the DHS Defendants used brutal and excessive force without any provocation.

7. Plaintiffs are Latinos who were working in the Plant the day of the raid.[2] They bring this action, individually and on behalf of themselves and a class of similarly situated individuals, to vindicate their rights under the Fourth and Fifth Amendments to the U.S. Constitution. Plaintiffs seek declaratory and monetary relief against the individual Defendants for violations of their clearly established constitutional rights the day of the raid.

## JURISDICTION AND VENUE

8. The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 2201-02.

9. Venue is proper in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and because at least one of the Plaintiffs resides in this district. 28 U.S.C. §§ 1391(b), (e).

10. The Court has personal jurisdiction over the Defendants because Defendants' acts and omissions giving rise to this lawsuit took place in in the Eastern District of Tennessee.

## PARTIES

### Plaintiffs

---

[2] This Second Amended Complaint uses "race" and "ethnicity" interchangeably in relation to Latino individuals. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017).

5

11. Plaintiff **Isabel Zelaya** ("Plaintiff Zelaya") was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, he had been working at the Plant for approximately two years. He is Latino.

12. Plaintiff **Geronimo Guerrero** ("Plaintiff Guerrero") was employed as a supervisor at the Plant. He was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, he had been working at the Plant for approximately eighteen years. He is Latino.

13. Plaintiff **Carolina Romulo Mendoza** ("Plaintiff Romulo Mendoza") was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, she had been working at the Plant for approximately three years. She is Latina.

14. Plaintiff **Luis Roberto Bautista Martínez** ("Plaintiff Bautista Martínez") was working at the Plant the morning of April 5, 2018 inside the loading dock. At the time of the raid, he had been working at the Plant for approximately two years. He is Latino.

15. Plaintiff **Martha Pulido** ("Plaintiff Pulido") was working at the Plant the morning of April 5, 2018 in the kill floor area. At the time of the raid, she had been working at the Plant for approximately one year. She is Latina.

16. Plaintiff **Maria del Pilar Gonzalez Cruz** ("Plaintiff Gonzalez Cruz") was working at the Plant the morning of April 5, 2018 constructing boxes near the processing area. At the time of the raid, she had worked in the Plant for approximately two years. She is Latina.

17. Plaintiff **Catarino Zapote Hernández** ("Plaintiff Zapote Hernández") was working at the Plant the morning of April 5, 2018 in the processing area. At the time of the raid, he had been working at the Plant for approximately ten years. He is Latino.

**Defendants**

6

18. Defendant **Jere Miles** ("Defendant Miles") was at all times relevant to this action the Special Agent in Charge with HSI New Orleans. He participated in the planning and execution of the Southeastern Provision raid. Defendant Miles is sued in his individual capacity.

19. Defendant **Robert Hammer** ("Defendant Hammer") was at all times relevant to this action an Assistant Special Agent in Charge with HSI. He oversaw the Southeastern Provision raid. Defendant Hammer is sued in his individual capacity.

20. Defendant **David Vicente Pena** ("Defendant Pena") was at all times relevant to this action an Agent of ICE ERO Knoxville. He participated in the planning and execution of the Southeastern Provision raid. Defendant Pena is sued in his individual capacity.

21. Defendant **Francisco Ayala** ("Defendant Ayala") was at all times relevant to this action an Agent of ICE, ERO in Mississippi. He participated in the planning and execution of the Southeastern Provision raid. Defendant Ayala is sued in his individual capacity.

22. Defendant **Billy Riggins** ("Defendant Riggins") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Riggins is sued in his individual capacity.

23. Defendant **Anthony Martin** ("Defendant Martin") was at all times relevant to this action a Deportation Officer of ICE, ERO. He participated in the planning and execution of the Southeastern Provision raid. Defendant Martin is sued in his individual capacity.

24. Defendant **Matthew Grooms** ("Defendant Grooms") was at all times relevant to this action a Deportation Officer of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Grooms is sued in his individual capacity.

25. Defendant **Jerrol Scott Partin** ("Defendant Partin") was at all times relevant to this action a Special Agent of ICE in Memphis. He participated in the planning and execution of the Southeastern Provision raid. Defendant Partin is sued in his individual capacity.

26. Defendant **Theodore Francisco** ("Defendant Francisco") was at all times relevant to this action a Special Agent of HSI in Knoxville. He participated in the planning and execution of the Southeastern Provision raid. Defendant Francisco is sued in his individual capacity.

27. Defendant **Travis Carrier** ("Defendant Carrier") was at all times relevant to this action a Special Agent of ICE in Knoxville. He participated in the planning and execution of the Southeastern Provision raid. Defendant Carrier is sued in his individual capacity.

28. Defendant **Trevor Christensen** ("Defendant Christensen") was at all times relevant to this action a Special Agent of ICE in Knoxville. He participated in the planning and execution of the Southeastern Provision raid. Defendant Christensen is sued in his individual capacity.

29. Defendant **Glen Blache** ("Defendant Blache") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Blache is sued in his individual capacity.

30. Defendant **Brenda Dickson** ("Defendant Dickson") was at all times relevant to this action an Agent of ICE. She participated in the planning and execution of the Southeastern Provision raid. Defendant Dickson is sued in her individual capacity.

31. Defendant **George Nalley** ("Defendant Nalley") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Nalley is sued in his individual capacity.

32. Defendant **Clint Cantrell** ("Defendant Cantrell") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Cantrell is sued in his individual capacity.

33. Defendant **Ricky Thornburgh** ("Defendant Thornburgh") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Thornburgh is sued in his individual capacity.

34. Defendant **Jonathan Hendrix** ("Defendant Hendrix") was at all times relevant to this action a Special Agent of HSI. He participated in the planning and execution of the Southeastern Provision raid. Defendant Hendrix is sued in his individual capacity.

35. Defendant **Ryan Hubbard** ("Defendant Hubbard") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Hubbard is sued in his individual capacity.

36. Defendant **Wayne Dickey** ("Defendant Dickey") was at all times relevant to this action a Special Agent of HSI. He participated in the planning and execution of the Southeastern Provision raid. Defendant Dickey is sued in his individual capacity.

37. Defendant **James Liles** ("Defendant Liles") was at all times relevant to this action a Special Agent of HSI. He participated in the planning and execution of the Southeastern Provision raid. Defendant Liles is sued in his individual capacity.

38. Defendant **Michael Perez** ("Defendant Perez") was at all times relevant to this action a Special Agent of HSI. He participated in the planning and execution of the Southeastern Provision raid. Defendant Perez is sued in his individual capacity.

39. Defendant **Keith Hale** ("Defendant Hale") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Hale is sued in his individual capacity.

40. Defendant **Connie Stephens** ("Defendant Stephens") was at all times relevant to this action an Agent of ICE. She participated in the planning and execution of the Southeastern Provision raid. Defendant Stephens is sued in her individual capacity.

41. Defendant **Tommy Pannell** ("Defendant Pannell") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Pannell is sued in his individual capacity.

42. Defendant **Shannon Hope** ("Defendant Hope") was at all times relevant to this action an Agent of ICE. She participated in the planning and execution of the Southeastern Provision raid. Defendant Hope is sued in her individual capacity.

43. Defendant **Troy McCarter** ("Defendant McCarter") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant McCarter is sued in his individual capacity.

44. Defendant **Bradley Harris** ("Defendant Harris") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Harris is sued in his individual capacity.

45. Defendant **Joshua McCready** ("Defendant McCready") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant McCready is sued in his individual capacity.

46. Defendant **Ronald Appel** ("Defendant Appel") was at all times relevant to this action a Resident Agent in Charge of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Appel is sued in his individual capacity.

47. Defendant **Bobby Smith** ("Defendant B. Smith") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant B. Smith is sued in his individual capacity.

48. Defendant **Blake Diamond** ("Defendant Diamond") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Diamond is sued in his individual capacity.

49. Defendant **Paul Criswell** ("Defendant Criswell") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Criswell is sued in his individual capacity.

50. Defendant **Jeffery Klinko** ("Defendant Klinko") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Klinko is sued in his individual capacity.

51. Defendant **Jeffrey Schroder** ("Defendant Schroder") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Schroder is sued in his individual capacity.

52. Defendant **David Lodge** ("Defendant Lodge") was at all times relevant to this action a Deportation Officer of ERO, ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Lodge is sued in his individual capacity.

53. Defendant **Wayne Hinkle** ("Defendant Hinkle") was at all times relevant to this action a Deportation officer of ERO, ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Hinkle is sued in his individual capacity.

54. Defendant **Dennis Fetting** ("Defendant Fetting") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Fetting is sued in his individual capacity.

55. Defendant **Deni Bukvic** ("Defendant Bukvic") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Bukvic is sued in his individual capacity.

56. Defendant **Kashif Chowhan** ("Defendant Chowhan") was at all times relevant to this action a Deportation Officer of ICE, ERO. He participated in the planning and execution of the Southeastern Provision raid. Defendant Chowhan is sued in his individual capacity.

57. Defendant **Robert Whited** ("Defendant Whited") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Whited is sued in his individual capacity.

58. Defendant **Trey Lund** ("Defendant Lund") was at all times relevant to this action a Deputy Field Office Director of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Lund is sued in his individual capacity.

59. Defendant **John Witsell** ("Defendant Witsell") was at all times relevant to this action a Special Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Witsell is sued in his individual capacity.

60. Defendant **Michelle Evans** ("Defendant Evans") was at all times relevant to this action an Agent of ICE. She participated in the planning and execution of the Southeastern Provision raid. Defendant Evans is sued in her individual capacity.

61. Defendant **Westley Anthony** ("Defendant Anthony") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Anthony is sued in his individual capacity.

62. Defendant **Steven Ledgerwood** ("Defendant Ledgerwood") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Ledgerwood is sued in his individual capacity.

63. Defendant **Francis Coker** ("Defendant Coker") was at all times relevant to this action an Agent of ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Coker is sued in his individual capacity.

64. Defendant **Christopher Cannon** ("Defendant Cannon") was at all times relevant to this action a Deportation Officer of ERO, ICE. He participated in the planning and execution of the Southeastern Provision raid. Defendant Lodge is sued in his individual capacity.

65. Defendant **John Heishman** ("Defendant Heishman") was at all times relevant to this action a Chief, CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant Heishman is sued in his individual capacity.

66. Defendant **Aunrae Navarre** ("Defendant Navarre") was at all times relevant to this action an Agent of CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant Navarre is sued in his individual capacity.

13

67. Defendant **Ricky Smith** ("Defendant R. Smith") was at all times relevant to this action an Agent of CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant R. Smith is sued in his individual capacity.

68. Defendant **Matthew Moon** ("Defendant Moon") was at all times relevant to this action an Agent of CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant Moon is sued in his individual capacity.

69. Defendant **Jason Miller** ("Defendant Miller") was at all times relevant to this action an Agent of CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant Miller is sued in his individual capacity.

70. Defendant **Jeff Bednar** ("Defendant Bednar") was at all times relevant to this action a Port Director of CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant Bednar is sued in his individual capacity.

71. Defendant **Austin Williams** ("Defendant Williams") was at all times relevant to this action a Port Director of CBP. He participated in the planning and execution of the Southeastern Provision raid. Defendant Williams is sued in his individual capacity.

72. Defendant **Nicholas R. Worsham** ("Defendant Worsham") was at all times relevant to this action a Special Agent of IRS in Johnson City, Tennessee. He prepared and signed the affidavit submitted in support of the application for a warrant to search for financial documents related to the alleged crimes of James Brantley. Defendant Worsham is sued in his individual capacity.

73. The identities and capacities of Defendants Does 1 through 10 are presently unknown to Plaintiffs, and on this basis, they sue these defendants by fictitious names. Plaintiffs' efforts to obtain the names of the Doe Defendants have only been partially successful as the U.S.

14

Government is continuing to withhold the identities of some of the Doe Defendants. Plaintiffs will amend the complaint to substitute the true names and capacities of the Doe Defendants when they are ascertained. Plaintiffs are informed, believe, and thereon allege that the Does 1 through 10 are, and were at all times relevant to this action, employees and/or agents of ICE, HSI, CBP and/or ERO and are responsible for the acts and omissions complained of herein including, but not limited to, their unlawful seizure and arrest, and violation of their Fourth and Fifth Amendment rights.[3]

## CLASS ACTION ALLEGATIONS

74. Plaintiffs Maria del Pilar Gonzalez Cruz and Catarino Zapote Hernández ("Class Representative Plaintiffs") seek to bring the claims in Counts I, II, III, IV, and V pursuant to Rule 23 on behalf of a class defined as:

> All Latino individuals working in the Plant on April 5, 2018 who were detained.[4]

75. The Class Representative Plaintiffs seek to bring as a class action the claims set forth in Counts I-V under Federal Rules of Civil Procedure 23(a) and (b)(3), for their requests for damages. These claims satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

76. The Class Representative Plaintiffs' proposed Classes meets the prerequisites of Rule 23(a):

    1.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. The Class Representative Plaintiffs believe that the Class consists of

---

[3]    The Defendants in Paragraphs 61-71 are named upon information and belief that they participated in the planning and execution of the raid because DHS has not confirmed whether they were involved.

[4]    Plaintiffs reserve the right to revise the class definition based upon information learned after the filing of this action.

approximately 100 individuals. Membership in the Class is readily ascertainable from the DHS Defendants' arrest records from the day of the raid and Defendants' public statements regarding the raid.[5]

2. **Commonality**: There are numerous questions of law or fact common to the Class, and those issues predominate over any question affecting only individual Class Members. The common legal and factual issues include, but are not limited to, the following:

(a) Whether the DHS Defendants' conduct set out in paragraphs 94-153 and Count I violated the Fifth Amendment rights of the Class.

(b) Whether the DHS Defendants' conduct set out in paragraphs 94-153 and Count II violated the Fourth Amendment rights of the Class.

(c) Whether Defendant Worsham's conduct set out in paragraphs 94-110 and Count III violated the Fourth Amendment rights of the Class.

(d) Whether the Defendants conspired to violate the rights of the Class under the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution in violation of 42 U.S.C. §§ 1985(3) and 1986.

(e) Whether the Defendants conspired to violate the rights of the Class under the Fourth Amendment to the U.S. Constitution in violation of 42 U.S.C. §§ 1985(3) and 1986.

(f) Whether the Defendants' plan to seize, search, detain, and interrogate only the Latino workers in the Plant was lawful.

(g) Whether the IRS search warrant lacked probable cause.

---

[5] *ICE Worksite Enforcement Surge FY18*, https://www.ice.gov/news/releases/ice-worksite-enforcement-investigations-fy18-surge (Dec. 11, 2018) (stating that HSI arrested 104 people at the April 5, 2018 raid).

16

(h)	Whether the IRS Search Warrant for documents authorized the DHS Defendants to detain every Latino worker on the premises.

(i)	Whether the Class Representative Plaintiffs and the Class Members are entitled to damages and other monetary and declaratory relief.

3.	**Typicality**:  The claims asserted by Class Representative Plaintiffs are typical of the claims of the Class, in that the Plaintiffs Gonzalez Cruz and Zapote Hernández, like all Class Members, (a) are Latino and (b) were targeted by the Defendants' conspiracy to detain and practice of detaining all the Latino workers solely based on their ethnicity or race and without reasonable suspicion, probable cause, or any lawful authority. Further, Plaintiff Gonzalez Cruz and Plaintiffs Zapote Hernández, and each member of the proposed Class have been similarly injured by Defendants' misconduct.

4.	**Adequacy**: The Class Representative Plaintiffs will fairly and adequately protect the interests of the Class.  The Class Representative Plaintiffs have retained attorneys experienced in class actions and complex litigation, including litigation arising under violations of constitutional rights.  The Plaintiffs and their counsel will vigorously prosecute this litigation. Neither the Plaintiffs nor their counsel have interests that conflict with the interests of the other Class Members.

77. Plaintiffs' proposed Class meets the requirements of certification under Rule 23(b)(3):

5.	**Predominance of Common Questions:**  The questions of law or fact common to the Class, identified above in paragraph 65(2), predominate over any questions affecting only individual members, including the legality of the Defendants' conspiracy to detain and practice of detaining all the Latino workers solely based on their ethnicity or race, which

17

ensnared all Plaintiffs and Class Members; and the legality of the Defendants' conspiracy to seize and practice of seizing all the Latino workers without lawful basis.

6. **Superiority:** The Class Representative Plaintiffs and Class Members have all suffered damages as a result of Defendants' wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed Class who could not individually afford to litigate a claim such as is asserted in this Second Amended Complaint. Additionally, a class action is superior because the Class is comprised of many individuals who are low-income, do not speak English as their native language, and are geographically dispersed. Finally, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

78. Alternatively, class-wide liability and punitive damages liability under the theories advanced in this action are properly certified under Federal Rule of Civil Procedure 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## STATEMENT OF FACTS

### Southeastern Provision Meatpacking Plant

79. The Plant is located at 1617 Helton Road, Bean Station, Tennessee, in Grainger County, just north of Morristown. Its primary business, at all times relevant to this action, was the processing and packaging of beef.

80. Bean Station is a quiet community with a population of just over 3,000 people.

81. The Plant sits on top of a hill in a sparse, remote area of Bean Station. Access to the Plant is achieved by way of Helton Road, a windy, two-lane country road off Highway 11 West.

82. The Plant consists of a collection of smaller structures resembling storage sheds, connected to a large, two-story warehouse.

83. Inside the Plant there are three offices, a locker room, bathrooms, several large freezer sections, a processing area, and a "kill floor." Some of the areas are not separated by solid doors or walls, but rather are completely open or separated by clear, heavy curtains.

84. The workers stored personal items in the locker area and would retrieve their uniforms there at the beginning of their shift.

85. The processing area was one of two main work areas in the Plant. In the processing area, workers prepared and packaged cuts of meat to be distributed for sale.

86. Approximately sixty workers were working in the processing area on April 5, 2018.

87. The second main work area at the Plant was the "kill floor," which is where workers butchered and cut apart the cows to be processed into meat.

88. Approximately forty workers were working on the "kill floor" on April 5, 2018.

89. The Plant's physical and electronic documents were stored in offices and a locked storage room in the Plant.  They are not accessible to the workers employed on the processing and kill floor areas.

90. Most people working at the Plant arrived sometime before 7 a.m. each day, five or six days each week, to put on their uniforms and "clock-in" before the morning shift began at 7 a.m.

91. The work was grueling and physically demanding as well as hazardous.  The Plant lacked first aid providers, guardrails for high platforms, and protective equipment and wash stations to protect workers against cuts, chemical burns, and temperature extremes.

92. Many of the workers had been working at the Plant for several years, some over a decade.

93. The workers began their shift at 7 a.m. and worked until 9:30 a.m., when they received their first break.  The break lasted for 15 minutes, during which time workers were permitted to use the bathroom, exit the building, and/or make phone calls.

## The Internal Revenue Service Search Warrant

94. At some point prior to April 5, 2018, the IRS began investigating the owner of the Plant, Mr. James Brantley ("Brantley"), in relation to various alleged tax and immigration law violations. As part of that investigation, the IRS obtained a search warrant authorizing the search for and seizure of an enumerated list of items.  *See In re the Search of: 1617 Helton Road, Bean Station, TN 37708* (E.D. Tenn. Apr. 2, 2018) (attached hereto as Exhibit 1) ("IRS Search Warrant"); Affidavit in Support of a Search Warrant, at Attachment B (attached hereto as Exhibit 2).

95. James Brantley was the only named suspect listed in the Search Warrant for whom the IRS claimed to have probable cause to believe was violating the law.  *See* Exhibit 1.

96. The items to be seized pursuant to the IRS Search Warrant were, among other things, all "records, documents and materials…related to the financial activities of James Brantley." *See* Ex. 1, at 5.

97. The IRS Search Warrant includes an aerial layout of the Plant, noting that the office was separate from the Plant, the Inedible Storage, and the Warehouse. *Id.* at 3.

98. The IRS Search Warrant did not authorize the detention or arrest of any individual(s), nor name any other individual(s) as the target of the IRS Search Warrant for suspected criminal activity.

99. Neither the Affidavit nor the IRS Search Warrant disclosed the plan to seize, detain and arrest as many as 100 workers present during the execution of this Warrant. Nor did the Affidavit or the IRS Search Warrant make any mention of the IRS involving ICE agents in the execution of its Warrant.

100. The Affidavit submitted with the IRS Search Warrant heavily relies on information from a Confidential Informant ("CI"). The only information provided in the Affidavit about the CI is that he or she was "working with law enforcement." The Affidavit provides no other information as to how the CI was recruited, what agency the CI was working with, any criminal history of the CI, or any indicia of the CI's reliability. Ex. 2, at 7-10.

101. The Affidavit also does not set forth facts learned from the CI that were independently corroborated by law enforcement to prove the CI's reliability.

102. The Affidavit does not state or imply any potential safety concerns involved in the execution of the IRS Search Warrant. *See generally id*. The Affidavit does not mention any concern regarding weapons or dangerous persons expected to be present during the IRS Search Warrant.

103. The Affidavit states that the Plant's employees are "Hispanic" on five separate occasions. *See id.* at 7-10.

104. The Affidavit notes the CI observed that many of the Plant's workers are "Hispanic," and that the CI believes many are "exploited" and without "legal recourse for workplace mistreatment." *Id.* at 10.

105. The Affidavit states that "personnel" at Brantley's bank said, during a tour of the Plant, "they were told [by the owner's wife] that the employees were Hispanic and were paid weekly with cash." *Id.* at 7.

106. The Affidavit omits information as to the identity, credibility, background, or reliability of the "personnel" who allegedly reported the Plant representatives' statements about payment of wages in cash to "Hispanic" workers.

107. The Affidavit states that a Plant employee the CI "knows from living in Morristown" told the CI he could work at the Plant without lawful documentation. *Id.* at 7-8. The Affidavit omits information as to the identity, credibility, background or reliability of the Plant employee who so informed the CI.

108. According to the Affidavit, HSI and THP had already been participating in the IRS investigation of Brantley before the search warrant was obtained. *Id.* at 6.

109. The presence of the DHS Defendants at the Plant on the morning of April 5th was pursuant to the IRS Search Warrant.

110. The DHS Defendants did not obtain a separate criminal or administrative warrant related to their presence and activities in the Plant that day.

**The Raid**

111. The morning of April 5 began like most other mornings at the Plant.

22

112. Plaintiffs and the Class Members arrived sometime before 7 a.m. to prepare for their shift, which began promptly at 7 a.m.

113. Once the shift began, Plaintiffs and the Class Members were all working at their respective stations in the Plant.

114. None of the Plaintiffs or the Class Members worked in the Plant's offices.

115. At around 9 a.m., near the morning break time, when the workers were anticipating the opportunity to take a break from their work to attend to personal needs, such as using the restroom, the raid began.

116. Officers from ICE, HSI, ERO, CBP, and THP formed a perimeter around the Plant. Multiple armed agents secured every Plant exit.

117. The THP officers sealed off the one public road to the Plant with official vehicles.

118. THP helicopters surveilled and secured the Plant from above.

119. Dozens of officers from ICE burst, unannounced, into the Plant. They poured through the Plant's multiple doors and quickly fanned out throughout its interior.

120. The DHS Officers wore black uniforms with bullet-proof vests, and they were armed. Some of the officers had their firearms on display or drawn.

121. The DHS Officers did not wear nametags or identify themselves by name to the workers. Most officers did not verbally identify themselves by agency.

122. The DHS Officers were yelling and loudly ordering the Plaintiffs and the Latino workers to freeze and to stop working.

123. The commotion caused by the DHS Officers' sudden and forcible entry into the Plant terrorized the Plaintiffs and the Class Members. In the first minutes of the raid, many

workers were confused and uncertain about who the officers were and the purpose of their presence inside of the Plant.

124. Some DHS Officers ordered individuals to put their hands in the air.

125. Some DHS Officers pointed guns at workers while they ordered them to stop working.

126. Individuals who had work equipment on their person were ordered to take off any equipment. Others were ordered to put down any tools they were holding.

127. None of the Latino workers were permitted to continue working.

128. Plaintiffs and the Latino workers were not permitted to use the restroom or otherwise move freely about the Plant as they would have done on their break time.

129. The DHS Officers then ordered the Plaintiffs and the Latino workers to walk from their work station into a line up.

130. Many of the workers were restrained during the Plant seizure with plastic zip ties, including Plaintiffs Gonzalez Cruz, Zapote Hernández, Zelaya, Pulido, Bautista Martínez, and Guerrero. Other workers witnessed the DHS Officers handcuff their coworkers and were fearful that they too might be handcuffed.

131. After forcing the workers to line up, the DHS Officers ordered the Plaintiffs and the other Class Members to walk outside of the Plant and told them to remain in line outside.

132. When they went outside the Plant, Plaintiffs saw that the THP officers had secured the perimeter, the parking lot, and the public road leading to the Plant. Plaintiffs saw and heard two helicopters circling overhead.

133. Some of the THP officers outside stood behind large machine guns that were pointed at the Plant and the workers.

134. Plaintiffs and the Class Members, seeing the number of officers, the firearms, the helicopters, and the police cars, felt terrified.

135. While detained outside the Plant, the workers were not allowed to move freely or talk. When a worker attempted to speak, officers ordered the worker to shut up.

136. As a result of the actions of the DHS Defendants, Plaintiffs and the Class Members were not free to leave.

137. Under these highly coercive conditions, the DHS Defendants interrogated some of the workers about their immigration status at the Plant.

138. After being detained, some for more than an hour, Plaintiffs and all the Latino workers were loaded into vans and transported to a National Guard Armory ("Armory") located at 5255 E. Andrew Jackson Highway, Russellville, Tennessee 37860, where they were interrogated and fingerprinted.

139. The DHS Officers did not tell the workers where they were being taken.

140. The Armory is an approximately twenty- to thirty-minute drive from the Plant.

141. Some workers were not questioned about their identity or immigration status until after they were transported from the Plant to the Armory, including Plaintiffs Zelaya, Romulo Mendoza, Bautista Martínez, Guerrero, and Pulido.

142. Throughout the raid, various DHS Officers berated the workers with racial slurs.

143. During his detention, Plaintiff Zapote Hernández heard a DHS Officer who was Latino make fun of Mexicans. The officer addressed a dog that was on the premises and said, "I suppose you are from Mexico, too."

144. Plaintiff Guerrero saw Defendant Pena yell angrily at a worker. Defendant Pena shouted at this worker, stating that the problem with them (the workers) was that they lived in the

United States but did not speak English. Plaintiff Guerrero observed this worker shaking as Defendant Pena yelled at him. The worker had asked Defendant Pena not to put the handcuffs on so tight. Defendant Pena's only response was that the worker could not tell Defendant Pena what to do. Plaintiff Guerrero was upset upon seeing this treatment.

145. Throughout the raid, the Defendants did not treat the white workers in the Plant in the same intrusive and aggressive manner nor subject them to the prolonged detention that the Latino workers experienced.

146. The white workers were not restrained and were not handcuffed. They did not have guns pointed at them. Many were standing outside smoking while the Latinos were seized and detained.

147. The white workers were not interrogated.

148. The white workers were not loaded into vans and taken to the Armory.

149. The Defendants planned and executed a course of action that led to the seizure, interrogation, and detention of Plaintiffs and the Class Members in the Plant solely on the basis of their race or ethnicity.

150. The DHS Defendants seized the Plaintiffs and every Latino worker without individualized suspicion or valid authority, in violation of the Fourth Amendment.

151. The DHS Defendants' actions in detaining Plaintiffs and the Class Members also exceeded the scope of a reasonable detention in violation of the Fourth Amendment.

152. The DHS Defendants executed the raid based on invidious animus against the workers who were of Latino race and ethnicity, in violation of the Fifth Amendment.

153. As a result of the Defendants' actions, the Plaintiffs and the Class Members have suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

**The Claims of Named Plaintiff Isabel Zelaya**

154. Plaintiff Zelaya was working in the processing area of the Plant the morning of the raid when he saw two DHS Officers approach his work station with their hands on their firearms. One officer was a brunette male. The other officer was a brunette female. He then saw many more officers approach. He was shocked and scared when he saw the armed officers' approach.

155. He observed the DHS Officers treat the Latino workers in his work area aggressively. These two officers pointed their guns at the workers and shoved some to the ground. Plaintiff Zelaya also observed armed officers blocking the exits from the Plant.

156. Plaintiff Zelaya was terrified by the aggressive treatment of his coworkers he observed. He feared that these two DHS Officers would point a firearm at him or throw him to the ground as well.

157. The same two DHS Officers ordered Plaintiff Zelaya to throw his apron and work tools on the ground. He immediately complied.

158. During this time, Plaintiff Zelaya saw these officers point a firearm at his son because he did not take off his tool belt fast enough. Plaintiff Zelaya feared for his son's safety.

159. The same two DHS Officers then forced him and the other Latino workers in his work area to gather in a central area of the Plant.

160. Plaintiff Zelaya is legally authorized to live and work in the United States.

161. While gathered with the other workers, Plaintiff Zelaya told a Latino DHS officer who spoke Spanish that he had legal status and offered to show him documents as proof. He

took out his Employment Authorization Card and handed it to the officer. The DHS officer grabbed the card from him and told him in Spanish that they needed to "investigate" him. The officer then proceeded to handcuff Plaintiff Zelaya.

162. Once gathered, the DHS Officers, including the Latino officer, walked Plaintiff Zelaya and the other workers outside the Plant.

163. The officers then transported Plaintiff Zelaya in a van to the Armory.

164. The DHS Officers at the Armory interrogated Plaintiff Zelaya. Finally, after establishing proof of his legal status, Plaintiff Zelaya was released.

165. Plaintiff Zelaya was detained for approximately two hours.

166. Plaintiff Zelaya was not questioned about his identity, work authorization, or immigration status prior to being detained at the Plant. When Plaintiff Zelaya offered proof of his legal authorization to live and work in the United States, the DHS Officers ignored this proof and prolonged his detainment unnecessarily by transporting him to the Armory.

**The Claims of Named Plaintiff Carolina Romulo Mendoza**

167. Plaintiff Romulo Mendoza was working in the processing area of the Plant the morning of the raid. When the raid began, she was walking back to her work station from the restroom.

168. When Plaintiff Romulo Mendoza exited the restroom, she observed several armed officers inside the Plant.

169. Two officers ordered her not to leave or to resist. Both officers were male. One officer was Latino and the other appeared to be of South Asian descent. The two officers told her to be quiet and to put her hands on her head. Then they ordered her into a line up. She was

28

afraid the officers would physically harm her if she did not comply, as the officers had firearms. She complied with their orders.

170. The DHS Officers then walked Plaintiff Romulo Mendoza outside. Outside, she saw that the THP officers had blocked the exits to the Plant. She also saw patrol cars blocking the public road to the Plant. She saw at least one law enforcement helicopter was flying above.

171. Plaintiff Romulo Mendoza was terrified and could only think of her family.

172. The DHS Officers, including one officer who was an African-American woman, eventually loaded Plaintiff Romulo Mendoza and approximately fifteen other Latino workers into vans. The officers did not tell Plaintiff Romulo Mendoza or the other workers in the van where they were going.

173. The van transported Plaintiff Romulo Mendoza to the Armory. At the Armory, Plaintiff Romulo Mendoza was patted down, and her belongings were taken from her. The DHS Officers interrogated and fingerprinted Plaintiff Romulo Mendoza.

174. Plaintiff Romulo Mendoza was detained for approximately ten hours.

175. Plaintiff Romulo Mendoza was not questioned about her identity, work authorization, or immigration status prior to being detained at the Plant. Nor was Plaintiff Romulo Mendoza questioned about her identity, work authorization, or immigration status prior to being transported to the Armory.

**The Claims of Named Plaintiff Martha Pulido**

176. Plaintiff Pulido was working on the kill floor area of the Plant the morning of the raid.

177. She suddenly heard officers ordering workers to put their hands up. The Plant quickly became a chaotic scene filled with armed officers shouting. She observed an officer

29

point a firearm at a woman who had tripped and fallen and another tall, white, male officer pushing another female worker. She also observed another male officer punch Plaintiff Guerrero.

178. As a result of the Defendants' actions, Plaintiff Pulido feared that the officers would physically harm her if she did not comply with their orders. She was terrified. She complied with their orders to put up her hands.

179. The DHS Officers then ordered Plaintiff Pulido and other workers to exit the Plant. Once Plaintiff Pulido was outside the Plant, officers handcuffed her wrists with zip ties.

180. During this time, Plaintiff Pulido was not free to move around or even to talk. When a worker attempted to speak, officers ordered them to shut up. She was extremely humiliated by this treatment. She felt like she was being treated like a dangerous criminal.

181. Plaintiff Pulido observed that white workers were outside the Plant. Those workers were allowed to walk around freely, were not handcuffed, and were allowed to smoke. None of the officers interrogated the white workers.

182. Eventually, Plaintiff Pulido and other Latino workers were transported to the Armory.

183. Upon arrival at the Armory, her personal items were confiscated. Plaintiff Pulido was interrogated and fingerprinted. She was restrained in zip ties until she was fingerprinted.

184. Plaintiff Pulido was detained for approximately fourteen hours.

185. Plaintiff Pulido was not questioned about her identity, work authorization, or immigration status prior to being detained at the Plant. Nor was she questioned about her identity, works authorization, or immigration status prior to being transported to the Armory.

30

## The Claims of Named Plaintiff Geronimo Guerrero

186. Plaintiff Guerrero, a long-term employee and supervisor at the Plant, was in the processing area the morning of the raid.

187. From his location, Plaintiff Guerrero observed numerous officers with firearms inside the Plant.

188. A short, white, male officer ("Defendant Doe 1"), who was armed, approached Plaintiff Guerrero and shouted at him to come towards him. Defendant Doe 1 simultaneously made a fist and intentionally struck Plaintiff Guerrero in the face.

189. Immediately after Defendant Doe 1 punched Plaintiff Guerrero, a second male officer who was tall and of Asian descent arrived and grabbed Plaintiff Guerrero by the arm. Defendant Doe 1 and the other officer pushed Plaintiff Guerrero against the wall and patted him down.

190. Plaintiff Guerrero asked the officers why he had been struck, but he did not receive a response. Plaintiff Guerrero was extremely fearful because he did not know who the officers were. The officers never identified themselves nor provided him any information about their presence in the Plant. Plaintiff Guerrero was not informed that he was being detained pursuant to the execution of an IRS Search Warrant.

191. He was confused and scared because there were many officers with firearms, and he had just been punched in the face for no apparent reason. He thought that the officers were coming to kill him and the rest of the workers.

192. After the officers patted down Plaintiff Guerrero, an officer handcuffed him with zip ties and officers ordered him to sit down just outside one of the Plant's offices. Plaintiff Guerrero remained handcuffed just outside the office entrance with other Latino workers who

had also been handcuffed and required to remain there. The Plant's general supervisor, Carl Kinser, who is white, was outside the office. He was permitted to move freely and was not handcuffed.

193. Plaintiff Guerrero remained handcuffed and was required to remain seated at the office entrance area for about an hour. While detained in this area, Plaintiff Guerrero was in a complete state of shock and fear. Other officers patrolled this area closely, watching over the workers and ordering them not to move.

194. Eventually the officers escorted Plaintiff Guerrero outside the Plant, where he continued to be detained.

195. He was eventually taken to the Armory with the other Latino workers, where he was interrogated and fingerprinted.

196. At the Armory, Plaintiff Guerrero continued to be restrained by plastic zip ties.

197. Plaintiff Guerrero was detained for approximately twelve hours.

198. Plaintiff Guerrero was not questioned about his identity, work authorization, or immigration status prior to being detained at the Plant. Nor was Plaintiff Guerrero questioned about his identity, work authorization, or immigration status prior to being transported to the Armory.

**The Claims of Named Plaintiff Luis Roberto Bautista Martínez**

199. Plaintiff Bautista Martínez was working inside the loading dock of the Plant the morning of the raid.

200. Once the raid began, three white male officers approached him with their firearms pointed at him. Plaintiff Bautista Martínez thought they were terrorists and were going to kill him. He stopped working and put his hands up in the air.

32

201. A tall, white, male officer grabbed Plaintiff Bautista Martínez by the shirt to walk him outside.

202. Outside, Plaintiff Bautista Martínez saw many DHS and THP officers surrounding the Plant and blocking the exits. He saw patrol cars and a helicopter flying above.

203. One of Plaintiff Bautista Martínez's coworkers fell on the ground, and officers immediately ran toward him. One officer put his foot on the coworker's head and pointed a gun at him. Two other officers handcuffed the worker.

204. Seeing this, Plaintiff Bautista Martínez feared that the officers would treat him with the same level of aggression.

205. Plaintiff Bautista Martínez and other workers were lined up outside the Plant. Officers handcuffed him while he was standing outside. Plaintiff Bautista Martínez and some of his coworkers were left standing handcuffed outside of the Plant for about two hours.

206. During this time, Plaintiff Bautista Martínez asked Defendant Ayala if a pregnant coworker could sit down. Defendant Ayala refused and told Plaintiff Bautista Martínez to "Shut [his] f--king mouth."

207. Plaintiff Bautista Martínez asked several times for permission to use the restroom himself. Defendant Ayala refused and cursed at Plaintiff Bautista Martínez, saying to him "You don't have rights here" and calling him "Mexican sh-t."

208. Eventually, after Plaintiff Bautista Martínez said that he urgently needed to use the bathroom, a white, male DHS officer ("Defendant Doe 2") grabbed him by the shoulder and led him to an outside area behind a trailer. Defendant Doe 2 held a firearm to Plaintiff Bautista Martínez's head and told him to relieve himself right there, in plain sight of the other officers outside. Then Defendant Doe 2 laughed and cursed at him. Plaintiff Bautista Martínez felt

33

extremely humiliated by this treatment. Plaintiff Bautista Martinez was still restrained in handcuffs during this time and had made no attempt to resist the officer's instructions.

209. Approximately two hours after Plaintiff Bautista Martínez was moved outside the Plant, an officer grabbed him by his clothes and pushed him into a van along with the other Latino workers. The van transported Plaintiff Bautista Martínez to the Armory. No white workers were transported to the Armory in the van with Plaintiff Bautista Martínez.

210. While in the van, a male officer, who was tall, overweight, white, and had long blond hair down to his waist, took out his phone and took a picture of himself with the Latino workers in the van, yelling "selfie!" while he snapped the shot.

211. At the Armory, Plaintiff Bautista Martínez continued to be handcuffed with plastic zip ties.

212. During this time, Defendant Ayala berated Plaintiff Bautista Martínez and the other workers. He told them in Spanish to "shut [their] f--king mouths," to not ask any questions, and yelled that they were "going back to [their] damned s--t country."

213. Eventually, Plaintiff Bautista Martínez was interrogated and fingerprinted at the Armory.

214. Plaintiff Bautista Martínez was detained for approximately twelve hours.

215. Plaintiff Bautista Martínez was not questioned about his identity, work authorization, or immigration status prior to being detained at the Plant. Nor was Plaintiff Bautista Martinez questioned about his identity, work authorization, or immigration status prior to being transported to the Armory.

34

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Equal Protection Deprivation in Violation of Fifth Amendment
### *On Behalf of the Class*
### (Bivens *claim against DHS Defendants*)

216. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

217. The DHS Defendants stopped, detained, searched, seized, and/or arrested Plaintiffs and the Class solely on the basis of Plaintiffs' and Class Members' race and ethnicity, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

218. The DHS Defendants did not seize, detain, search, and/or arrest the similarly situated white workers in the Plant on the day of the raid.

219. The DHS Defendants prolonged the detention and seizure of Plaintiffs and the Class solely on the basis of Plaintiff's and Class Members' race and ethnicity, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

220. The DHS Defendants' actions were motivated by discriminatory intent and racial animus toward Plaintiffs and the Class.

221. The actions of the DHS Defendants were intentional, malicious, and reckless and reflect a callous disregard or indifference to the civil rights of Plaintiffs and the Class.

222. The DHS Defendants violated the Plaintiffs' and the Class Members' clearly established rights under the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution

223. As a result of the DHS Defendants' actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

**SECOND CAUSE OF ACTION**
**Unreasonable Seizures and/or Arrests in Violation of the Fourth Amendment**
***On Behalf of the Class***
**(Bivens *claim against DHS Defendants*)**

224. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

225. The DHS Defendants seized the Plaintiffs and the Class Members when dozens of armed agents in bullet-proof vests surrounded the Plant, blocked the one public road to the Plant with numerous law enforcement vehicles, controlled the perimeter of the Plant from above with helicopters, secured the Plant's exits and entrances, aggressively burst into the Plant, and loudly ordered the Plaintiffs and the Class Members to cease moving.

226. The DHS Defendants conducted the factory seizure without a warrant authorizing the seizure of each individual, reasonable, articulable suspicion that each Plaintiff and Class Member had violated U.S. immigration laws or any other U.S. criminal laws, or exigent circumstances.

227. The IRS Search Warrant did not authorize the DHS Defendants' prolonged, intrusive, and forceful seizure of the Plaintiffs and the Class members.

228. The DHS Defendants' actions were unreasonable in that they used excessive force to effect the detention of the Plaintiffs and Class Members.

229. The DHS Defendants' forceful and intrusive factory seizure far-exceeded the scope of any allowable investigatory detention or detention incident to a search.

36

230. The DHS Defendants' prolonged Plaintiffs' and Class Members' detention unreasonably without reasonable suspicion, probable cause, or other lawful authority.

231. The DHS Defendants violated the clearly established Fourth Amendment rights of the Plaintiffs and the Class to be free from unreasonable searches and seizures.

232. As a result of the DHS Defendants' conduct, the Plaintiffs and the Class members suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

**THIRD CAUSE OF ACTION**
**Unreasonable Seizures and/or Arrests in Violation of the Fourth Amendment**
***On Behalf of the Class***
**(Bivens *claim against Defendant Worsham*)**

233. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

234. The IRS search warrant was not supported by probable cause.

235. Defendant Worsham secured a search warrant by providing the Court with a false and misleading affidavit.

236. Defendant Worsham deliberately and/or recklessly made false statements and/or omissions in the Affidavit to the warrant that were material to the court's finding of probable cause.

237. Defendant Worsham misrepresented the plan to seize, detain and arrest as many as 100 workers and made it appear that the sole purpose behind the search was to investigate the alleged crimes of the Plant's owner without disclosing a true motivation, which was to arrest all of the "Hispanic" workers in the Plant.

238. Defendant Worsham omitted information regarding the identity, credibility, background, and reliability of material witnesses to the investigation whose hearsay was relied upon in the Affidavit.

239. Defendant Worsham omitted information regarding the identity, credibility, background, and reliability of the Confidential Informant ("CI") whose hearsay was relied upon in the Affidavit. Defendant Worsham omitted all information relating to any criminal history of the CI or other material witnesses relied upon in the Affidavit.

240. Defendant Worsham omitted any information from which the issuing judge could have a basis for finding that the CI was reliable or credible and was in a position to know the information provided.

241. Defendant Worsham omitted any information regarding any independent law enforcement corroboration of the information provided by the CI.

242. Defendant Worsham omitted necessary factual background information and submitted his affidavit based on conclusory statements insufficient to provide the magistrate with a substantial basis for determining the existence of probable cause.

243. Defendant Worsham obtained the IRS Search Warrant, at least in part, as a pretext to seize and arrest workers of the Plant without lawful authority to do so.

244. As a result, the search performed pursuant to the warrant was unlawful in violation of the Fourth Amendment.

245. As a result, the detentions and arrests that occurred attendant to the warrant were unlawful in violation of the Fourth Amendment.

246. As a result of Defendant Worsham's actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

### FOURTH CAUSE OF ACTION
**42 U.S.C. § 1985: Conspiracy to Violate Civil Rights**
*On Behalf of the Class*
(**Bivens** *claim against All Defendants*)

247. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

248. By agreeing to stop, detain, search, seize, and/or arrest Plaintiffs and the Class solely on the basis of their Latino race and ethnicity, Defendants conspired to deprive Plaintiffs and the Class of the equal protection of the law of the United States, in violation of 42 U.S.C. § 1985(3).

249. By agreeing to stop, detain, search, and/or seize Plaintiffs and the Class through forceful and intrusive means, without a warrant supported by sufficient probable cause, and without individualized reasonable suspicion, Defendants conspired to deprive Plaintiffs and the Class of their right to be free from unreasonable searches and seizures, in violation of 42 U.S.C. § 1985(3).

250. As a result of Defendants' actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

### FIFTH CAUSE OF ACTION
**42 U.S.C. § 1986: Failure to Prevent Violation of Civil Rights**
*On Behalf of the Class*
(**Bivens** *claim against All Defendants*)

251. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

39

252. Defendants, having knowledge of the conspiracy to violate Plaintiffs' and the Class' civil rights as specified in Count IV above, willfully or negligently failed to prevent the wrongful acts complained of herein, in violation of 42 U.S.C. § 1986.

253. As a result of Defendants' actions, Plaintiffs and Class Members suffered damages, including but not limited to actual damages, loss of liberty, humiliation, fear, and emotional distress.

### SIXTH CAUSE OF ACTION
**Unreasonable Seizures and/or Arrests in Violation of the Fourth Amendment**
***On Behalf of Plaintiffs Isabel Zelaya, Geronimo Guerrero, Carolina Romulo Mendoza,***
***Luis Bautista Martínez, and Martha Pulido***
**(Bivens *claim against DHS Defendants*)**

254. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

255. The DHS Defendants seized the Plaintiffs when dozens of armed agents in bullet-proof vests surrounded the Plant, blocked the one public road to the Plant with numerous law enforcement vehicles, controlled the perimeter of the Plant from above with helicopters, secured the Plant's exits and entrances, aggressively burst into the Plant, loudly ordered them to cease moving, and detained them.

256. The DHS Defendants conducted the seizures without a warrant authorizing the seizure of each individual, reasonable, articulable suspicion that each Plaintiff had violated U.S. immigration laws or any other U.S. criminal laws, or exigent circumstances.

257. The IRS Search Warrant did not authorize the Defendants' prolonged, intrusive, and forceful seizure of the Plaintiffs.

258. The IRS Search Warrant was not supported by probable cause.

259. The DHS Defendants violated the clearly established Fourth Amendment rights of the Plaintiffs to be free from unreasonable searches and seizures.

260. The DHS Defendants unlawfully detained and seized the Plaintiffs when they detained Plaintiffs at the Plant.

261. The DHS Defendants unreasonably prolonged the detention and seizure of the Plaintiffs by transporting them to the Armory without asking them a single question about their identity, work authorization, or immigration status.

262. The DHS Defendants arrested the Plaintiffs without an arrest warrant, probable cause that they had violated U.S. immigration or criminal laws, or exigent circumstances in violation of their Fourth Amendment rights.

263. The right to be free from seizures and arrests that are not supported by a warrant, probable cause, or exigent circumstances is clearly established.

264. As a result of the DHS Defendants' conduct, the Plaintiffs have suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

<u>SEVENTH CAUSE OF ACTION</u>
**Excessive Force in Violation of Fourth Amendment**
*On Behalf of Plaintiff Geronimo Guerrero*
(**Bivens** *claim against Defendant Doe 1*)

265. Plaintiff Guerrero realleges and incorporates by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

266. The Defendants engaged in unreasonable, excessive force when effectuating the seizure and arrest of Plaintiff Guerrero in violation of his Fourth Amendment rights.

267. Defendant Doe 1 violated Plaintiff Guerrero's clearly established right to be free from excessive force under the Fourth Amendment.

41

268. Defendant Doe 1 brutally and without provocation struck Plaintiff Guerrero in the face when he approached Plaintiff Guerrero at his work area in the Plant the day of the raid.

269. Plaintiff Guerrero did not present a safety threat to Defendant Doe 1. When Defendant Doe 1 approached Plaintiff Guerrero, he was in his work area and was unarmed.

270. Plaintiff Guerrero was attempting to comply with Defendant Doe 1's orders when the officer approached. Plaintiff Guerrero was not attempting to flee or resist detention.

271. Defendant Doe 1 lacked any particularized suspicion that Plaintiff Guerrero had violated U.S. immigration laws or committed a crime.

272. The right to be free from the use of excessive force is clearly established.

273. As a result of Defendant Doe 1's actions, Plaintiff Guerrero has suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

### EIGHTH CAUSE OF ACTION
### Excessive Force in Violation of Fourth Amendment
### *On Behalf of Plaintiff Luis Roberto Bautista Martínez*
### (Bivens *claim against Defendant Doe 2*)

274. Plaintiff Bautista Martínez realleges and incorporates by reference each and every allegation contained in paragraphs 1-215 as if fully set forth herein.

275. The Defendants engaged in unreasonable, excessive force when effectuating the seizure and arrest of Plaintiff Bautista Martínez in violation of his Fourth Amendment rights.

276. Defendant Doe 2 violated Plaintiff Bautista Martínez's clearly established right to be free from excessive force under the Fourth Amendment.

277. Defendant Doe 2 brutally and without provocation pointed his firearm at, and/or caused his firearm to make physical contact with Plaintiff Bautista Martínez's head while insisting that Plaintiff Bautista Martínez urinate in front of his coworkers.

42

278. Plaintiff Bautista Martínez did not present a safety threat to Defendant Doe 2, as he remained handcuffed, and Defendant Doe 2 held him by the shoulder as Plaintiff Bautista Martínez urinated. Moreover, Plaintiff Bautista Martínez had attempted to comply with all orders and was not attempting to flee or resist detention.

279. Defendant Doe 2's use of excessive force against Plaintiff Bautista Martínez occurred well after the federal officers had restrained the Plant's Latino workforce.

280. Defendant Doe 2 lacked any particularized suspicion that Plaintiff Bautista Martínez had violated U.S. immigration laws or committed a crime.

281. The right to be free from the use of excessive force is clearly established.

282. As a result of Defendant Doe 2's actions, Plaintiff Bautista Martínez has suffered damages, including but not limited to actual damages, pain and suffering, humiliation, fear, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members request that the Court enter a judgment against Defendants and award the following:

a. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' seizure, detention, search, and questioning of Plaintiffs and the Class Members were a clear violation of Plaintiffs' and the Class Members' Fifth and Fourth Amendment rights and 42 U.S.C. §§ 1985, 1986;

b. An order awarding Plaintiffs and the Class Members nominal damages for the clear violation of their Fifth and Fourth Amendment rights and 42 U.S.C. §§ 1985, 1986;

c. An order awarding Plaintiffs and all Class Members compensatory damages in an amount to be proven at trial;

43

d.   An order holding Defendants jointly and severally liable for compensatory damages in an amount to be proven at trial;

e.   An order awarding Plaintiffs and all Class Members punitive damages against each Defendant in an amount to be proven at trial;

f.   A determination that Plaintiffs' First, Second, Third, Fourth, and Fifth Causes of Action may properly be maintained as class actions pursuant to Fed. R. Civ. P. 23(b)(3);

g.   An order finding that Plaintiffs Gonzalez Cruz and Zapote Hernández are proper representatives of the Class Members, and appointing the undersigned as Class Counsel.

h.   An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law; and

i.   Such other and further relief as the Court deems equitable, just and proper.

Dated: April 5, 2019                                    Respectfully Submitted,

s/ Julia Solórzano
Julia Solórzano
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
T: (404) 521-6700
F: (404) 221-5857
julia.solorzano@splcenter.org

Meredith B. Stewart
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
T: (504) 486-8982
F: (504) 486-8947
meredith.stewart@splcenter.org

Araceli Martínez-Olguín
Melissa S. Keaney
Nora A. Preciado
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108 – 62
Los Angeles, CA 90010
T: (213) 639-3900
F: (213) 639-3911
martinez-olguin@nilc.org
keaney@nilc.org
preciado@nilc.org

Trudy S. Rebert*
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
T: (646) 867-8793
F: (213) 639-3911
rebert@nilc.org

Eben P. Colby
500 Boylston Street
Boston, Massachusetts 02116
T: 617-573-4855
F: 617-305-4855
Eben.Colby@probonolaw.com

Jeremy A. Berman
4 Times Square
New York, NY 10036-6522
T: 212-735-2032
F: 917-777-2032
Jeremy.Berman@probonolaw.com

Arthur R. Bookout
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
T: 302-651-3026
F: 302-434-3026
Art.Bookout@probonolaw.com

Whitney Wester*
1000 Louisiana
Suite 6800
Houston, TX 77002
T: 713-655-5152
F: 713-483-9152
Whitney.Wester@probonolaw.com

William L. Harbison (No. 7012)
Phillip F. Cramer (No. 20697)
John L. Farringer IV (No. 22783)
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
T: (615) 742-4200
F: (615) 742-4539
bharbison@srvlaw.com
pcramer@srvlaw.com
jfarringer@srvlaw.com

*Pro hac vice application forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2019 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. All other Parties will be served by regular U.S. mail at the below addresses. Defendants who have not been served yet will be served with the Second Amended Complaint with the summons. When service is complete a Proof of Service form will be filed with the Court, which Proof of Service will list the date, method, and documents served.

Robert Hammer, Assistant Special Agent in Charge, HSI



David Vicente Pena, Agent, ICE, ERO



Francisco Ayala, Agent, ICE, ERO



Billy Riggins, Special Agent, ICE
ICE HSI Memphis
842 Virginia Run Cove
Memphis, TN 38122

Anthony Martin, Deportation Officer, ICE, ERO



Mathew Tyler Grooms, Deportation Officer, ICE

Jerrol Scott Partin, Special Agent, ICE

Theodore Francisco, Special Agent, HSI

Travis Carrier, Special Agent, ICE



Trevor Christensen, Special Agent, ICE



Glen Blache, Special Agent, ICE
ICE HSI Knoxville
324 Prosperity Rd.
Knoxville, TN 37923

Brenda Dickson, Special Agent, ICE
ICE HSI Chattanooga
2150 Stein Drive
Chattanooga, TN 37421

George Nalley, Agent of ICE
Address Currently Unknown

Clint Cantrell, Special Agent, ICE
ICE HSI Chattanooga
2150 Stein Drive
Chattanooga, TN 37421

Ricky Thornburgh, Agent of ICE
Address Currently Unknown

Jonathan Hendrix, Special Agent, HSI
ICE HSI Nashville
501 Brick Church Park Drive
Nashville, TN, 37207

46

Patrick Ryan Hubbard, Special Agent, ICE
ICE HSI Nashville
501 Brick Church Park Drive
Nashville, TN, 37207

Wayne Dickey, Special Agent, HSI
ICE HSI Nashville
501 Brick Church Park Drive
Nashville, TN, 37207

James K. Liles, Special Agent, HSI
ICE HSI Nashville
501 Brick Church Park Drive
Nashville, TN, 37207

Michael Perez, Special Agent, HSI
ICE HSI Nashville
501 Brick Church Park Drive
Nashville, TN, 37207

Keith Hale, Special Agent, ICE
ICE HSI Memphis
842 Virginia Run Cove
Memphis, TN 38122

Connie Stephens, Agent, ICE
ICE HSI Memphis
842 Virginia Run Cove
Memphis, TN 38122

Tommy Pannell, Agent, ICE
ICE HSI Memphis
842 Virginia Run Cove
Memphis, TN 38122

Shannon Hope, Agent, ICE
Address Currently Unknown

Troy McCarter, Agent, ICE
Address Currently Unknown

Bradley Harris, Agent, ICE
Address Currently Unknown

Joshua McCready, Agent, ICE
Address Currently Unknown

Ronald Appel, Resident Agent in Charge,
ICE
Address Currently Unknown

Bobby Smith, Agent, ICE
Address Currently Unknown

Blake Diamond, Agent, ICE
Address Currently Unknown

Paul Criswell, Agent, ICE
Address Currently Unknown

Jeffery Klinko, Agent, ICE
Address Currently Unknown

Jeffrey Schroder, Agent, ICE
Address Currently Unknown

David Lodge, Deportation Officer, ICE,
ERO
Address Currently Unknown

Wayne Hinkle, Deportation Officer, ICE,
ERO
Address Currently Unknown

Dennis Fetting, Special Agent, ICE
ICE HSI Nashville
501 Brick Church Park Drive
Nashville, TN, 37207

Deni Bukvic, Agent, ICE
Address Currently Unknown

Kashif Chowhan, Deportation Officer, ICE,
ERO
ICE HSI Knoxville
324 Prosperity Rd.
Knoxville, TN 37923

Robert Whited, Agent, ICE
Address Currently Unknown

47

Trey Lund, Deputy Field Office Director
ICE HSI New Orleans
1250 Poydras St., Suite 2200
New Orleans, LA 70113

John Witsell, Special Agent, ICE
Address Currently Unknown

Michelle Evans, Agent, ICE
Address Currently Unknown

Wesley Anthony
Address Currently Unknown

Steven Ledgerwood
Address Currently Unknown

Francis Coker
Address Currently Unknown

Christopher Cannon, ICE, ERO
Address Currently Unknown

Chief John Heishman, Agent of CBP
Address Currently Unknown

Aunrae Navarre, CBP Officer
Address Currently Unknown

Ricky Smith, CBP Officer
Address Currently Unknown

Matthew Moon, Agent of CBP
Address Currently Unknown

Jason Miller, CBP Officer
Address Currently Unknown

Jeff Bednar, CBP Port Director
Address Currently Unknown

Austin Williams, CBP Port Director
Address Currently Unknown

Nicholas R. Worsham, Special Agent, IRS
███████████

Dated: April 24, 2019

_s/ Julia Solórzano_____
*Counsel for Plaintiffs*

48