## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

ISABEL ZELAYA, GERONIMO )
GUERRERO, CAROLINA ROMULO )  Case No. 3:19-cv-62
MENDOZA, LUIS ROBERTO )
BAUTISTA MARTÍNEZ, MARTHA )  Judge Travis R. McDonough
PULIDO, CATARINO ZAPOTE )
HERNÁNDEZ, and MARIA DEL PILAR )  Magistrate Judge H. Bruce Guyton
GONZALEZ, individually and on behalf of )
all others similarly situated, )
)
     *Plaintiffs,* )
)
v. )
)
ROBERT HAMMER, *et al.*, )
)
     *Defendants.* )
)

---

## MEMORANDUM OPINION

---

This putative class action arises from a large immigration raid executed in northeastern Tennessee. Various Defendants have filed motions to dismiss. (Docs. 328, 330, 332, 334.) For the following reasons, the motions to dismiss will be **GRANTED IN PART** and **DENIED IN PART**.

## I.     BACKGROUND

The Southeastern Provision Meatpacking Plant (the "Plant")[1] is situated in the small town of Bean Station, Tennessee. (Doc. 315, at 20.)[2] Its primary business at the relevant time was

---

[1] The complaint describes the company as "Southeastern Provision," while the materials attached to the complaint refer to it as "Southeastern Provisions." The Court uses the former designation throughout.

[2] All facts are taken from the Third Amended Complaint and presumed true for present purposes, unless otherwise noted.

processing and packaging beef.  (*Id.*)  The Plant is a large, two-story warehouse connected to several small buildings.  (*Id.*)  It contains three offices, a locker room, bathrooms, several large freezer sections, a processing area, and a "kill floor" where workers butcher cattle.  (*Id.*)  The Plant's physical and electronic records are stored in the offices and a storage area.  (*Id.* at 21.)

### A.  The Search Warrant

At some point, the Internal Revenue Service ("IRS") began investigating the Plant's owner, James Brantley, for possible violations of federal tax and immigration law.  (*Id.*)  On April 2, 2018, a federal magistrate judge issued a warrant for the IRS to search the Plant and to seize a list of items, such as financial records, employee records, currency, and electronic storage devices.  (*Id.*; *see also* Doc. 315-1, at 2–7.)  The warrant was predicated on the affidavit of IRS Special Agent Nicholas R. Worsham.  (Doc. 315-2.)  In his affidavit, Worsham swore that investigation of the Plant had given him probable cause to believe that Brantley had evaded assessment and payment of federal employment taxes in violation of 26 U.S.C. § 7201; willfully failed to collect and pay federal employment taxes in violation of 26 U.S.C. § 7202; filed false federal tax returns in violation of 26 U.S.C. § 7206(1); and unlawfully employed illegal aliens in violation of 8 U.S.C. § 1324(a).  (*See id.* at 4.)  While the affidavit referenced the suspected presence of undocumented immigrants at the Plant, it did not discuss—and the warrant did not authorize—the seizure, detention, or arrest of any individual, undocumented or otherwise.  (Doc. 315, at 21–22; *see also* Docs. 315-1, 315-2.)

The affidavit explained that Worsham had been an IRS special agent since 2006, investigating potential violations of federal internal-revenue, money-laundering, and currency laws.  (Doc. 315-2, at 3.)  Worsham began investigating Brantley and the Plant because personnel at Citizens Bank had noticed large, weekly cash withdrawals from Southeastern

Provision's accounts. (*Id.* at 7.) Pamela Brantley (wife of James Brantley), Kelsey Brantley (daughter of Pamela and James), and Priscilla Keck, an employee of Southeastern Provision, made the withdrawals. (*Id.* at 7–8.) They told bank personnel that "the cash was used for payroll." (*Id.* at 8.) Bank personnel toured the Plant with Pamela Brantley, observed the installation of a large vault, and heard her explain that "the employees were Hispanic and were paid weekly with cash." (*Id.*) According to Worsham, his knowledge, experience, and training suggested that employers "who pay employees with cash often do so to avoid paying various types of taxes including federal employment taxes" and that employers "who employ illegal aliens often pay the illegal aliens in cash because [they] do not possess appropriate documentation to complete" tax forms. (*Id.* at 4.) After the investigation began, Worsham obtained documents reflecting Southeastern Provision's $25 million in cash withdrawals since 2008. (*Id.* at 7–8.)

As part of the investigation, a confidential informant (the "Informant") gained employment at the Plant in May 2017. (*Id.* at 8.) The Informant completed no paperwork and provided no documentation or identification prior to hiring. (*Id.*) After the Informant used a fake name when speaking with a person he/she knew from the area, a Plant employee encouraged the Informant to use his/her real name and "not to worry" because one "need not have a lawful identity" to work at the Plant. (*Id.* at 8–9.) Plant personnel told the Informant that the wage was $10 per hour, payable weekly in cash. (*Id.* at 9.) Other employees told the Informant that they received the same pay in the same manner and that all employees recorded their hours in a logbook in a main office or lobby area at the end of each day. (*Id.*) The Informant was told he/she would "be a 'supervisor' because [he/she] was capable of speaking both Spanish and English," from which the Informant inferred "that many of the other employees

spoke only Spanish." (*Id.*)

The Informant worked at the Plant for four days, during which time he/she observed "approximately 25 employees working on the production line, 4 employees on the cleaning crew, 3 employees working as mechanics, 3 employees driving fork lifts, and two females working in the main lobby." (*Id.* at 9–10.) Other than the women in the lobby, every employee the Informant observed was Hispanic. (*Id.* at 10.) Worsham concluded that this was "relevant" because "representatives of Southeastern Provision told Citizens Bank personnel that the large cash withdrawals were made for the purpose of paying cash wages to *Hispanics*." (*Id.* (emphasis in original).) During the week that the Informant worked at the Plant, Worsham learned that representatives of Southeastern Provision withdrew $101,000 in cash from Citizens Bank; assuming each employee worked eight hours per day, Worsham calculated that hourly wages for the employees the Informant observed would have been $72.14—more than Worsham estimated that production-line workers, cleaners, mechanics, and fork-lift drivers ordinarily earn—leading Worsham to conclude that the Plant likely employed more than the 35 people the Informant observed (*Id.*) and more than the 39 (2013), 32 (2014), 37 (2015), and 23 (2016) W-2 employees Southeastern Provision reported to federal authorities in prior tax years (*Id.* at 16). The Informant also knew independently that some workers at the Plant had lost jobs at another meat-processing facility because their identity documentation was fraudulent. (*Id.* at 10.) Finally, on March 2, 2018, law-enforcement agents instructed the Informant to return to the Plant while equipped with covert-video-surveillance equipment, during which he/she observed 60–70 mostly Hispanic employees at the Plant. (*Id.* at 11.)

Worsham reviewed bank records for Southeastern Provision and concluded that the company had withdrawn cash sums ranging from $62,000 to $122,000 each week of 2017. (*Id.*)

Based upon the Informant's observations and the bank records, law enforcement conducted surveillance of two representatives of Southeastern Provision on October 11, 2017, and November 14, 2017. (*Id.* at 12.) Each was observed withdrawing large sums of cash from the bank before returning to the Plant (or, in the case of one representative who lived adjacent to the Plant, to the representative's residence). (*Id.*) Aerial photographs of the Plant on October 11, 2017, and November 14, 2017, confirmed the presence of 87 passenger vehicles and 80 passenger vehicles, respectively. (*Id.* at 13.)

Worsham also concluded that, for tax years 2013–2016, Southeastern Provision withdrew cash exceeding reported wages by amounts between approximately $1.5 million to $2.6 million. (*Id.* at 15–17.) Worsham's calculations led him to conclude that he had "probable cause to believe that for 2013 through 2016, Southeastern Provision[] . . . paid approximately $8,421,210 in wages that it did not report to the IRS" and avoided "approximately $2.5 million in payroll taxes in addition to the amount it actually paid." (*Id.* at 17.) Worsham also asserted that his record established that the Plant's owners and supervisory staff were falsifying their tax returns to reflect lower incomes than they actually received. (*Id.* at 17–19.)

### B. The Raid

On April 5, 2018, approximately sixty people were working in the processing area, while approximately forty people were working on the "kill floor." (Doc. 315, at 20.) No Plaintiffs or members of the putative class were working in the office area. (*Id.* at 24.) At around 9:00 a.m., roughly the time of the employees' morning break, officers from U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations[3] ("HSI"), Enforcement and Removal

---

[3] At one point, the complaint uses the term "Homeland Security Operations," but the complaint caption properly identifies this entity as Homeland Security Investigations.

Operations ("ERO"), Customs and Border Protection ("CBP"), the IRS, and the Tennessee Highway Patrol ("THP") arrived at the Plant, formed a perimeter, and secured its exits.[4] (*Id.* at 24.) THP blocked the only road to the plant while dozens of armed federal officers entered through the Plant's multiple doors, unannounced, and spread throughout its interior. (*Id.*)

Workers at the Plant were confused about who the officers were and why they were present. (*Id.* at 24–25.) Some federal officers ordered Latino workers to put their hands in the air, and some pointed guns at them and told them to stop working. (*Id.* at 25.) The officers instructed Latino workers to remove work clothes, put down their tools, and line up. (*Id.*) They were not permitted to use the restroom or move freely, and some were handcuffed with zip ties. (*Id.*) The officers then ordered these Latino workers to walk outside the Plant, where THP officers stood with large machine guns pointed at them while helicopters circled overhead. (*Id.*) While outside the Plant, the Latino workers were not allowed to move freely or talk, and one was told to "shut up" when trying to speak. (*Id.* at 25–26.) Under these conditions, government officers questioned some of the Latino workers about their immigration status. (*Id.* at 26.) Meanwhile, the officers did not restrain white workers at the Plant, did not point guns at them, and allowed them to stand outside and smoke. (*Id.* at 26.)

After at least an hour of detention, government officers loaded all the Latino workers into vans and transported them to a National Guard Armory (the "Armory") twenty to thirty minutes away. (*Id.*) Some, including some named Plaintiffs, were not asked about their identity or immigration status until they reached the Armory. (*Id.*) Throughout the course of these events, "various federal officers berated the workers with racial slurs." (*Id.*) One of the named Plaintiffs

_____

[4] HSI and ERO are divisions within ICE. ICE and CBP fall under DHS. These officers are referred to, at times, as the "DHS Defendants." These officers plus IRS officers are referred to, at times, as the "Federal Officers."

heard Defendant Pena, an ERO/ICE agent, yell at a worker—who had asked Pena not to put the handcuffs on so tight—that he had a problem with the workers because they lived in the United States but did not speak English, and (to the handcuff request) that the worker could not tell him what to do. (*Id.* at 26–27.) The officers neither interrogated the white workers about their immigration status nor transported them to the Armory. (*Id.* at 27.)

### C. The Named Plaintiffs

All named Plaintiffs worked at the Plant prior the raid for at least one year and as long as eighteen years. (*Id.* at 7–8.) During the raid, they all suffered considerable confusion, distress, anxiety, and fear for their own safety and the safety of others. (*Id.* at 28–36.)

#### i. Isabel Zelaya

Plaintiff Isabel Zelaya was working in the processing area when the raid began. (*Id.* at 28.) Two federal officers—a brunette male and a brunette female—first approached him, and then others followed. (*Id.*) The first two officers pointed guns at Latino workers and shoved some to the ground while other armed officers blocked the exits. (*Id.*) They ordered Zelaya to remove his apron and tools, and he did so. (*Id.*) The officers then pointed a gun at Zelaya's son because he did not remove his tool belt quickly enough. (*Id.*)

Zelaya is authorized to live and work in the United States and informed a Latino officer who spoke Spanish of his status. (*Id.* at 29.) He gave his Employment Authorization Card to the officer, who said in Spanish that they needed to "investigate" him. (*Id.*) The officer handcuffed Zelaya, who was then taken to the Armory. (*Id.*) He was eventually released after establishing his legal status. (*Id.*) In all, he was detained for approximately two hours. (*Id.*)

#### ii. Carolina Romulo Mendoza

Plaintiff Romulo Mendoza was walking to the restroom when the raid began. (*Id.*)

When she exited, two armed DHS officers ordered her to be quiet, to put her hands on her head, and to enter a line-up. (*Id.* at 29–30.) She was transported to the Armory, where officers patted her down, took her belongings, interrogated her, and fingerprinted her. (*Id.* at 30.) She was detained for ten hours.[5] (*Id.*)

### iii. Martha Pulido

Plaintiff Pulido was working on the "kill floor" when the raid began. (*Id.*) She observed an officer point a firearm at a woman who had tripped and fallen and another tall, white, male officer pushing a female worker. (*Id.* at 31.) Plaintiff Pulido also observed an officer punch Plaintiff Geronimo Guerrero. (*Id.*) Officers ordered her to exit the Plant and then handcuffed her with zip ties. (*Id.*) She was transported to the Armory for interrogation and fingerprinting. (*Id.*) She was not asked about her identity, work authorization, or immigration status prior to being detained or transported to the Armory; in all, she was detained for approximately fourteen hours. (*Id.* at 31–32.)

### iv. Geronimo Guerrero

Plaintiff Guerrero was working in the processing area when the raid began. (*Id.*) A short, white, male, armed federal officer approached Plaintiff Guerrero and shouted for him to come closer. (*Id.*) Plaintiff Guerrero attempted to comply, while the officer simultaneously made a fist and struck him in the face. (*Id.*) A second male officer of Asian descent arrived, grabbed Plaintiff Guerrero by the arm, and, together with the first officer, pushed him against the wall and patted him down. (*Id.*) Plaintiff Guerrero asked why he was struck but received no answer and was not told why he was being detained. (*Id.*) Another officer handcuffed him with

---

[5] The complaint contains no allegations regarding whether Plaintiff Romulo Mendoza, or any Plaintiff other than Zelaya, was authorized to live and work in the United States.

zip ties and ordered him to sit down outside the Plant's office area.  (*Id.* at 33.)  The Plant's general supervisor, Carl Kinser—who is white—was outside the office but was permitted to move freely and not handcuffed.  (*Id.*)  Plaintiff Guerrero was transported to the Armory, where he was interrogated and fingerprinted.  (*Id.*)  He was not asked about his identity, work authorization, or immigration status prior to being detained and transported to the Armory; in all, he was detained for approximately twelve hours.  (*Id.*)

### v.  *Luis Roberto Bautista Martínez*[6]

Plaintiff Bautista Martínez was working in the loading dock when the raid began.  (*Id.* at 34.)  Three officers approached him with their firearms pointed at him, and he "thought they were terrorists and were going to kill him."  (*Id.*)  A tall, white, male officer grabbed Plaintiff Bautista Martínez by the shirt and walked him outside.  (*Id.*)  One of his coworkers fell on the ground, after which officers ran toward him; one put his foot on the coworker's head and pointed a gun at him while two other officers fastened handcuffs.  (*Id.*)  Plaintiff Bautista Martínez asked Defendant Francisco Ayala if a pregnant coworker could sit down.  (*Id.*)  Defendant Ayala refused and told Plaintiff Bautista Martínez to "shut [his] fucking mouth."  (*Id.*)  Plaintiff Bautista Martínez also asked to use the restroom several times; Defendant Ayala refused and said to him "you don't have rights here" and called him "Mexican shit."  (*Id.* at 35.)  After Plaintiff Bautista Martínez persisted in expressing his need to use the restroom, a different white, male officer grabbed him by the shoulder and led him to an outside area behind a trailer.  (*Id.*)  The officer held a gun to Plaintiff Bautista Martínez's head and told him to relieve himself right there, in sight of other officers, while staring at his genitals, laughing, and cursing at him.  (*Id.*)  At no point during this time did Plaintiff Bautista Martínez resist or fail to comply.  (*Id.*)

---

[6] The Court uses Plaintiffs' names as they appear in their pleadings, including accent marks.

Later, an officer shoved Plaintiff Bautista Martínez into a van along with other Latino workers, which transported him to the Armory.  (*Id.*)  While in the van, a white, male officer who was tall and overweight and had long blond hair down to his waist took out his phone and yelled "selfie!" while taking a picture of himself with the workers.  (*Id.*)

At the Armory, Plaintiff Bautista Martínez remained handcuffed.  (*Id.*)  Defendant Ayala berated Plaintiff Bautista Martínez and other workers, telling them in Spanish to "shut [their] fucking mouths" and that they were "going back to [their] damned shit country."  (*Id.*)  Eventually, Plaintiff Bautista Martínez was interrogated and fingerprinted.  (*Id.* at 36.)  At no point prior to being detained at the Plant or transported to the Armory was Plaintiff Bautista Martínez asked about his identity, work authorization, or immigration status; in all, he was detained for approximately twelve hours.  (*Id.*)

### vi.  *Maria del Pilar Gonzalez Cruz and Catarino Zapote Hernández*

The complaint does not contain specific raid allegations about Plaintiffs Gonzalez Cruz and Zapote Hernández.  (*See id.*)  They seek to bring five claims as named representatives of a class under Federal Rule of Civil Procedure 23.  (*Id.* at 16.)

### D.  The Lawsuit

Plaintiffs filed this lawsuit in February 2019.  (Doc. 1.)  It includes a putative class of "[a]ll Latino individuals working in the Plant on April 5, 2018 who were detained."  (Doc. 315, at 16.)  The operative pleading asserts thirteen claims based upon the facts outlined above:

1.  A class-action claim against the named officers employed by ICE, ERO, HSI, and CBP (the "DHS Defendants") for violating the equal-protection component of the Fifth Amendment, brought pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971);

2.  A class-action claim against the DHS Defendants for unreasonable seizures and/or arrests in violation of the Fourth Amendment, brought pursuant to *Bivens*;

3.  A class-action claim against Defendant Worsham for unreasonable seizures and/or

arrests in violation of the Fourth Amendment, brought pursuant to *Bivens*;

4. A class-action claim against all individual Defendants for conspiracy to violate civil rights, brought pursuant to 42 U.S.C. § 1985(3);

5. A class-action claim against all individual Defendants for failure to prevent violation of civil rights, brought pursuant to 42 U.S.C. § 1986;

6. Individual claims by Plaintiffs Zelaya, Guerrero, Romulo Mendoza, Bautista Martínez, and Pulido against the DHS Defendants for unreasonable seizure and/or arrest in violation of the Fourth Amendment, brought pursuant to *Bivens*;

7. An individual claim by Plaintiff Guerrero against the "Assaulting Officer"[7] Defendant for excessive force in violation of the Fourth Amendment, brought pursuant to *Bivens*;

8. An individual claim by Plaintiff Bautista Martínez against the "Gun to the Head Officer" Defendant for excessive force in violation of the Fourth Amendment, brought pursuant to *Bivens*;

9. Individual claims by Plaintiffs Zelaya, Guerrero, Romulo Mendoza, Bautista Martínez, Zapote Hernández, Gonzalez Cruz, and Pulido against Defendant United States of America for false imprisonment and false arrest, brought pursuant to the Federal Tort Claims Act;

10. Individual claims by Plaintiffs Guerrero and Bautista Martínez against Defendant United States of America for battery, brought pursuant to the Federal Tort Claims Act;

11. Individual claims by Plaintiffs Guerrero and Bautista Martínez against Defendant United States of America for assault, brought pursuant to the Federal Tort Claims Act;

12. Individual claims by Plaintiffs Guerrero and Bautista Martínez against Defendant United States of America for intentional infliction of emotional distress, brought pursuant to the Federal Tort Claims Act; and

13. Individual claims by Plaintiffs Guerrero and Bautista Martínez against Defendant United States of America for negligent infliction of emotional distress, brought pursuant to the Federal Tort Claims Act.

(Doc. 315, at 36–54.)  Different groups of Defendants have filed four motions to dismiss most

---

[7] At the time of this complaint's filing, the identity of the officer who allegedly hit Plaintiff Guerrero in the face was unknown.  Subsequent discovery has led Plaintiffs to believe that Defendant Witsell was the responsible officer.

claims (Docs. 328, 330, 332, 334), and Plaintiffs have responded (Docs. 337, 338, 339).  The motions are ready for adjudication.

## II.    STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 8, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6).  On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id*. at 679.  For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman*, 484 F.3d at 859.  This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859.  This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In ruling on a Rule 12(b)(6) motion to dismiss, a court may consider documents that a plaintiff references or quotes in the complaint without converting the 12(b)(6) motion into a Rule 56 motion for summary judgment. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.")

## III. ANALYSIS

### A. Class Claim for Equal-Protection Violation Against the DHS Defendants Under *Bivens*

The "Fifth Amendment . . . does not itself contain a guarantee of equal protection, but instead incorporates, as against the federal government, the Equal Protection Clause of the Fourteenth Amendment." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citing *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954)). The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform*, 648 F.3d at 379 (quoting *Club Italia Soccer & Sports Org. v. Charter Twp. Of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006), *overruled on other grounds as recognized by Davis v. Prison Health Servs.*, 679 F.3d 433, 442 n.3 (6th Cir. 2012)).

In the law-enforcement context, a plaintiff can establish an equal-protection violation for

racially "selective enforcement of facially neutral criminal laws" by "demonstrat[ing] that the challenged law enforcement practice 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533–34 (6th Cir. 2002) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)) [hereinafter "*FLOC*"]; *cf. id.* at 533 ("[I]f the plaintiffs can show that they were subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop, that would be sufficient to demonstrate a violation of the Equal Protection Clause."). Discriminatory effect can be shown by identifying "a similarly situated individual who was not investigated or through the use of statistical or other evidence which 'address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" *Id.* at 534 (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001)). Whether the conduct was "motivated by intentional discrimination 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" under the totality of relevant information, including whether the practice "bears more heavily on one race than another." *Id.* (second set of internal quotation marks omitted) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), and *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Discriminatory intent requires that the actor be motivated at least in part "because of," not merely "in spite of," adverse effects on the target group. *Id.* (cleaned up).

For well over a century, constitutional violations by those acting under color of state law have been actionable for damages in federal court under 42 U.S.C. § 1983. No statute, however, authorizes suits for damages against federal agents who violate the Constitution. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). This has led the Supreme Court to find implied causes of action within the Constitution itself for certain kinds of violations, beginning with the landmark

Fourth Amendment case *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971):

> In 1871, Congress passed a statute that was later codified at Rev. Stat. § 1979, 42 U.S.C. § 1983.  It entitles an injured person to money damages if a state official violates his or her constitutional rights.  Congress did not create an analogous statute for federal officials.  Indeed, in the 100 years leading up to *Bivens*, Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government.
>
> In 1971, and against this background, this Court decided *Bivens*.  The Court held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the [Fourth Amendment's] prohibition against unreasonable search and seizures.

*Abbasi*, 137 S. Ct. at 1854.  After *Bivens*, however, the Supreme Court found implied causes of action in only two other cases:

> In *Davis v. Passman*, 442 U.S. 228, . . . (1979), an administrative assistant sued a Congressman for firing her because she was a woman.  The Court held that the Fifth Amendment Due Process Clause[8] gave her a damages remedy for gender discrimination.  *Id.*, at 248–249, . . .  And in *Carlson v. Green*, 446 U.S. 14, . . . (1980), a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma.  The Court held that the Eighth Amendment Cruel and Unusual Punishments Clause gave him a damages remedy for failure to provide adequate medical treatment.  See *id.*, at 19, . . . .  These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.

*Id.* at 1854–55.  In the forty years since *Carlson*, the Supreme Court has rejected numerous attempts to extend *Bivens* beyond these three cases.  *See Hernandez v. Mesa*, 140 S. Ct. 735 (2020); *Abbasi*, 137 S. Ct. 1843; *Minneci v. Pollard*, 565 U.S. 118 (2012); *Wilkie v. Robbins*, 551 U.S. 537 (2007); *FDIC v. Meyer*, 510 U.S. 471 (1994); *Schweiker v. Chilicky*, 487 U.S. 412 (1988); *United States v. Stanley*, 483 U.S. 669 (1987), *Chappell v. Wallace*, 462 U.S. 296 (1983); *Bush v. Lucas*, 462 U.S. 367 (1983).  In short, the Supreme Court "has made clear that expanding

---

[8] The Fifth Amendment's Due Process Clause—"[n]o person shall be . . . deprived of life, liberty, or property, without due process of law"—encompasses equal-protection principles.  *See Davis*, 442 U.S. at 234 ("In numerous decisions, this Court [ ]has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws . . . ." (quotation omitted)).

the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi*, 137 S. Ct. at 1857 (citation omitted).

When considering whether to expand *Bivens* beyond its original scope, courts first assess "whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.'" *Hernandez*, 140 S. Ct. at 743 (citation omitted). A context is "new" if "it is 'different in a meaningful way from previous *Bivens* cases decided by'" the Supreme Court. *Id.* (citation omitted); *see also Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523 (6th Cir. 2020) (applying the "different in a meaningful way" standard). *Abbasi* provides a non-exhaustive list of potentially meaningful differences:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

137 S. Ct. at 1860.

"When . . . a claim arises in a new context," courts "proceed" to considering "whether there are any special factors that counsel hesitation about granting the extension." *Hernandez*, 140 S. Ct. at 743 (cleaned up). Separation-of-powers principles are central to this analysis, principally because Congress may doubt that a damages remedy is appropriate for the violation at hand and the judiciary is not always positioned to make a cost-benefit, policy-oriented analysis. *See id.*

In this case, the Court cannot extend a *Bivens* remedy to Plaintiffs' equal-protection claim under the Fifth Amendment. (Doc. 315, at 36 (alleging that "the DHS Defendants stopped, detained, searched, seized, and/or arrested Plaintiffs and the Class solely on the basis of Plaintiffs' and Class Members' race and ethnicity, in violation of the equal protection component

of the Due Process Clause of the Fifth Amendment").)  First, this action arises in a different

context than *Bivens*, *Davis*, and *Carlson*.  None of those cases dealt with a race-based equal-

protection claim under the Fifth Amendment.[9]  Indeed, *Bivens* and *Carlson* dealt with search and

seizure under the Fourth Amendment and cruel and unusual punishment under the Eighth

Amendment, respectively.  *Davis* involved gender discrimination under the Fifth Amendment,

meaning it traveled under the same constitutional provision as Plaintiffs' equal-protection claim.

But suing a Congressman who fired a woman because of her gender is a far cry from suing

dozens of federal immigration agents who allegedly raided a worksite and targeted Latinos for

detention and investigation under the legal framework that regulates immigration.  *See Abbasi*,

137 S. Ct. at 1864 ("[E]ven a modest extension is still an extension.").  Nor can this Fifth

Amendment equal-protection claim against immigration agents be fairly described as a "run-of-

the-mill challenge[] to 'standard law enforcement operations'" under the Fourth Amendment

---

[9] Plaintiffs cite *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106 (D. Conn. 2010), which extended a *Bivens* remedy in a context similar to the one before the Court.  In *Diaz-Bernal*, four teams of ICE agents:

> allegedly entered private residences without search warrants or consent, and arrested persons therein without arrest warrants or probable cause. . . . According to the plaintiffs, the defendants detained all of the plaintiffs before learning about their immigration status. . . . The defendants also did not inform the plaintiffs of their rights or why they were being seized, and the plaintiffs did not feel free to leave.  Although the plaintiffs' primary language [was] Spanish, the defendants coerced them into signing English forms with no or minimal translation.

758 F. Supp. 2d at 113.  The *Diaz-Bernal* court, however, extended a *Bivens* remedy without a "new context" analysis, as *Abbasi* and *Hernandez*—both decided after *Diaz-Bernal*—plainly require.  *See* 758 F. Supp. 2d at 128 (relying on *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007), for a two-part test that inquires (1) whether an alternative process could protect the plaintiffs' constitutional rights and provides a convincing reason to bar a *Bivens* remedy, and (2) whether special factors indicate that a court should not recognize a cause of action).  However persuasive *Diaz-Bernal* may be standing alone, the Court is skeptical that the holding could be sustained under current *Bivens* jurisprudence.

"that fall[s] well within *Bivens* itself." *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019).[10]

In sum, Plaintiffs' Fifth Amendment claim "bear[s] little resemblance to the three *Bivens* claims

the [Supreme] Court has approved in previous cases" and amounts to a "new context." *Abbasi*,

137 S. Ct. at 1860.

Second, special factors counsel hesitation. "Immigration enforcement is, at bottom,

about ensuring that only those foreign nationals who are legally authorized to be in the United

States remain present here." *Tun-Cos v. Perotte*, 922 F.3d 514, 526 (4th Cir. 2019). It

necessarily implicates diplomacy and foreign policy, and, in turn, the constitutional roles of the

non-judicial branches and related, concrete separation-of-powers concerns.[11] *See id.*; *cf. Arizona*

*v. United States*, 567 U.S. 387, 394–95 (2012) ("The [federal] Government . . . has broad,

undoubted power over the subject of immigration and the status of aliens. . . . This authority

rests, in part, on the National Government's constitutional power [under Article I, which

establishes Congress and enumerates its powers] to 'establish an uniform Rule of

---

[10] Plaintiffs simultaneously argue that Defendants were executing a "criminal [search] warrant"
sought by the IRS which "sets this case outside the immigration context" and within ordinary
law enforcement, and that the criminal warrant was not supported by probable cause and was
essentially pretext "to conduct an immigration raid." (Doc. 337, at 22; Doc. 339, at 19.)
Conversely, the DHS Defendants claim both that they "had the right to detain Plaintiffs pursuant
to the [criminal] search warrant" and that they "were enforcing immigration laws under the
Immigration and Nationality Act . . . not criminal law," meaning "this case arises in a new
context." (Doc. 329, at 32; *id.* at 7.)

[11] While various other courts have concluded that immigration enforcement involves "national
security," this Court cannot go so far on the record before it. Far from posing any kind "national
security" threat, the alleged details of this raid indicate that federal officers detained Plaintiffs at
a workplace purely to enforce immigration laws, not because Plaintiffs posed any particular
heightened threat to national security. Generalized "national security" is no reason to decline a
*Bivens* remedy in this case. *Compare Abbasi*, 137 S. Ct. at 1862 ("[N]ational-security concerns
must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a
multitude of sins.'" (citation omitted)), *with Hernandez*, 140 S. Ct. at 747 ("Since regulating the
conduct of [immigration] agents at the [Mexican] border unquestionably has national security
implications, the risk of undermining border security provides reason to hesitate before
extending *Bivens* into this field.").

Naturalization,' . . . and its inherent power as sovereign to control and conduct relations with foreign nations." (quoting U.S. Const. art. I, § 8, cl. 4; other citations omitted)). Indeed, "immigration enforcement is 'a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the judiciary to interfere.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858); *see also id.* (listing provisions of the Immigration and Nationality Act and its implementing regulations that control the availability of remedies in the immigration context); *cf. Arizona*, 567 U.S. at 395 ("Federal governance of immigration and alien status is extensive and complex."). That Congress has not provided a damages remedy in the context before the Court, despite creating and frequently altering the relevant legal framework that the Constitution explicitly authorizes it to devise, is all the more reason to conclude that the Court should not attempt to augment Congress's lawmaking efforts with a freestanding damages remedy.[12] *See id.* at 526–27; *see also Abbasi*, 137 S. Ct. at 1865

---

[12] Plaintiffs also cite *Elhady v. Pew*, 370 F. Supp. 3d 757 (E.D. Mich. 2019), and *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018). *Elhady* extended a *Bivens* remedy to a Fifth Amendment due-process claim for "imposing torture or cruel and unusual punishment conditions on non-convicted detainees" where the plaintiff alleged that U.S. Customs and Border Protection agents intentionally decreased temperatures in his holding cell prior to detention, took his jacket and shoes, and ignored his begging for help while suffering "dehydration, shock, and hypothermia" before falling unconscious and being transported to a hospital. 370 F. Supp. 3d at 764–65. The *Elhady* court concluded that despite being a new context, "national security" was not a special factor counseling hesitation—relying primarily on *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), *vacated and remanded by* 140 S. Ct. 1258 (2020) (mem.)—but did not meaningfully address other possible special factors.

*Lanuza* extended a *Bivens* remedy to a Fifth Amendment due-process claim where "a federal immigration prosecutor submitted falsified evidence in order to deprive [the plaintiff] of his right to apply for lawful permanent residence." 899 F.3d at 1027. The Ninth Circuit held that the case was a new context but that special factors did not counsel hesitation because (1) the prosecutor's actions were not federal policy and in fact violated federal criminal law; (2) immigration law enforcement does not reach criminal acts; (3) the case involved "a single low-level federal officer" and so would not unacceptably "burden the Executive Branch"; (4) Congress had not manifested an intent to preclude damages against "attorneys intentionally manipulating evidence to deprive immigrants of rights under U.S. laws"; (5) judges are "well-equipped to weigh the costs of constitutional violations that threaten the credibility of our judicial system," i.e., "the

("[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation.").  In sum, there is at least some reason to doubt that Congress believes a damages remedy is warranted in this context, and, therefore, special factors counsel hesitation.  Accordingly, the Court cannot extend a *Bivens* remedy to the present case.  Plaintiffs' first cause of action will therefore be dismissed.

### B.  Class Claim for Unreasonable Seizure and Arrest Against the DHS Defendants Under *Bivens*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "A warrantless seizure is presumptively unreasonable," with a few key exceptions. *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009).  First, a "temporary involuntary detention," or "*Terry* stop," is permissible if "predicated upon 'reasonable suspicion.'"  *Id.*  "The officer must have a particularized and objective basis for suspecting wrongdoing" given the "totality of the circumstances," though the likelihood of criminal activity "need not rise to the level of probable cause."  *Id.* at 773 (citing *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir.

---

submission of false evidence"; and (6) there is little risk of a "'deluge' of potential claimants seeking to avail themselves of this particular *Bivens* action.'"  *Id.* at 1028–34.

*Elhady* did not address many of the special factors that the DHS Defendants raise in this case. *Lanuza*'s special-factors analysis is thorough, but some of the key rationales do not apply here. First, this was not a single low-level officer, but instead a coordinated and large-scale immigration raid that the Government routinely undertakes.  *See De La Paz v. Coy*, 786 F.3d 367, 379 (5th Cir. 2018).  Second, the alleged constitutional violations here are not the sort that implicate judicial process, but instead go to the heart of Congress's authority to create immigration laws and the Executive Branch's authority to enforce them.  *Id.* at 379.  And, third, given the number of undocumented immigrants in this country and the Executive Branch's extensive efforts to remove them, the Court cannot conclude that a *Bivens* remedy in the immigration-raid context would fail to yield a "deluge" of litigation.  *Id.* at 379–80 ("There are over 11 million illegal aliens in the United States. . . . In 2013, the federal government apprehended 662,483 illegal aliens."  (citations omitted)).  In sum, *Lanuza* does not support the extension of a *Bivens* remedy to this case.

2008)); *see also id.* at 776 ("We have recognized the importance of allowing police officers to draw reasonable inferences from their observations in light of their specialized training and experience."). And while an encounter between law enforcement and a civilian may begin consensually or without seizure, the encounter "becomes a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 772 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Second, a warrantless arrest is permissible but "must be based upon probable cause." *Id.* (cleaned up).

The Court must determine whether to extend a *Bivens* remedy to Plaintiffs' Fourth Amendment class-action claim against the DHS Defendants, which entails only unlawful seizure and detention. Plaintiffs disavow any excessive-force component of this claim. (Doc. 337, at 47 ("The DHS Defendants misconstrue Plaintiffs' [class-action Fourth Amendment] claim as a class-wide excessive force claim. . . . The Cause of Action is titled 'Unreasonable Seizures and/Or Arrests in Violation of the Fourth Amendment,' . . . and the paragraphs describing the claim clearly allege an unjustified seizure."); *id.* at 44–45 (describing the Fourth Amendment causes of action as "(1) the unlawful seizure and prolonged detention of the Latino workers (Second Cause of Action); (2) the unlawful arrest of five named Plaintiffs (Sixth Cause of Action); and (3) excessive force against Plaintiffs Guerrero and Bautista Martínez (Seventh and Eighth Causes of Action)); *id.* at 45 n.3 (further explaining that the "other named Plaintiffs do not allege excessive force claims")).

*Bivens* was a Fourth Amendment case, which might suggest that this case arises in the same context. After *Abbasi* and *Hernandez*, however, such a conclusion is difficult to reach. *Abbasi* highlighted a non-exhaustive list of factors that would make a context meaningfully

different and therefore "new," including "the statutory or other legal mandate under which the officer was operating." 137 S. Ct. at 1860. Immigration agents conducted this raid to enforce immigration laws, rather than ordinary law-enforcement agents enforcing ordinary criminal law as in *Bivens*. Because "even a modest extension is still an extension," the Court must conclude, as above, that this a "new context." *Id.* at 1864. Accordingly, the Court must assess whether special factors counsel hesitation, and, for the same reasons set forth in connection with Plaintiff's equal-protection claim, the Court must answer this question affirmatively.

Accordingly, the Court cannot extend *Bivens* in connection with Plaintiffs' class claim for unreasonable seizure and arrests. Plaintiffs' second cause of action will be dismissed.

### C. Class Claim for Unreasonable Seizure and Arrest Against Defendant Worsham Under *Bivens*

The Fourth Amendment "mandates that warrants be based on the government's showing of 'probable cause' and include language 'particularly describ[ing] the place to be searched, and the persons to be seized.'" *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019) (quoting U.S. Const. amend. IV). The existence of probable cause for a search warrant turns not on "rigid tests" but on "a 'totality of the circumstances' approach." *United States v. Allen*, 211 F.3d 970, 972 (6th Cir. 2000) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). Probable cause often turns on the credibility of information provided by a confidential informant:

> We agree [with the lower court] that an informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of [their] report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . . Rather, . . . they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

*Gates*, 462 U.S. at 230 (footnote omitted); *see also Allen*, 211 F.3d at 972–73 (quoting and

applying this passage from *Gates*). "While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, . . . in the absence of any indicia of the informant['s] reliability, courts insist that the affidavit contain substantial independent [law enforcement] corroboration." *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (citations omitted). "Line-by-line scrutiny" of an affidavit in support of a warrant is "inappropriate in reviewing a magistrate's decisions," however, and courts must "accord the magistrate's determination great deference." *Allen*, 211 F.3d at 973 (cleaned up). "The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Id.* at 975.

IRS Agent Worsham sought, and the magistrate judge issued, a search warrant for the Plant allowing collection of various categories of "records, documents and materials . . . related to the financial activities of James Brantley, Southeastern Provision[], LLC, and/or entities owned by James Brantley and/or any related entities to Southeastern Provision[], LLC from January 1, 2013 to the present." (Doc. 315-1, at 6.) Agent Worsham's affidavit totaled 22 pages (plus four pages of attachments) and detailed Worsham's investigation of Brantley and the Plant's operations. (*See generally* Doc. 315-2.) Plaintiffs attached the affidavit to their pleadings. (*See id.*)

Plaintiffs allege that "the IRS search warrant was not supported by probable cause," that Worsham "secured [the] search warrant by providing the Court with a false and misleading affidavit," that any false statements or material omissions were "deliberately and/or recklessly made," and, at bottom, that Worsham "misrepresented" to the Court a "plan to seize, detain and arrest as many as 100 workers" under the "pretext" of the search warrant. (Doc. 315, at 38–40.)

First, Plaintiffs argue that Worsham misrepresented that federal law-enforcement agents

were planning to conduct an immigration raid at the Plant. But the search warrant was sought and obtained by an IRS agent—Worsham—to locate evidence of suspected federal tax-law violations. While Plaintiffs rightly point out that omissions can be misleading, it is difficult to see how a plan to conduct a concurrent immigration raid could denude probable cause to believe that federal tax violations occurred at the Plant. *See Allen*, 211 F.3d at 975 ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."). And, to the extent Plaintiffs argue that the warrant amounted to circumvention of federal regulations governing removal, again, this does not denude probable cause to search the Plant for evidence of federal tax-law violations. In other words, a cause of action for improperly securing a search warrant cannot lie against Worsham just because another agency allegedly exploited the warrant to conduct its own search and seizure.

The primary case on which Plaintiffs rely does not contradict this conclusion. In *Perez Cruz v. Barr*, 926 F.3d 1128, 1133 (9th Cir. 2019), the Ninth Circuit held that ICE agents violated removal regulations (which are at least as restrictive as the Fourth Amendment) when they "implemented a preconceived plan to 'target' over 200 factory workers for detention and for interrogation as to their immigration status" by "obtaining and implementing" a pretextual "search warrant for employment records at the factory." The Ninth Circuit, however, did not conclude that the search warrant was unsupported by probable cause. *See generally id.* Rather, it concluded that the ICE agents violated their regulations and the Fourth Amendment because they intended to use the search warrant as a pretextual basis for mass detention—detention without individualized, reasonable suspicion—and were not conducting ordinary detentions incident to the lawful execution of a search warrant under *Michigan v. Summers*, 452 U.S. 692 (1981). Accordingly, the Ninth Circuit held that the petitioner was "entitled to suppression of

the evidence gathered" in violation of "an ICE regulation (as well as the Fourth Amendment)"
and remanded to the Board of Immigration Appeals with instructions "to dismiss [the] removal
proceedings [against a detainee from the raid] without prejudice." *Id.* at 1146. Critically, the
search warrant itself was not held improper, but only the mass detention initiated by ICE agents.
*Perez Cruz* therefore does not bear upon whether Worsham improperly secured the search
warrant.[13]

Second, Plaintiffs argue that the affidavit failed to establish the Informant's credibility,
that the Informant's observations were not independently corroborated, that the bank personnel's
statements were not independently corroborated, that Worsham's statements about his training
and experience were conclusory, and that Worsham's calculations did not square with his
conclusions. For example, they point out that the Informant at one point observed thirty to forty
employees, but that aerial surveillance showed eighty or more vehicles at the Plant, undermining
the Informant's credibility. As another example, they argue that Worsham's calculations
indicate that at least some of the cash withdrawal must not have been used for payroll, and that
he articulated no basis for thinking that jobs like fork-lift driver or production-line workers are
not usually paid $72.14 per hour. This is precisely the sort of line-by-line scrutiny that courts
should avoid. *See Allen*, 211 F.3d at 973. Worsham's recounting of the investigation of the
bank records, information from bank personnel, surveillance of Southeastern Provision's
representatives, and aerial surveillance of the Plant are sufficient to corroborate the Informant's
observations. Indeed, statements by confidential informants known to law enforcement have
been found adequately corroborated by much less. *See United States v. May*, 399 F.3d 817, 824

---

[13] *Perez Cruz* does suggest that the ICE agents in this case may have violated the Fourth
Amendment. As detailed above, however, the Court cannot imply a civil damages remedy under
the Fourth Amendment in this context.

(6th Cir. 2005) ("The additional evidence substantiating an informant's reliability need not be obtained from a source unrelated to the confidential informant—e.g., an independent police investigation or a second confidential informant—but may be *any set of facts that support the accuracy of the information* supplied by the informant." (emphasis added)). Exactitude is neither realistic nor required by the Fourth Amendment. *See United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008) ("Our inquiry requires the review of the totality of the circumstances 'to make a practical, commonsense,' not hyper-technical, determination of whether probable cause is present." (quoting *Gates*, 462 U.S. at 238)). Worsham's affidavit set forth a sufficient basis for the magistrate to find probable cause, and the minor inconsistencies that Plaintiffs identify do not plausibly show that Worsham delivered false or misleading statements to obtain the warrant.

The Court concludes that Plaintiffs have not plausibly pleaded a constitutional violation by Worsham in his efforts to obtain the IRS search warrant. Accordingly, the Court needs neither to further assess qualified immunity on this issue nor to determine whether a *Bivens* remedy can be extended to Plaintiffs' claim against Defendant Worsham. Plaintiffs' third cause of action will be dismissed.

### D. Class Claim for Conspiracy to Deprive Equal Protection Against All Individual Defendants Under 42 U.S.C. § 1985(3)

42 U.S.C. § 1985(3) "creates a cause of action for a conspiracy between two or more persons to deprive another of the equal protection of the laws." *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019). The Supreme Court has articulated four elements required to establish a cause of action under § 1985(3):

> To come within [§ 1985(3)] a complaint must allege that the defendants did (1) "conspire or go in disguise on the highway or on the premises of another" (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did,

or caused to be done, "any act in furtherance of the object of (the) conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

*Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971); *see also Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 993 (6th Cir. 1994) (applying the *Griffin* elements). A § 1985(3) plaintiff must "prove that the conspiracy was motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus,'" though the class "must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender." *Haverstick Enters.*, 32 F.3d at 994 (quoting *United Brotherhood of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983)).

Defendants argue that: (1) § 1985(3) does not apply to federal officers, (2) even if it does apply, its application is not clearly established such that Defendants are entitled to qualified immunity, (3) the intracorporate-conspiracy doctrine bars these particular claims, and (4) even if these claims are not barred by the intracorporate-conspiracy doctrine, it is not clearly established that the doctrine does not apply such that Defendants are entitled to qualified immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The doctrine is designed to preclude liability unless "it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation [they] confronted.'" *Abbasi*, 137 S. Ct. at 1866–67 (citations omitted). Qualified immunity seeks to strike "a proper balance" between the vindication of rights through damages suits and the prevention of undue liability for reasonable, if ultimately mistaken, judgments. *Id.* at 1866.

The parties agree that neither the Sixth Circuit nor the Supreme Court has held directly that § 1985(3) applies to federal officers. "[A]bsent controlling authority," a "robust 'consensus

of cases of persuasive authority'" must clearly establish the right at issue to preclude qualified immunity. *al-Kidd*, 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

Plaintiffs cite decisions from Second, Seventh, Eighth, Ninth, and Tenth Circuits concluding that § 1985(3) applies to federal officials, as well as two district courts from the Sixth Circuit. *Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir. 2007) (reasoning that the Supreme Court's decision in *Griffin*, which extended § 1985(3) to private conspiracies, compels the conclusion that "§ 1985(3) applie[s] to federal officials"), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Jafree v. Barber*, 689 F.2d 640, 643 (7th Cir. 1982) (explaining the § 1981 cause of action against federal officials for race discrimination and noting "[m]oreover, the allegation of conspiracy (and an act by one of the conspirators) to further such purposeful discrimination states a cause of action under 42 U.S.C. § 1985(3)" (citation omitted)); *Federer v. Gephardt*, 363 F.3d 754, 758 (8th Cir. 2004) ("Unlike 42 U.S.C. § 1983 . . . the scope of § 1985(3) is considerably broader and can reach conspiracies composed of federal officers or federal employees."); *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980) (accepting argument that § 1985 "does not require action under the color of state law" because it "is derived from the thirteenth amendment and covers all deprivations of equal protection of the laws and equal privileges and immunities under the laws," including by federal officers); *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 931 (10th Cir. 1975) (reviving claim that "individual [federal] defendants other than the Secretary of Interior conspired to deprive [the plaintiffs] of equal protection or equal privileges and immunities contrary to 42 U.S.C. § 1985"); *see also Muniz-Muniz v. U.S. Border Patrol*, No. 3:09 CV 2865, 2012 WL 5197250, at *6 (N.D. Ohio Oct. 19, 2012) (noting that § 1985(3) reaches conspiracies by federal officers), *rev'd on other grounds by* 741 F.3d 668 (6th Cir. 2013); *Bergman v. United States*, 551 F. Supp. 407, 414

(W.D. Mich. 1982) (noting that "§ 1985(3) applie[s] to federal officers acting under color of federal law"). Plaintiffs have identified substantial persuasive authority that § 1985(3) provides a cause of action against federal agents acting under color of federal law. *See Davis v. Samuels*, 962 F.3d 105, 114 (3d Cir. 2020) ("A significant consensus among our sister Courts of Appeals is that *Griffin* has rendered untenable the argument that § 1985(3) is inapplicable to those acting under color of federal law.").[14] And, indeed, in the 2017 *Abbasi* decision, the Supreme Court assumed that § 1985(3) applies to federal officers but granted qualified immunity on other grounds, suggesting—if not directly holding—that these lower-court cases were not wrongly decided. 137 S. Ct. at 1865–66 (assuming § 1985(3) applies to federal officials and proceeding to grant qualified immunity due to legal uncertainty surrounding the intracorporate-conspiracy doctrine).

Defendants cite a Fifth Circuit case and a district court case to the contrary. In *Cantú v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019), the Fifth Circuit observed:

> Our precedent holds § 1985(3) does not apply to federal officers. In *Mack v. Alexander*, 575 F.2d 488 (5th Cir. 1978) (per curiam), we concluded § 1983 and § 1985 "provide a remedy for deprivation of rights under color of state law and do not apply when the defendants are acting under color of federal law." *Id.* at 489; *accord Bethea v. Reid*, 445 F.2d 1163, 1164 (3d Cir. 1971).[15] Other circuits have criticized that holding for failing to grapple with Supreme Court precedent. *See, e.g.*, *Iqbal v. Hasty*, 490 F.3d 143, 176 n.13 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 . . . (2009); *Ogden v. United States*, 758 F.2d 1168, 1175 n.3 (7th Cir. 1985). And the Supreme Court recently assumed § 1985(3) applies to federal officers. *See Ziglar v. Abbasi*, ––– U.S. ––– –, 137 S. Ct. 1843, 1865–69 . . . (2017). *Mack* may not have aged well, but we need not decide whether it remains binding on us.

---

[14] *Davis* went on to "join many of our sister Circuits in holding that § 1985(3) can redress conspiracies to violate constitutional rights involving those acting under color of federal law." 962 F.3d at 115. Although *Davis* itself was decided in 2020 and does not bear upon whether the law was clearly established prior to the raid, it bears noting that *Davis* relies upon cases which predated the raid by years and even decades.

[15] Since overruled by *Davis*, 962 F.3d at 115.

*Cantú* quite plainly fails to contradict the decisions of other Courts of Appeals, and, in fact, concedes that the Fifth Circuit's outlier, per curiam precedent from 1978 "may not have aged well." *Id.* And, while *Alharbi v. Miller*, 368 F. Supp. 3d 527 (E.D.N.Y. 2019) concluded that § 1985(3) does not extend to federal officers, it did not grapple with any decisions by Courts of Appeals and cannot reasonably be understood to contravene them in a serious way. Finally, in reply, Defendants cite *Burch v. Blouir*, 831 F.2d 293, 1987 WL 44944, at *2 (6th Cir. 1987) (table), for the proposition that "a § 1985(3) claim cannot rest on a violation of the Fourth Amendment," or, at least, that a reasonable officer in the Sixth Circuit could have so understood. (Doc. 347, at 45.) It is evident from the face of the statute that a § 1985(3) claim must rest on an equal-protection violation, and, indeed, the crux of Plaintiffs' § 1985(3) claim is a race-based deprivation of equal protection:

> By agreeing to stop, detain, search, seize, and/or arrest Plaintiffs and the Class solely on the basis of their Latino race and ethnicity, Defendants conspired to deprive Plaintiffs and the Class of the equal protection of the law of the United States, in violation of 42 U.S.C. § 1985(3).

(Doc. 315, at 40.) That Defendants allegedly *also* contravened the Fourth Amendment while conspiring to commit race-based equal-protection violations cannot reasonably be understood, under *Burch*—which held only that an alleged Fourth Amendment violation alone is not actionable under § 1985(3)—to preclude a remedy for conspiracy to deprive individuals of equal protection on the basis of race under § 1985(3). *See Burch*, 1987 WL 44944, at *2 ("Finally, to the extent that plaintiff's allegations of conspiracy relate to the search of his apartment, we agree with the district court's conclusion that such a claim is based on the [F]ourth [A]mendment and the right to due process, and is, therefore, not cognizable under § 1985(3)."). Accordingly, § 1985(3) does apply to federal officers, and the great weight of persuasive authority at the time of the raid clearly established that federal officers can be liable for conspiracy under § 1985(3).

Under the intracorporate-conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Id.* at 1867. While the Supreme Court has never applied the intracorporate-conspiracy doctrine to the § 1985(3) context, it has noted "a division in the courts of appeals . . . respecting the validity or correctness of the intracorporate-conspiracy doctrine with reference to § 1985 conspiracies." *Id.* at 1868. In *Abbasi*, the Court ultimately declined to decide the question and granted qualified immunity because a reasonable official could have thought that the intracorporate-conspiracy doctrine would bar conspiracy liability among individuals in the same federal department:

> These considerations suggest that officials employed by the same governmental department do not conspire [under the intracorporate-conspiracy doctrine] when they speak to one another and work together in their official capacities. Whether that contention should prevail need not be decided here. It suffices to say that the question is sufficiently open so that the officials in this suit could not be certain that § 1985(3) was applicable to their discussions and actions. Thus, the law respondents seek to invoke cannot be clearly established. It follows that reasonable officers in petitioners' positions would not have known with any certainty that the alleged agreements were forbidden by law.

*Id.* at 1868–69.

Plaintiffs argue that IRS and DHS officers are not part of the same "entity" and therefore can conspire, or, alternatively, that the involvement of the Tennessee Highway Patrol in the raid bars application of the intracorporate-conspiracy doctrine. The first argument fails, for it is not clearly established that the intracorporate-conspiracy doctrine fails to protect planning between officers of different departments within the Executive Branch. *See, e.g.*, *K.O. v. U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350, 370 (D.D.C. 2020) (holding that whether the intracorporate-conspiracy doctrine "applies to conversations and planning . . . across executive departments" is "sufficiently open that the issue is not 'beyond debate'" for purposes of qualified immunity

(citation omitted)).[16] The second argument prevails, however, because the intracorporate-conspiracy doctrine plainly applies only to individuals within the same legal entity. *See Abbasi*, 137 S. Ct. at 1867 ("[A]n agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy."). No reasonable officer could believe that Tennessee Highway Patrol officers—who are employed by a Tennessee state agency—are part of the same legal entity as federal IRS and DHS officers.

Defendants do "not argu[e] that Plaintiffs cannot state a conspiracy claim because no one from THP is a defendant" (Doc. 347, at 45 n.35) but instead assert that the conspiracy-claim section of Plaintiffs' complaint references only "Defendants" (i.e., not THP) and inadequately pleads that Defendants and THP formed a conspiratorial agreement to deprive Plaintiffs of equal protection of the laws. While Defendants assert that the standard for pleading conspiracy claims is relatively strict, it is not so strict that the Court must ignore the gravamen of Plaintiffs' complaint, nor that its conspiracy-claim section "reallege[s] and incorporate[s] by reference each and every allegation contained" in prior paragraphs. (Doc. 315, at 40.) And, indeed, a prior paragraph alleges "[o]fficers of the IRS, ICE, HSI, ERO, CBP, and THP conspired to plan and execute the forceful, prolonged, and unlawful seizure of the Plant's Latino workforce solely on the basis of their race or ethnicity, and without reasonable suspicion, probable cause, or other lawful authority." (*Id.* at 5.) The complaint further references Worsham's sworn statement that "IRS-CID, Homeland Security Investigations . . ., and Tennessee Highway Patrol, Criminal Investigative Division . . . are conducting an investigation of Southeastern Provision and its owners." (Doc. 315-2, at 7.) Contrary to Defendants' arguments, the complaint is shot through with allegations that the agents planning the raid—which included THP officers, who

---

[16] Though decided in 2020, the result flowed directly from *Abbasi* and other pre-raid cases.

participated in the raid by blocking the road, surrounding the Plant, and pointing machine guns at Plaintiffs—intentionally used the search warrant as a pretext to target Latino workers for illegal arrests, claims bolstered by related allegations that agents detained only Latinos, pointed firearms only at Latinos, handcuffed only Latinos, transported only Latinos to the Armory, hurled racial slurs only at Latinos, physically harmed only Latinos, humiliated only Latinos, and all the while allowed white individuals who also worked at the Plant to stand by unmolested, despite that white individuals were the ostensible targets of the IRS investigation. (*See generally* Doc. 315.) Defendants also argue that even if the raid *resulted* in race-based constitutional violations, it was not *planned* to do so, but at this stage, that is necessarily an inferential conclusion—and the Court must draw reasonable inferences from the facts alleged in favor of Plaintiffs. Indeed, it is far more reasonable to infer from the facts alleged that the raid was planned to be executed in the way described, as opposed to dozens of officers coincidentally executing it in the same manner. And while Defendants argue that their targeting of Latinos was permissible based upon the knowledge contained in Worsham's affidavit,[17] the alleged method of execution is sufficient to plausibly show that the raid "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019) (internal quotation marks omitted) (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005)). In sum, Plaintiffs have stated a claim under 42 U.S.C. § 1985(3), meaning dismissal on the pleadings would be improper.

---

[17] Given that the affidavit was sworn by an IRS agent, this argument further confirms a close inter-connection between the agencies conducting the Raid. But it is noteworthy that ICE agents argue they derived reasonable suspicion and probable cause for immigration-related detentions and arrests from an IRS agent's conclusions, given that Worsham's training, affidavit, and investigatory purview focus on tax and currency violations, not alien identification, detention, and removal.

### E. Class Claim for Failure to Prevent Equal-Protection Deprivation Against All Individual Defendants Under 42 U.S.C. § 1986

42 U.S.C. § 1986 "establishes a cause of action against anyone 'having knowledge that any of the wrongs conspired to be done [as described in § 1985]' and 'having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.'" *Thurmond v. Cnty. of Wayne*, 447 F. App'x 643, 650 (6th Cir. 2011) (quoting 42 U.S.C. § 1986). "Dismissal of a § 1986 claim is proper if a plaintiff fails to state a cause of action under § 1985." *Id.*

Defendants move to dismiss Plaintiffs' § 1986 claim only on the basis that their § 1985(3) claim should also be dismissed. Having concluded that Plaintiffs' § 1985(3) claim should not be dismissed, the Court has no basis to dismiss their § 1986 claim.

### F. Individual Claims by the Named Plaintiffs for Unreasonable Seizure and Arrest Against the DHS Defendants Under *Bivens*

The Sixth Cause of Action is an individual Fourth Amendment *Bivens* claim asserted only by the Named Plaintiffs. It is not, however, substantively distinguishable from the Fourth Amendment *Bivens* claim brought on behalf of the class and is dismissed for the same reasons given above.

### G. Plaintiff Guerrero's Claim for Excessive Force Against the "Assaulting Officer" Under *Bivens*

When a government agent allegedly "used excessive force during the process of an arrest, seizure, or investigatory stop," courts "perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances." *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers

are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97 (citations omitted).  Relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 397.

The DHS Defendants do not move to dismiss Plaintiff Guerrero's Fourth Amendment excessive-force claim against the "Assaulting Officer"—who allegedly punched him in the face without provocation—brought pursuant to *Bivens*, but Defendant John Witsell appeared through separate counsel and has done so.[18]  Defendant Witsell argues that (1) the complaint states no specific facts against him, so he should be dismissed; (2) a *Bivens* remedy should not be recognized against him; and (3) he is entitled to qualified immunity as to Plaintiff Guerrero's excessive-force claim.

While it is true that some particularity is required to state a claim for damages against a government agent, that argument has limits:

> Although "damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right," . . . courts are disinclined to dismiss complaints that fail to allege specific conduct  by each officer when the officers' actions have made them impossible to identify.

*Greer v. City of Highland Park, Mich.*, 884 F.3d 310, 315–16 (6th Cir. 2018) (citations omitted) (emphasis in original).  A contrary rule "would risk immunizing officers to Fourth Amendment

---

[18] For context:  though Witsell admits nothing at this stage, the DHS Defendants state that "Defendant Witsell initially encountered Plaintiff Guerrero, not any of the DHS Defendants." (Doc. 329, at 28.)

claims" by allowing dismissal on the pleadings "so long as they successfully disguised their identities." *Id.* at 316. While *Greer* involved masked officers, the Court concludes that dozens of officers swarming into a crowded meat-processing facility with guns drawn and pointed at individuals who, in many cases, do not speak English is also the kind of situation in which the officers' actions preclude identification. Moreover, as in *Greer*, "the parties here do not dispute that a raid of the [Plant] occurred, and the [Defendant] officers have been identified as the parties who executed the search warrant." *Id.* Accordingly, blanket dismissal of claims against Defendant Witsell is unwarranted.

Defendant Witsell incorporates the DHS Defendants' argument that a *Bivens* remedy should not be extended to Plaintiff Guerrero's excessive-force claim. Notably, however, the DHS Defendants effectively concede that excessive-force claims are actionable under *Bivens* in the immigration context. *See, e.g.*, *De La Paz*, 786 F.3d at 374 (noting that prior Fifth Circuit decisions "permit *Bivens* actions against immigration officers who deploy unconstitutionally excessive force when detaining immigrants on American soil" because "'[t]here are . . . no identifiable national interests that justify the wanton infliction of pain'" (quoting *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 623 (5th Cir. 2006)).

For the reasons set forth above, the Court concludes that Plaintiff Guerrero's excessive-force claim similarly arises in a "new context." However, special factors do not counsel hesitation in extending a *Bivens* remedy to Plaintiff Guerrero under these circumstances.

First, no separation-of-powers interest is vindicated by declining to recognize a *Bivens* remedy for unconstitutionally excessive force in the immigration-enforcement context. *See Abbasi*, 137 S. Ct. at 1857 ("When a party seeks to assert an implied cause of action under the Constitution itself, . . . separation-of-powers principles are or should be central to the analysis.").

Whatever interest Congress and the Executive Branch have in creating and vigorously enforcing immigration laws and weighing related costs and benefits, the interest does not stretch so far as to include the application of unconstitutional force; unconstitutional force is, by definition, at odds with the legitimate goals of law enforcement. Therefore, such force does not serve a congressional purpose.

Second, the unconstitutional application of force is not a federal immigration policy, and the Court is not interfering with federal policy by recognizing a damages remedy for it. Indeed, the allegations here suggest some subset of officers applied excessive force against particular individuals, while dozens of other officers apparently did not. The use of excessive force against an individual on American soil during a guns-drawn, mass immigration raid animated only by an IRS search warrant cannot be fairly conflated with federal immigration policy and therefore placed beyond the reach of *Bivens*.

Third, there is no reason to fear a deluge of *Bivens* excessive-force litigation arising from immigration enforcement. The federal government's removal efforts are prolific, and a generalized Fourth Amendment *Bivens* remedy in the immigration context could indeed flood the courts. But excessive-force claims are the immigration-enforcement exception, not the rule. Accordingly, the judiciary need not fear the consequences of vindicating the constitutional right to be free of excessive force in this context. In sum, special factors do not counsel hesitation in extending a *Bivens* remedy to Plaintiff Guerrero's excessive-force claim.

Defendant Witsell also argues that he is entitled to qualified immunity on Plaintiff Guerrero's excessive-force claim. But Plaintiff Guerrero plausibly alleges the violation of a clearly established right.

> A short, white, male federal officer, who was armed . . ., approached Plaintiff
> Guerrero and shouted at him to come towards him. Plaintiff Guerrero attempted to

comply with his orders.  The [a]ssaulting [o]fficer then simultaneously made a fist and intentionally struck Plaintiff Guerrero in the face.

(Doc. 315, at 32; *see also id.* at 43 (alleging unconstitutionally excessive force for the "intentional[]" striking of Plaintiff Guerrero's face).[19])

First, all three *Graham* factors weigh in Plaintiff Guerrero's favor.  On the allegations presented, it is not obvious what particular crime law enforcement could have had probable cause to believe that Plaintiff Guerrero, in particular, had committed.[20]  The "severity of the crime at issue" weighs against the use of force when it is not apparent what crime, if any, had been committed.  *Graham*, 490 U.S. at 396.  And even if Plaintiff Guerrero committed a criminal infraction, such as misdemeanor failure to register, *see* 8 U.S.C. §§ 1302, 1306, these kinds of essentially administrative immigration infractions are not, standing alone, severe enough to warrant a strike in the face during arrest.  This is especially true given that Plaintiff Guerrero was

---

[19] Defendant Witsell argues that any other components of the arrest—including a pat-down that followed the zip-tie restraints—did not entail excessive force.  Plaintiff Guerrero does not appear to allege that the force applied in those respects was excessive, nor does he argue that such claims should be preserved, confirming that the amended complaint alleges excessive force only as to the striking of Plaintiff Guerrero's face.

[20] *See Arizona*, 567 U.S. at 407 ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").  Defendants argue that this language in *Arizona* is not supported by its ostensible source, *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).  *Lopez-Mendoza* explains that "[a] deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."  *Lopez-Mendoza*, 468 U.S. at 1038.  It cites 8 U.S.C. §§ 1302, 1306, and 1325, which currently provide in relevant part that aliens (1) fourteen years of age or older, (2) who have not been registered and fingerprinted by federal authorities, and (3) who remain in the United States for thirty days or longer, must "apply for registration and . . . be fingerprinted before the expiration of such thirty days," 8 U.S.C. § 1302(a), and that an alien who must comply with these requirements but who "willfully fails or refuses to make such application or to be fingerprinted . . . shall be guilty of a misdemeanor," 8 U.S.C. § 1306(a).  It appears, then, that *Arizona* was attempting to state that *mere presence* is not actionable, while *Lopez-Mendoza* refers to aliens who remain present but fail to abide the statutory registration and fingerprinting requirements.  Whatever crime, if any, Plaintiff Guerrero actually committed, the allegations do not show that law enforcement would have had probable cause to believe that he had committed any particular crime at the time of detention.

not "pos[ing] an immediate threat to the safety of the officers or others." *Id.* The allegations reflect no aggression on Plaintiff Guerrero's part, and while Defendant Witsell makes much of the presence of knives and other tools one would expect to find in a meatpacking plant, the allegations do not connect any particular tool to Guerrero. (*See* Doc. 315, at 32.) That meat-cutting tools are in the same building as an individual cannot reasonably be understood to render that individual an "immediate threat" such that a punch in the face is warranted. *Graham*, 490 U.S. at 396. Finally, the allegations do not reflect that Plaintiff Guerrero was "actively resisting arrest or attempting to evade arrest by flight." *Id.* Defendant Witsell argues that Plaintiff Guerrero alleged he was only "attempting to comply," meaning he did not actually comply with the officer's instructions. Plaintiff Guerrero asserts that he "attempted" to comply but was prevented from doing so by being struck in the face. (Doc. 315, at 43 ("Plaintiff Guerrero was attempting to comply . . . when the officer approached.").) The ambiguity as to Plaintiff Guerrero's "attempt" must be resolved in his favor, but even if it were not, punching a person in the face is not a reasonable response to what was, at most, passive resistance.

"A suspect's right to be free from excessive force from arresting officers is clearly established." *Malory v. Whiting*, 489 F. App'x 78, 85 (6th Cir. 2012) (citing *Beltz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011). Indeed, since at least 2006, it has been clearly established that striking the head of an unrestrained but non-resistant individual is unconstitutional. *See Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) (holding that a reasonable factfinder could "conclude that [an officer's] strike to [a suspect's] head was unjustified and excessive" after the suspect fled, then surrendered and complied).[21] Accordingly, qualified

---

[21] The head-strike in *Baker* differs from the present allegations in two minor respects. First, the officer struck the suspect in the head with a baton. Second, the suspect raised his hands when the officer located him after fleeing. While the first distinction may suggest a different quantum of

immunity as to Plaintiff Guerrero's excessive-force claim is unwarranted. Defendant Witsell's motion to dismiss Plaintiff Guerrero's excessive-force claim will be denied.

### H. Plaintiff Bautista Martínez's Claim for Excessive Force Against the "Gun to the Head Officer" Under *Bivens*

No Defendant has moved to dismiss Plaintiff Bautista Martínez's Fourth Amendment excessive-force claim brought pursuant to *Bivens*.

### I. Individual Claims by Named Plaintiffs for False Imprisonment and False Arrest Against Defendant United States of America Under the Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA") "provides a limited sovereign immunity waiver and subject matter jurisdiction for plaintiffs to pursue state law tort claims against the United States." *Milligan v. United States*, 670 F.3d 686, 692 (6th Cir. 2012) (citing 28 U.S.C. § 1346(b)(1)). If "state law would impose liability against a private individual," then "the suit proceeds against the federal government 'in the same manner and to the same extent as a private individual under like circumstances.'" *Id.* (citing *Myers v. United States*, 17 F.3d 890, 894 (6th Cir. 1994), and quoting 28 U.S.C. § 2674). The FTCA is a limited grant of jurisdiction and waiver of sovereign immunity, so it must be strictly construed to the extent that it "excludes certain tort claims." *Id.* (citation omitted). Relevant here, it excludes certain intentional torts, though some intentional torts are actionable if committed by federal law-enforcement officers. 28 U.S.C. § 2680(h) (excluding "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with

---

excessive force used, a reasonable officer could not understand *Baker* as failing to preclude striking a non-resistant individual in the face with a fist instead of a baton. As for the second difference, Plaintiff Guerrero alleges that he never attempted to flee and did not resist arrest. A reasonable officer could not understand *Baker* to allow a head-strike because a non-evasive individual did not raise his hands in surrender.

contract rights," except that "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" are actionable when committed by federal law enforcement officers).

Plaintiffs Zelaya, Guerrero, Romulo Mendoza, Bautista Martínez, Zapote Hernández, Gonzalez Cruz, and Pulido allege false imprisonment and false arrest (collectively, "false arrest"[22]) under the FTCA. (Doc. 315, at 45.) Defendant United States of America ("United States," or the "Government") moves to dismiss—for failure to state a claim and lack of subject-matter jurisdiction—all FTCA false-arrest claims except those of Plaintiff Zelaya, who alleges that he is legally authorized to live and work in the United States.

"To successfully prosecute a claim of false arrest and imprisonment, the plaintiff must prove '(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint.'" *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). "[F]alse imprisonment requires that the defendant must have acted without probable cause." *Id.* (citation omitted).

The Government argues that the false-arrest claims (other than Zelaya's) fail to state a claim for relief, because undocumented aliens have "no right not to be detained," and therefore an unlawful detention that is actionable for damages could not have occurred. *De La Paz*, 786 F.3d at 379 (citing *Lopez-Mendoza*, 468 U.S. at 1048)).[23] Starting from this premise, *De La Paz*

---

[22] The parties agree that these torts, at least under the circumstances before the Court, are essentially the same.

[23] As a general matter, this assertion does not square easily with ICE regulations, which explicitly prohibit detention of undocumented aliens unless immigration officers have "a reasonable suspicion, based on specific articulable facts, that [a] person [detained for] question[ing] is . . . an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2); *see also id.* § 287.8(c) (requiring that arrests occur only when the officer "has reason to believe that the person to be arrested . . . is an alien illegally in the United States," and that a "warrant of arrest shall be obtained except when the . . . officer has reason to believe that the person is likely to

concluded that "the damages available in a *Bivens* action would be minimal . . . (absent unconstitutional physical abuse)" because undocumented aliens "are no less removable just because the manner of their apprehensions violated the Fourth Amendment." *Id.* The Government asks this Court to take *De La Paz* even a step further and to hold that the minimal nature of damages under a hypothetical *Bivens* remedy compels the unavailability of an FTCA remedy. The Court declines because state-law elements of false arrest are unrelated to the availability of a *Bivens* remedy. Neither party cites Tennessee case law addressing false arrest of undocumented aliens, and the Court's independent research has not identified any. Plaintiffs Guerrero, Romulo Mendoza, Bautista Martínez, Zapote Hernández, Gonzalez Cruz, and Pulido have alleged that they were detained against their will (Doc. 315, at 23–36) and that the detention was illegal (*Id.* at 45). Tennessee law requires nothing more and makes no exceptions for undocumented aliens.[24] *See Brown*, 428 S.W.3d at 54; *cf. Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207, 1218–31 (W.D. Wash. 2015) (granting summary judgment to an undocumented alien on false-arrest FTCA claim under Washington law brought against immigration agent because the agent caused the alien to be detained and arrested by a state officer without probable cause, as required by ICE regulations and the Fourth Amendment).

The Government also argues that Plaintiffs' detentions were permissible incident to a lawful search, that their detention was supported by reasonable suspicion, and that their arrest

---

escape before a warrant can be obtained"); *Perez Cruz*, 926 F.3d at 1137 (noting that the constraints created by these regulations "are at least as stringent as those imposed by the Fourth Amendment"); *Tejeda-Meta v. INS*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause." (citations omitted)).

[24] The Court observes that this particular application of the FTCA may raise colorable preemption concerns. Because the parties did not raise preemption, however, the Court will not address it.

was supported by probable cause. First, these facts are not distinguishable from *Perez Cruz*. There, the Ninth Circuit concluded that the incident-to-search exception established by the Supreme Court in *Summers v. Michigan* "does not justify using the execution of a search warrant for documents to 'target' for detention, interrogation, and arrest busloads of people who could not otherwise be detained," meaning such detention violates an ICE regulation "as well as the Fourth Amendment." *Id.* at 1146. While not bound by *Perez Cruz*, the Court finds its reasoning persuasive in concluding that Plaintiffs have adequately alleged they were not lawfully detained incident to a search under *Summers* for purposes of the Fourth Amendment.

Indeed, the Supreme Court's own explanation of *Summers* shows why this detention was not a valid exercise of the detention-incident-to-lawful-search exception. In *Bailey v. United States*, the Supreme Court explained that *Summers* "recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight." 568 U.S. 186, 194 (2013). While *Summers* may have justified detentions of everyone at the Plant, it says nothing about detentions based on race. On the allegations presented, the Court has no basis to conclude that officer safety, completion of the search, and flight prevention justified more-intrusive detentions of the Latino workers than everyone else, including the individuals whose actions triggered the IRS investigation in the first instance. Accordingly, based on Plaintiffs' allegations, the Court cannot conclude that the IRS search warrant justified the full scope of Plaintiffs' detentions under *Summers*. *Cf. Binay v. Bettendorf*, 601 F.3d 640, 647–60 (6th Cir. 2010) (explaining that force may be used to effectuate *Summers* detentions but that such force must be reasonable under the Fourth Amendment).

Second, Plaintiffs' allegations do not present articulable facts suggesting that they *as*

*individuals* could have been reasonably suspected of committing a crime or arrested with probable cause.  Indeed, the raid apparently arose from Worsham's discovery that the Plant's employees were paid in cash, some were Hispanic, and *some* were known by the Plant's management to be undocumented aliens.  This gave probable cause to believe that the individuals who owned and managed the Plant were violating certain federal laws.  Critically, however, the affidavit provides no basis for concluding that Plaintiffs *as individuals* had committed any particular crime.  Furthermore, Plaintiffs allege they were not even asked about their immigration status until after they had been confronted, moved outside, handcuffed, and eventually transported to the Armory.  Accordingly, Plaintiffs have plausibly alleged that there was not probable cause to detain them, and, therefore, that they were "unlawful[ly]" detained in violation of the Fourth Amendment.  *See Brown*, 428 S.W.3d at 54.[25]  Dismissal of the false-arrest claims brought under the FTCA would therefore be inappropriate.

### J.  Individual Claims by Plaintiffs Guerrero and Bautista Martínez for Battery Against Defendant United States of America Under the Federal Tort Claims Act

The Government has not moved to dismiss battery claims brought under the FTCA by Plaintiffs Guerrero and Bautista Martínez.

---

[25] Plaintiffs also argue they were falsely arrested because they were targeted for arrest based upon their race, in violation of the Fifth Amendment.  (Doc. 338, at 16.)  The complaint does not allege this theory of false arrest.  (*See* Doc. 315, at 45 ("The federal officers intentionally falsely imprisoned and arrested the Plaintiffs by forcefully restraining and detaining them against their will without an arrest warrant or probable cause that they had violated U.S. immigration or criminal laws.").)  Given that Tennessee law focuses on probable cause, the Court concludes that the viability of Plaintiffs' false-arrest claims turns upon the probable-cause analysis above, rather than a Fifth Amendment analysis.  *See Brown*, 428 S.W.3d at 54 ("[F]alse imprisonment requires that the defendant must have acted without probable cause." (citation omitted)).  Even if it did turn upon a Fifth Amendment analysis, however, the result would be the same because the Court concluded in its § 1985 analysis that Plaintiffs plausibly alleged that the raid entailed race-based equal-protection violations.

### K. Individual Claims by Plaintiffs Guerrero and Bautista Martínez for Assault Against Defendant United States of America Under the Federal Tort Claims Act

"[I]f a defendant intends to create an apprehension of harm in the plaintiff" and does so by a particular act, then the defendant "has committed the intentional tort of assault." *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 371 (Tenn. 2011); *see also Lacy v. Hallmark Volkswagen Inc. of Rivergate*, No. M2016-02366-COA-R3-CV, 2017 WL 2929502, at *4 (Tenn. Ct. App. July 10, 2017) (explaining that the plaintiff "must prove the [d]efendants committed an act with the intent to cause [the plaintiff] a fear of harm").

The Government moves to dismiss Plaintiff Guerrero's, but not Plaintiff Bautista Martínez's, assault claim brought under the FTCA. It argues that Plaintiff Guerrero's assault claim involves being struck in the face, and therefore sounds in battery, not assault. While the Government is right that Plaintiff Guerrero plausibly alleged a battery, it has identified no case law compelling the conclusion that the presence of a battery claim necessarily implies the absence of an assault claim. In reply, the Government further argues that Plaintiff Guerrero has not pleaded that the face punch placed him in a state of fear. It is reasonable to infer, however, that being punched in the face—even if sudden and unexpected—caused an apprehension of fear in the short timeframe immediately prior to the connection of fist with face. Given that reasonable inferences must be drawn in Plaintiff Guerrero's favor, the Court cannot conclude that he failed to plead facts that support an assault claim. Dismissal of Plaintiff Guerrero's assault claim is therefore inappropriate.

### L. Individual Claims by Plaintiffs Guerrero and Bautista Martínez for Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress Against Defendant United States of America Under the Federal Tort Claims Act

The Government argues that Plaintiffs Guerrero and Bautista Martínez may not pursue

claims for intentional infliction of emotional distress ("IIED") under the FTCA and that they did

not actually plead separate negligent infliction of emotional distress ("NIED"). (Doc. 346, at 9–

10.) While the FTCA must be construed narrowly, the Government's argument all but rewrites

it. Section 1346(b)(1) provides:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims
> against the United States, for money damages, . . . for . . . personal injury or death
> caused by the negligent or wrongful act or omission of any employee of the
> Government while acting within the scope of [their] office or employment, under
> circumstances where the United States, if a private person, would be liable to the
> claimant in accordance with the law of the place where the act or omission
> occurred.

Among the many exceptions to that general waiver of sovereign immunity for torts committed by

Government agents within the scope of their duties is the so-called intentional-tort exception:

> Any claim arising out of assault, battery, false imprisonment, false arrest,
> malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit,
> or interference with contract rights: *Provided*, That, with regard to acts or
> omissions of investigative or law enforcement officers of the United States
> Government, the provisions of this chapter and section 1346(b) of this title shall
> apply to any claim arising, on or after the date of the enactment of this proviso,
> out of assault, battery, false imprisonment, false arrest, abuse of process, or
> malicious prosecution. For the purpose of this subsection, "investigative or law
> enforcement officer" means any officer of the United States who is empowered by
> law to execute searches, to seize evidence, or to make arrests for violations of
> Federal law.

28 U.S.C. § 2680(h) (emphasis in original). Thus, the enumerated torts in § 2680(h) are not

actionable under § 1346(b)—meaning, by implication, that unlisted torts *are* actionable under §

1346(b), unless excepted elsewhere—with the exclusion of assault, battery, false imprisonment,

false arrest, abuse of process, and malicious prosecution if committed by a law enforcement

officer.

The Government asserts that because IIED and NIED are *not* listed in the law-

enforcement exclusion to the § 2680(h) exception, the United States has not waived its sovereign

immunity as to those torts. This construction cannot be squared with the statute, however,

because § 1346(b) waives federal sovereign immunity *except* as provided in § 2680(h), and § 2680(h) does not, at the threshold, bar IIED or NIED claims. However narrowly waivers of sovereign immunity must be construed, they cannot be rewritten by courts in ways that are plainly repugnant to statutory text and structure. Indeed, the Government's construction is flatly contrary to the Supreme Court's explanation of § 2680(h). *See Levin v. United States*, 568 U.S. 503, 507 n.1 (2013) (explaining that the term "intentional tort exception" is "not entirely accurate" because "[§] 2680(h) does not remove from the FTCA's waiver all intentional torts, *e.g.*, conversion and trespass"). Accordingly, dismissal is not appropriate.

## IV. CONCLUSION

Racial discrimination has a long history in this country. But the federal judiciary is, both by design and blemish, a less-than-perfect institution to address this history. *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214 (1944) (upholding forcible relocation of Japanese-Americans to concentration camps during World War II), *overruled by Trump v. Hawai'i*, 138 S. Ct. 2392, 2423 (2018)[26]; *Pace v. Alabama*, 106 U.S. 583 (1883) (upholding anti-miscegenation statute), *overruled by McLaughlin v. Florida*, 379 U.S. 184 (1964), *and Loving v. Virginia*, 388 U.S. 1 (1967); *Plessy v. Ferguson*, 163 U.S. 537 (1896) (upholding racial segregation under the "separate but equal" constraint), *overruled by Brown v. Board of Educ. of Topeka*, 347 U.S. 483 (1954); *Dred Scott v. Sandford*, 60 U.S. 393 (1857) (holding that the U.S. Constitution does not extend citizenship, nor rights and privileges, to Black people whether enslaved or free), *abrogated by* U.S. Const. amends. XIII, XIV. Courts' decisions on such issues have, at times,

---

[26] *But see Trump*, 138 S. Ct. at 2448 (Sotomayor, J., dissenting) (arguing that the majority decision "redeploys the same dangerous logic underlying *Korematsu* and merely replaces one 'gravely wrong' decision with another" by upholding executive order that suspended U.S. entry for nationals of Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen).

veiled the nation's original sin with the laudable ideals of judicial deference, separation of powers, and the presence of non-judicial concerns (such as foreign policy and national security). And even when the judicial system is finally authorized or willing to correct injustices, meaningful relief eludes those whose circumstances were misaligned with our nation's chronology.

Notably, of the four claims dismissed here, three are barred not because Plaintiffs failed to allege illegal conduct, but because the law provides them no pecuniary remedy for violation of their constitutional protections. Binding precedent mandates the conclusion that, however meritorious Plaintiffs' constitutional claims may be, they are entitled to pursue damages only because Defendants allegedly conspired with THP, bringing their equal-protection claim within the ambit of § 1985(3). Were it not for THP's involvement, Plaintiffs would have no access to the only recourse that can matter to them now: damages. Despite *Bivens* and its early progeny, the lesson here is that federal agents can avoid accountability for their violations of the Constitution by simply excluding state and local agencies from their next operation. Perhaps a higher court will recognize causes of action that more directly address agents' searches and seizures based on skin color. But this Court does not have the authority to do so.

In sum, Defendants' motions to dismiss (Docs. 328, 330, 332, 334) are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Plaintiffs' First, Second, and Third causes of action are **DISMISSED**;
2. Plaintiffs' Fourth and Fifth causes of action are not dismissed;
3. Plaintiffs' Sixth cause of action is **DISMISSED**; and
4. Plaintiffs' Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth causes of action are not dismissed.

Additionally, Plaintiffs' motion for hearing (Doc. 340) is **DENIED**, Plaintiffs' motion to file a supplemental brief (Doc. 349) is **GRANTED**, and Plaintiffs' motion to file supplemental

authority (Doc. 377) is **GRANTED**.  The Court presently defers ruling on Plaintiffs' motion to amend complaint (Doc. 369).  The parties are **ORDERED** to appear for a telephonic status conference on **February 17, 2021, at 1:00 p.m.**, to discuss the motion to amend and the progression of this case.  Dial-in instructions will be circulated by email.

       **SO ORDERED**.

                                       */s/ Travis R. McDonough*
                                       **TRAVIS R. MCDONOUGH**
                                       **UNITED STATES DISTRICT JUDGE**