# EXHIBIT 2
# Affidavit in Support of
# a Search Warrant


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

IN RE THE SEARCH OF:                    )

1617 HELTON ROAD, BEAN               )
STATION, TN 37708                        )

MISC. NO. 2:18- MJ-66

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Nicholas R. Worsham, being first duly sworn, hereby depose and state as follows:

### *Introduction*

(1)     I make this Affidavit in support of an application for the issuance of warrants to search the following premises and seize the items listed in Attachment B:

(a)     The business located at 1617 Helton Road, Bean Station, Tennessee 37708, and its curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage;  more particularly described in Attachment A, attached hereto and incorporated herein.

(2)     This Affidavit sets forth facts establishing probable cause to believe that James Brantley and others have willfully attempted to evade or defeat the assessment and payment of federal employment taxes in violation of Title 26, U.S.C. 7201; willfully failed to collect and pay over federal employment taxes in violation of Title 26, U.S.C. 7202; filed false federal tax returns in violation of Title 26, U.S.C. 7206(1); and are unlawfully employing illegal aliens in violation of Title 8, U.S.C. 1324(a) and within the locations which are further described in Attachment A, currently exists those items, set forth in Attachment B, which constitutes evidence, instrumentalities, contraband and/or fruits of the violations.

1

*Affiant Background*

## *Affiant Background*

(3)     I have been a Special Agent with the Internal Revenue Service, Criminal Investigation Division (IRS-CID) since 2006. I am currently assigned to the Johnson City, Tennessee post of duty. My responsibilities as a Special Agent include the investigation of potential violations of the Internal Revenue Laws under Title 26 of the United States Code, the Money Laundering Control Act under Title 18 of the United States Code and Currency Violations under Title 31 of the United States Code. I hold a Bachelor of Business Administration Degree in Accounting from East Tennessee State University. I have been trained at the Federal Law Enforcement Training Center in the laws of search and seizure and in the use of search warrants in criminal tax and tax-related investigations. I have conducted or assisted in numerous search warrants involving the seizure of financial records used in the commission of such crimes as evading taxes, filing fraudulent tax returns, money laundering, and structuring. Through my training and experience, I have become familiar with the types of records individuals and businesses typically maintain in the course of their regular activity.

## **PROBABLE CAUSE**

(4)     The information contained in this affidavit is based on my personal knowledge, information that I received from other law enforcement agents assisting in this investigation, and information that I have learned from the other sources specifically discussed herein. The facts set forth herein are based on my review of reports, documents and other evidence obtained since the beginning of the investigation, as well as information related to me by the law enforcement agents noted above. This affidavit is not intended to include each-and-every fact related to this investigation, but only those facts necessary to support probable cause.

2

(5) Based on the facts set forth herein, there is probable cause to believe that James Brantley has willfully attempted to evade or defeat the assessment and payment of federal employment taxes in violation of Title 26, U.S.C. 7201; willfully failed to collect and pay over federal employment taxes in violation of Title 26, U.S.C. 7202; filed false federal tax returns in violation of Title 26, U.S.C. 7206(1); and is unlawfully employing illegal aliens in violation of Title 8, U.S.C. 1324(a) and within the locations which are further described in Attachment A, currently exists those items, set forth in Attachment B, which constitutes evidence, instrumentalities, contraband and/or fruits of the violations.

## *Affiant's Knowledge, Training, and Experience*

(6) Based upon my knowledge, training, experience and participation in other financial investigations, I know:

(a) Employers who pay employees with cash often do so to avoid paying various types of taxes including federal employment taxes.

(b) Employers who employ illegal aliens often pay the illegal aliens in cash because the illegal employees do not possess the appropriate documentation to complete documents required for employment and withholding of taxes.

(c) Employers will report a minimal amount of wages and pay a minimal amount of employment taxes to meet the filing requirements and avoid detection. The amount of wages reported is often approximately equivalent to the state minimum wage amount even though the actual wages paid are significantly higher.

(d) Employers normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents in their personal residences. These records are often kept for a period of several years or longer.

3

Case 3:19-cr-00062-TBR-CHL   Document 39-1   Filed 04/02/20   Page 3 of 27   PageID #:
Case 2:18-mj-00066-MCLS   Document 39   Filed 05/05/21   Page 3 of 26   PageID #:
4062

(e)     Employers who operate businesses and engage in tax evasion and/or employ illegal aliens maintain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computers and associated electronic media.

(f)     Employers who operate businesses and engage in tax evasion and/or employ illegal aliens often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience where there is an ongoing criminal business or where the evidence is of a nature that would be kept long after the criminal activity has ceased, the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale.

(g)     There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letter and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief he/she has deleted, hidden or further destroyed any computer related evidence, but which may be retrievable by a trained forensic computer expert.

4

Case 3:19-cv-00066-TBM-LHS   Document 39-1   Filed 04/02/20   Page 6 of 27   PageID #:
Case 2:18-mj-00066-MCLHS   Document 39   Filed 04/02/20   Page 4 of 26   PageID #: 5
4063

(h)    The net worth/source and application of funds analyses show a suspect's known expenditures and/or accumulation of assets substantially exceed his reported and/or legitimate sources of income to prove that the suspect is engaged in tax evasion and/or illegal money generating activities such as fraud. The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal activity, to his/her arrest. The source and application of funds analysis focuses on the suspect's expenditures during the time period of the purported illegal activities and compares such expenditures with his reported/legitimate sources of income. Each analysis requires evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (e.g. one year). In addition to assisting in the net worth/source and application funds analyses, a financial profile of a suspect prior to the purported criminal activity evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity that are consistent with a person generating income from illegal activities (e.g. fraud and/or earning income that was not reported), as compared to a person earning income from legitimate sources. Evidence of a defendant's expenditures, asset accumulation, financial lifestyle, net worth/source and application of funds analyses, and underlying financial documents necessary for such analyses, and underlying financial documents necessary for such analyses are admissible evidence under federal case law in tax evasion, fraud and money laundering cases; thus, the need for such documents to be taken during the execution of the warrant.

5

Case 3:19-cv-00066-TBR-CHL   Document 39-2   Filed 04/02/20   Page 6 of 27   PageID #:
Case 2:18-mj-00066-MCLC   Document 39   Filed 04/02/20   Page 5 of 26   PageID #:
4064

*Summary of Investigative Findings*

*Summary of Investigative Findings*

(7)     The investigation has revealed the following individuals/entities are involved in the cash transactions:

(a)     **Southeastern Provisions, LLC ("Southeastern Provisions")**, a cattle slaughter facility location in Bean Station, Tennessee. The United States Department of Agriculture – Food Service and Inspection Service ("USDA-FSIS") is responsible for inspecting Southeastern Provisions. USDA-FSIS maintains a profile for all facilities they inspect. The profile for Southeastern Provisions lists the physical location of Southeastern Provisions at 1617 Helton Road, Bean Station, TN 37708, the captioned premises to be searched.

(b)     **James Brantley** and **Pamela Brantley,** husband and wife. The USDA-FSIS profile lists James Brantley as the President/General Manager of Southeastern Provisions. Pamela Brantley is an employee of Southeastern Provisions.

(c)     **Kelsey Brantley** is the daughter of James and Pamela Brantley and an employee of Southeastern Provisions.

(d)     **Priscilla Keck** is an employee of Southeastern Provisions.

(8)     IRS-CID, Homeland Security Investigations (HSI), and Tennessee Highway Patrol, Criminal Investigation Division (THP-CID) are conducting an investigation of Southeastern Provisions and its owners. The investigation began after federal authorities became aware of financial transactions involving Southeastern Provisions bank accounts at Citizens Bank. Bank personnel began noticing large amounts of cash being withdrawn from the Southeastern Provisions bank accounts. The cash withdrawals occurred on a weekly basis.

(9)     During the investigation, I obtained numerous financial records regarding several bank accounts pertaining to Southeastern Provisions. I have reviewed those financial records

6

Case 3:19-cv-00063-TRM-CHS   Document 39-6   Filed 04/02/20   Page 6 of 26   PageID #:
Case 2:18-mj-00066-MCLC   Document 2   Filed 05/05/21   Page 7 of 27   PageID #:
4065

and learned that from 2008 to the present date, in excess of $25 million dollars in cash has been withdrawn from the bank accounts.

(10)    Those records also reveal that Pamela Brantley, Kelsey Brantley, and Priscilla Keck conducted the cash withdrawals with a majority of them being conducted by Pamela and Kelsey Brantley. I know that bank personnel questioned the individuals conducting the transactions about the nature and purpose of the large cash withdrawals and were told that the cash was used for payroll. I also learned that in December 2016, bank personnel conducted a site visit at Southeastern Provisions. Bank personnel were given a tour of the facility by Pamela Brantley. Bank personnel were told during the tour the employees were Hispanic and were paid weekly with cash. Bank personnel also observed a vault, which Southeastern Provisions was preparing to install.

### *Confidential Informant*

(11)    In May 2017, a confidential informant (hereafter referred to as CI-1), who was working for law enforcement, was able to gain employment at Southeastern Provisions located at the captioned premises (1617 Helton Road). CI-1 worked there for four days. CI-1 reported the following:

(a)    CI-1 was never asked to complete any paperwork or provide any identification or documentation prior to being hired.

(b)    While attempting to gain employment, CI-1 was shown around Southeastern Provisions (1617 Helton Road) by two white males who were later identified as Jason and Carl Kinser. While there, CI-1 saw an employee that CI-1 knows from living in Morristown. CI-1 used a fake name when speaking to the employee on the assumption that his employment with Southeastern Provisions was contingent upon having a lawful identity. The

7

employee told CI-1 not to worry and that CI-1 could use his/her real name, confirming that CI-1 need not have a lawful identity in order to work at Southeastern Provisions.

    (c)    CI-1 was hired that day by the representatives of Southeastern Provisions and began working in the spring of 2017 at 1617 Helton Road.

    (d)    At the time CI-1 was hired, representatives of Southeastern Provisions told CI-1 that he/she would be paid $10 per hour and would be paid weekly in cash. On the same day, CI-1 spoke with other employees who stated they were also paid $10 per hour and were paid weekly in cash. CI-1 stated that all employees had to sign their names and log the hours worked each day at the end of the shift in a book that was kept in the main office/lobby.

    (e)    CI-1 also explained that CI-1 was told CI-1 would be a "supervisor" because CI-1 was capable of speaking both Spanish and English. CI-1 inferred from this that many of the other employees spoke only Spanish.

    (f)    At the end of the week, CI-1 went to 1617 Helton Road to pick up CI-1's pay. CI-1 walked into the main office where there were a few other employees in and around the office area. CI-1 spoke with a white female identified as Pamela Brantley. CI-1 gave Pamela Brantley CI-1's assumed name. Pamela Brantley told CI-1 to wait and she left the office. A few minutes later, Pamela Brantley returned and asked CI-1 to sign the time sheet CI-1 had completed and to sign CI-1's name in a notebook acknowledging receipt of payment. Pamela Brantley handed CI-1 a white envelope with CI-1's name on the outside. The envelope contained cash for payment for duties performed by CI-1 while employed at Southeastern Provisions.

    (g)    During the four days that CI-1 worked at Southeastern Provisions at 1617 Helton Road, CI-1 observed approximately 25 employees working on the production line, 4

8

employees on the cleaning crew, 3 employees working as mechanics, 3 employees driving fork lifts, and two females working in the main lobby. CI-1 stated that all of these employees (other than the two females working in the main lobby) were Hispanics. This is relevant for the reasons stated in paragraph (10) – representatives of Southeastern Provisions told Citizens Bank personnel that the large cash withdrawals were made for the purpose of paying cash wages to *Hispanics.* On this occasion, CI-1 observed approximately 35 Hispanic employees at 1617 Helton Road. During the same week, representatives of Southeastern Provisions withdrew $101,000.00 from Citizens Bank. If we assume that each employee worked eight hours per day, then 1,400 person-hours were worked that week. 1,400 divided into $101,000.00 equals $72.14 per hour, which, based on my training and experience, I know is substantially more than the hourly wage paid to production line workers, cleaning crew personnel, mechanics, and fork lift operators. Moreover, as described above, CI-1 and numerous other employees were paid $10 per hour. For this reason, I have probable cause to believe that the number of employees working at the facility exceeds the approximately 35 people observed by CI-1 and greatly exceeds the number of wage-earning employees that Southeastern Provisions reported for payroll-tax purposes as described in paragraphs (21) – (24), below. This point is corroborated by CI-1's observation that his/her particular job required him/her to work from 4:30 pm to approximately midnight, at which time the primary business functions of the plant had ceased for the day and most employees had left.

        (h)     CI-1 stated that he knew that several of these employees used to work at another meat-processing plant (the identity of which is known to law enforcement) in Morristown, TN, but had been fired because their identification paperwork was fraudulent.

9

(i)     CI-1 again observed Carl Kinser and Jason Kinser. The two are believed to be brothers that act in supervisory roles at Southeastern Provisions. CI-1 was hired by one of the brothers. CI-1 later identified the brothers to law enforcement.

(j)     CI-1 also learned that the production workers are required to work overtime, but do not receive additional compensation for the overtime hours. CI-1 believes that Southeastern Provisions exploited these employees because they were illegal aliens and have no legal recourse for workplace mistreatment. In fact, CI-1 observed employees who were required to work with extremely harsh chemicals, including bleach mixed with other cleaning agents, without the appropriate protective eyewear.

(k)     On Friday, March 2, 2018, law enforcement officers instructed CI-1 to return to 1617 Helton Road to obtain video footage of the facility for purposes of executing the search warrant sought by this Affidavit. CI-1 was equipped with covert video surveillance equipment and provided the excuse that he was visiting the facility for purposes of picking up another employee. While there, CI-1 observed approximately 60-70 employees. CI-1 stated that most of these employees were Hispanic, which is relevant for the reasons set forth in paragraph (10).

### *Surveillance*

(12)     As described above, I have reviewed the bank records for the primary payroll account for Southeastern Provisions. The records for this payroll account revealed a steady increase in the size of the large, weekly cash withdrawals. In 2017, that large, weekly cash withdrawals range from a low of $62,000 on 1/5/2017 to a high of $122,000 on 12/20/2017. As described above, interviews with bank employees revealed that these large cash withdrawals were typically made by Pamela Brantley or Priscilla Keck on Tuesdays or Wednesdays. As

10

described above, approximately $25,000,000 in cash has been withdrawn from this account on a weekly basis since 2008.

(13)     Based upon the information provided by the confidential informant, law enforcement officers involved in the investigation suspected that Pamela Brantley, Priscilla Keck, and others made the large cash withdrawals in the middle of the week for the purpose of paying the numerous illegal aliens employed at 1617 Helton Road at the end of the week and that such large quantities of cash were likely stored in the vault installed at 1617 Helton Road, described above. These suspicions led to a decision to conduct surveillance.

(14)     Based on the foregoing, law enforcement offices participating in the investigation conducted surveillance on October 11, 2017 and November 14, 2017. On both occasions, surveillance was initiated at the bank at the time that law enforcement expected (based upon an analysis of the years' of bank records) one of the suspects to make a large cash withdrawal.

(15)     On October 11, 2017, Kelsey Brantley was observed entering Citizens Bank located at 155 Terrace Lane, Morristown, TN and then emerging shortly thereafter. Subsequent investigation revealed that Kelsey Brantley withdrew $98,200 in cash on this date. After leaving the bank with $98,200 in cash, Kelsey Brantley stopped briefly at a feed store before returning to Southeastern Provisions at 1617 Helton Road.

(16)     On November 14, 2017, Priscilla Keck was observed entering Citizens Bank located at 155 Terrace Lane, Morristown, TN and then emerging shortly thereafter. Subsequent investigation revealed that Priscilla Keck withdrew $93,000 in cash on this date. After leaving the bank with $93,000 in cash, Priscilla Keck went to a restaurant in Morristown for approximately 90 minutes. She left the restaurant and returned to her residence located at 1598 Helton Road, Bean Station, TN, which is immediately adjacent to 1617 Helton Road. Keck took

11

the currency inside her residence. Based on the following, I have probable cause to believe that the two large cash withdrawals that law enforcement observed were made for the purpose of paying illegal aliens to work at 1617 Helton Road. I have probable cause to believe this because:

(a)     As part of the surveillance effort, aerial photographs of 1617 Helton Road were taken on October 11, 2017 and November 14, 2017. I have analyzed the photographs and have found the following: On October 11, 2017, there were approximately 87 passenger vehicles parked on the premises of 1617 Helton Road. On November 14, 2017, there were approximately 80 passenger vehicles parked on the premises.

(b)     However, our investigation has revealed that not more than 44 lawful employees work for Southeastern Provisions, consisting of:

(i)     44 employees who received wages, tips, or other compensation, as reported to the IRS on Form 941 filed by Southeastern Provisions in January 2018.

(ii)     Approximately eight other employees who were contractors to Southeastern Provisions, as reported by the 1099-MISC's issued by Southeastern Provisions in respect of tax year 2016 (2017 data are not yet available).

(iii)     One USDA inspector and one veterinarian required by federal law or regulations to be on site while the slaughterhouse at 1617 Helton Road is operational.

(c)     As such, assuming that *all* wage employees, *all* 1099-MISC recipients, the USDA inspector, *and* the veterinarian were *all* present on the two surveillance dates, then I have probable cause to believe that on the two surveillance dates, and on other dates during which Pamela Brantley, Priscilla Keck, or another suspect make large cash withdrawals from Citizens Bank, Southeastern Provisions was employing between 30 and 40 illegal aliens at 1617 Helton Road whose wages were unreported and untaxed

12

### *Financial Analysis*

(17)     As part of the investigation, law enforcement issued a grand jury subpoena to Citizens Bank requesting the account records of the bank accounts for Southeastern Provisions and James Brantley. Citizens Bank provided records for six bank accounts, only five of which are related to this investigation: Four accounts were in the name of Southeastern Provisions and one account in the name of James Brantley, Pamela Brantley, and Rick Coffman. Those accounts are described as follows:

(a)     Account number ****0414 styled "Southeastern Provisions, LLC" is a business checking account. The signatories on this account are James Brantley, Pamela Brantley, Kelsey Brantley, and Priscilla Keck.

(b)     Account number ****2311 styled "Southeastern Provisions, LLC ODD Account" is a business checking account. The signatories on this account are James Brantley and Pamela Brantley.

(c)     Account number ****2444 styled "Southeastern Provisions, LLC" is a business checking account. The signatories on this account are James Brantley, Pamela Brantley, Kelsey Brantley, and Priscilla Keck.

(d)     Account number *****5749 styled "Southeastern Provisions, LLC" is a business savings account. The signatories on this account are James Brantley, Pamela Brantley, and Kelsey Brantley.

(e)     Account number ****7831 styled "James M. Brantley, Pamela K. Brantley, Rick Coffman" is a personal checking account. The signatories on this account are James Brantley, Pamela Brantley, and Rick Coffman. The investigation revealed that Rick Coffman was an employee of Southeastern Provisions.

13

Case 3:19-cv-00062-TRM-CHS Document 39-2 Filed 05/05/21 Page 14 of 27 PageID #:
Case 2:18-mj-00066-MCLC Document 3 Filed 04/02/18 Page 13 of 26 PageID #: 14
4072

(18)     All four of the business accounts identify 1617 Helton Road, Bean Station, TN, 37708 (the business address for Southeastern Provisions) as the address of record. The personal account identifies 1570 Helton Road, Bean Station, TN, 37708 (the personal residence of James and Pamela Brantley) as the address of record.

(19)     My analysis of the four business accounts and the personal account reveal that they all are used for business purposes relating to the operations of Southeastern Provisions. The accounts receive deposits from clients and payments to vendors. Cash is withdrawn from the four business accounts, which is then used to pay employees including illegal aliens. A minimal amount of checks are written from all of the accounts which are made payable to employees. During my review of the financial records, I did not find sufficient evidence that wages are being paid with checks.

### *False Employer Tax Returns*

(20)     I have reviewed the Forms 941, Employer's Quarterly Federal Tax Returns, Forms W-2, Wage and Tax Statement, and Forms 1099-MISC, Miscellaneous Income for Southeastern Provisions for the tax years 2013, 2014, 2015 and 2016. All of the Forms 941 filed by Southeastern Provisions were signed under penalties of perjury by James Brantley. I have also reviewed the cash withdrawals for Southeastern Provisions bank accounts for the same time period. The total wages reported on the Forms 941 are significantly less than the actual wages paid, as indicated by the aggregated cash withdrawals.

(21)     For the 2013 tax year, Southeastern Provisions filed 39 Forms W-2, which reported total wages of $441,701. Southeastern Provisions also filed four Forms 1099, which reported contract labor of $68,665. The total wages and contract labor reported for 2013 was

14

Case 2:18-mj-00066-MCLC Document 2 Filed 04/02/18 Page 14 of 26 PageID #: 15

$510,366.  The total cash withdrawals for 2013, as depicted on the bank account records, were $2,037,870.

(22)    For the 2014 tax year, Southeastern Provisions filed 32 Forms W-2, which reported wages of $445,704.  Southeastern Provisions also filed four Forms 1099, which reported contract labor of $119,965.  The total wages and contract labor reported for 2014 was $565,309.  The total cash withdrawals for 2014, as depicted on the bank account records, were $2,696,278.

(23)    For the 2015 tax year, Southeastern Provisions filed 37 Forms W-2, which reported wages of $403,693.  Southeastern Provisions also filed six Forms 1099, which reported contract labor of $173,625.  The total wages and contract labor reported for 2015 was $577,318.  The total cash withdrawals for 2015, as depicted on the bank account records, were $2,671,455.

(24)    For the 2016 tax year, Southeastern Provisions filed 23 Forms W-2, which reported wages of $583,353.  Southeastern Provisions also filed eight Forms 1099, which reported contract labor of $234,118.  The total wages and contract labor reported for 2016 was $817,471.  The total cash withdrawals for 2016, as depicted on the bank account records, were $3,486,074.

(25)    In total, for years 2013 through 2016, the difference between the Form W-2 wages and Form 1099-MISC non-employee compensation reported to the IRS, on the one hand, and the cash withdrawals from the business bank accounts is over $8.4 million, as depicted in the following chart:

| Tax Year | Forms W-2 (number filed & wages reported) | Forms 1099 (number filed & wages reported) | Total Wages/Contract Labor Reported | Cash Withdrawals | Difference |
|---|---|---|---|---|---|
| 2013 | 39 - $441,701 | 4 - $ 68,665 | $ 510,366 | $ 2,037,870 | $1,527,503 |
| 2014 | 32 - $445,704 | 4 - $119,965 | $ 565,309 | $ 2,696,278 | $2,130,969 |
| 2015 | 37 - $403,693 | 6 - $173,625 | $ 577,318 | $ 2,671,455 | $2,094,136 |
| 2016 | 23 - $583,353 | 8 - $234,118 | $ 817,471 | $ 3,486,074 | $2,668,602 |
| | | | | | |
| | | Total: | $2,470,825 | $10,891,677 | $8,421,210 |

(26)     Federal tax laws require employers to withhold FICA, Social Security, and Medicare taxes from employees' pay. Employers are also required to match the contributions at the same rate. The FICA rate is 7.65%, the Social Security rate is 6.2%, and the Medicare rate is 1.45%. Based upon the evidence described above, I have probable cause to believe that for 2013 through 2016, Southeastern Provisions has paid approximately $8,421,210 in wages that it did not report to the IRS. If Southeastern Provisions had properly reported these wages, Southeastern Provision would have owed approximately $2.5 million in payroll taxes in addition to the amount it actually paid. This total is comprised of approximately $1.28 million in unpaid FICA taxes, approximately $1.04 million in Social Security taxes, and approximately $244,000 in Medicare taxes.

### *Cash Payroll*

(27)     As previously mentioned, representatives of Southeastern Provisions told bank personnel on two occasions that the cash withdrawals were used to pay employees. CI-1 confirmed that employees are paid in cash. Further evidence of a cash payroll is established by a proof of employment letter issued by Southeastern Provisions.

(28)     The investigation revealed that in December 2016, Kelsey Brantley applied for a loan at Citizens Bank. Southeastern Provisions provided a letter on company letterhead to serve as proof of employment for Kelsey Brantley. The letter was signed by Priscilla Keck. The letter states, in part, *"We do not furnish pay check stubs."*

### *False Wage and Tax Statements*

(29)     In addition to Southeastern Provision's failure to withhold payroll taxes as described above, I have probable cause to believe that Southeastern Provisions is not withholding the appropriate amount of taxes for legal employees who receive Forms W-2.

16

(30)     As a result of my review of the Forms W-2, Wage and Tax Statement, I have
determined that Southeastern Provisions grossly underreported wages for its legitimate
employees. Examples of false Forms W-2 for James Brantley, Pamela Brantley, Carl Kinser,
and Jason Kinser are below:

(a)     Forms W-2 filed for James Brantley reported wages of $25,500, $25,000,
$25,000, and $25,500 for 2013, 2014, 2015, and 2016 respectively. Based on a full time
schedule of 40 hours a week, this would mean his hourly rate of pay was approximately twelve
dollars an hour. However, the investigation has revealed that James Brantley and Pamela
Brantley are the owners of Southeastern Provisions. Based on my training and experience, I
know that owners of companies like Southeastern Provisions make more than $12 per hour.

(b)     Forms W-2 filed for Pamela Brantley reported wages of $16,320, $16,000,
$16,000, and $16,320 for 2013, 2014, 2015, and 2016 respectively. Based on a full time
schedule of 40 hours a week, this would mean her hourly rate of pay is less than eight dollars an
hour. However, the investigation has revealed that James Brantley and Pamela Brantley are the
owners of Southeastern Provisions. Based on my training and experience, I know that owners of
companies as large as Southeastern Provisions make more than $8 per hour.

(c)     Forms W-2 filed for Carl Kinser reported wages of $18,078, $18,707,
$18,558, and $19,304 for 2013, 2014, 2015, and 2016 respectively. Based on a full time
schedule of 40 hours a week, this would mean his hourly rate of pay is less than nine dollars an
hour. This amount is less than the laborers are paid. A USDA-FSIS profile obtained as part of
the investigation lists Carl Kinser as Plant Manager. Based on my training and experience,
supervisory positions are usually full-time positions compensated at a rate in excess of $9 / hour.

17

(d)     Forms W-2 filed for Jason Kinser reported wages of $17,671, $17,734, $17,559, and $18,315 for 2013, 2014, 2015, and 2016 respectively. Based on a full time schedule of 40 hours a week, this would mean his hourly rate of pay is less than nine dollars an hour. This amount is less than the laborers are paid. A USDA-FSIS profile obtained as part of the investigation lists Jason Kinser as Pen and Slaughter/Processing Area Supervisor. Based on my training and experience, supervisory positions are usually full-time positions compensated at a rate in excess of $9 / hour.

### *False Personal Tax Returns*

(31)     As part of the investigation, I have also reviewed the personal income tax returns filed by James and Pamela Brantley, Carl Kinser, and Jason Kinser for 2013 through 2016. My review of those records revealed that the only income from Southeastern Provisions (including wages, distributions, dividends, or other income) were the wage amounts corresponding to the Forms W-2 issued by Southeastern Provisions. The amounts reported on the Forms W-2 do not include payments received in cash.

(32)     For 2013, 2014, 2015, and 2016, James Brantley filed Forms 1040, U.S. Individual Income Tax Return, with Pamela Brantley. They reported income that consisted of Form W-2 wages from Southeastern Provisions for both James and Pamela; Form 1099-R wages from the Tennessee Consolidated Retirement System for Pamela; and Schedule K-1 profits of approximately $20,000 per year from Southeastern Provisions.

### **INFORMATION RELATING TO COMPUTER EVIDENCE**

(33)     I know documents, records and equipment can be in the form of printed documents or stored in computer memory, digital storage disks, or other digital storage media. Computer memory is referred to interchangeably as digital storage media.

(34)	The following is based upon your affiant's knowledge, training, and experience, and consultation with Special Agent Robert McCorkle, Computer Investigative Specialist, IRS-CI. Special Agent McCorkle has received specialized training regarding the seizure of computers and related evidence. Special Agent McCorkle advised your affiant that computer hardware, computer software, computer-related documentation, passwords, and data security devised may be important to a criminal investigation in three important respects: (a) as instrumentalities for the violations of federal laws enumerated herein; (b) as devices used in conjunction with the collection and storage of electronic data and records related to the alleged violations and (c) fruits of illegal activity. Search and seizure of computer hardware, software, documentation, passwords, and data security devices, either as instrumentalities of criminal activity or as storage devices for evidence thereof, is contemplated.

(35)	Special Agent McCorkle advised that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is necessary to seize the entire operating system, installed programs and data stored on the computer media. The computer specialist will attempt to obtain an image of the computer hard drives (that is a "bit by bit" copy of the hard drive). This image allows the seizure of the data without actually removing the hard drive from the premises. However specific, permission is requested from the Court to remove such equipment if necessary to an off-site location, such as a computer forensic lab to process and search the computer and related media. Once imaged, the data is then processed in a secure off-site environment by a qualified computer specialist. The offsite analysis in required because of the following:

19

(a) *The volume of evidence*. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, USB drives "thumb drives", etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to perform this data analysis "on-site."

(b) *Technical requirements*. Analyzing computer systems for criminal evidence is a highly technical process requiring specialized skills and a properly controlled environment. Since computer evidence is extremely vulnerable to destruction (both from accidental or inadvertent destruction and from destructive methods employed as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

(36) Computer hardware is described as any and all computer equipment, including any electronic devices that are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include, but are not limited to, any data-processing hardware (such as central processing units, self-contained "laptop or notebook" computers, "tablets" and "smart-phones"); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and other memory storage devices); peripheral input/output devices; as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

(37) Computer software is described as any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic, optical, or

20

other media that are capable of being interpreted by a computer or its related components. This software commonly includes operating systems, programs/applications (such as word-processing, graphics, spreadsheet programs, databases programs, accounting and tax preparation software) and utilities.

(38) Computer passwords and data security devices or software are described as all those devices, programs, or data, whether themselves in the nature of hardware or software, that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related data.

(39) The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files)/ "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation or in some instances operating a clone of the seized computer to allow access to the installed programs and data.

(40) The terms "records, documents, and materials, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually

21

initiated), of any computer or computer system. The form such information might take includes, but is not limited to, hard drives, diskettes, tapes, USB (Universal Serial Bus) storage media (Thumb drives), other solid state type storage media or any other media capable of storing information in a form that can be read or interpreted by a computer.

(41)     All attempts will be made by the computer specialist to obtain images of the computer's hard drive and leave the equipment intact at the search location. However, specific permission is requested from the Court to remove such equipment to an offsite location, such as the computer specialist's lab to process and search the computer and related media.

## CONCLUSION

(42)     Based upon the foregoing information, evidence and intelligence gathered as a result of the investigation, I believe there is probable cause to believe within the business and residence described above including their curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage; more particularly described in Attachment A, attached hereto and incorporated herein, there are presently concealed those items set forth in Attachment B, attached hereto and incorporated herein, which items constitute evidence, instrumentalities, contraband, and/or fruits of violations of Title 26 U.S.C. §§ 7201, 7206(1), and 7202 and Title 8 U.S.C. § 1324(a).

\* \* \*

Respectfully submitted,

Nicholas R. Worsham, Special Agent
IRS – Criminal Investigations

Subscribed and sworn to before me on _Apil_   _2_ _NP_____, 2018

Honorable Clifton L. Corker
United States Magistrate Judge

22

## Attachment A

### PROPERTY TO BE SEARCHED
Search Warrant Affidavit

### 1617 HELTON ROAD, BEAN STATION, TN 37708

Business of Southeastern Provisions, LLC located at 1617 Helton Road, Bean Station, TN, 37708, and its curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage.

Property Map



Property to be searched is contained within the parcels identified with the black border more specifically described as the business location of Southeastern Provisions, LLC which is located at 1617 Helton Road, Bean Station, Tennessee. The property to be searched contains four parcels of land all which are owned by James Brantley. The property contains multiple buildings and structures used in the operation of Southeastern Provisions, LLC which is owned by James Brantley.

1

## Aerial View



2

Case 3:19-cv-00062-TRM-CHS Document 396-2 Filed 05/05/21 Page 25 of 27 PageID #:
Case 2:18-mj-00066-MCLC Document 2 Filed 04/02/18 Page 24 of 26 PageID #:
4083

## ITEMS TO BE SEIZED

The following records, documents and materials in whatever form and by whatever means they may have been created or stored, including any paper, electrical, electronic, or magnetic form which are related to the financial activities of James Brantley, Southeastern Provisions, LLC, and/or entities owned by James Brantley and/or any related entities to Southeastern Provisions, LLC from January 1, 2013 to the present, are to be seized:

(1)     The notebook or other written record in which employees are required to sign their names and log the number of hours they worked.

(2)     Financial Statements, bookkeeper's and/or accountant's work papers used in the preparation of records or tax returns; copies of all federal and state income tax returns; any and all books, records, invoices, receipts, bank statements and related records which reflect income and expenses.

(3)     Bank account information including passbooks or bank statements, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, records reflecting the identity of checks deposited, withdrawal slips, cancelled checks and records disclosing the disposition of withdrawals, and Forms 1099. Records of any certificates of deposit, money market certificates, safety deposit boxes, wire transfers, U.S. Treasury Notes or Bills purchased, money orders, check ledgers, and checkbooks.

(4)     Loans Payable and Loans Receivable records including applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files and internal memoranda relative to these loans.

(5)     Indicia of occupancy, residency, rental and/or ownership of real estate; records detailing all properties titled, leased, or otherwise held by James Brantley, Southeastern Provisions, LLC, and/or entities owned by James Brantley and/or any related entities to Southeastern Provisions, LLC

(6)     Records of real estate transactions including listing agreements, sales contracts, leases or rental contracts; rental applications, financial worksheets and/or loan applications, addendums; deeds (whether recorded as a public record or not); promissory notes or other loan documentation or financing information; rental receipt ledgers; property use agreements, occupancy agreements, or contracts; documents reflecting the receipt of payments and description thereof; and correspondence, notes, telephone messages or other memoranda relating to sales or lease transactions.

(7)     Diaries, calendars (whether conventional or electronic), appointment books, journals, address/telephone books (including and address/telephone rolodex or similar index).

(8)     Currency Transaction Reports, Forms 8300 or information related to the legal requirement to file such reports, regardless of their date of creation.

(9)     Records and/or documents which are related to the receipt of income, the disposition of the same, or banking activities, to include publications, notes, correspondence and/or memoranda, the content of which, in whole or in part, involves financial information or transactions.

(10)     Currency or cash.

(11)     Contents of any vault, safe, or lockbox of any kind, located at the location to be searched, provided that the contents are within the specifications as set forth in this list of items to be seized.

(12)     Employee files including applications for employment and identification documents provided by employees to gain employment.

(13)     Any electronic devices that are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word processing equipment, modem, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

(14)     Any instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs of software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

(15)     Any written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device.

(16)     Any information and/or data stored in the form of magnetic or electronic media capable of being read by a computer or with the aid of computer related equipment. This media includes floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, tapes, USB jump/"thumb" drives and other devices, laser disks, video cassettes, and any other media which is capable of storing magnetic coding.