**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

|  |  |
|---|---|
| ISABEL ZELAYA, et al., | |
| Plaintiffs, | C.A. No. 3:19-CV-00062-TRM-CHS |
| v. | |
| ROBERT HAMMER, et al., | |
| Defendants. | |

**PLAINTIFFS' OPENING MEMORANDUM OF LAW**
**IN SUPPORT OF CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF FACTS ..................................................................................................2

    A.      The Plan. ...............................................................................................2

    B.      The Raid. ..............................................................................................8

    C.      The Aftermath Of The Raid ..............................................................13

    D.      The Proposed Class Representatives. .................................................14

PROCEDURAL HISTORY...............................................................................................15

ARGUMENT .....................................................................................................................16

I.       STANDARD FOR CLASS CERTIFICATION. ...................................................16

II.      THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED. ..............................18

    A.      The Proposed Class Is So Numerous That Joinder Of All Members Is Impracticable...................................................................18

    B.      The Class Members Share Common Questions Of Law And Fact. .....................20

    C.      The Named Plaintiffs' Claims Are Typical Of The Class Claims........................23

    D.      The Named Plaintiffs And Class Counsel Will Fairly And Adequately Protect The Interests Of The Class. ..................................25

III.    THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED...............................28

    A.      Common Questions Stand At The Heart Of Plaintiffs' §§ 1985(3) And 1986 Claims, Which Can Be Proven Through Common Evidence......................28

          1.      Common issues predominate the § 1985(3) claim....................29

          2.      Common questions stand at the heart of Plaintiffs' § 1986 claim and the claim can be proven through common evidence...........................34

    B.      Class Treatment Is Superior To Individual Litigation. ..........................34

    C.      The Class Is Ascertainable...................................................36

CONCLUSION...................................................................................................................36

# TABLE OF AUTHORITIES

**CASES**                                                        **PAGE(S)**

*Alkire v. Irving*,
330 F.3d 802 (6th Cir. 2003) ........................................................................20

*Allard v. SCI Direct, Inc.*,
No. 16-CV-1033, 2017 WL 3236448 (M.D. Tenn. July 31, 2017) ................................18

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ............................................................20, 23, 25

*Avio, Inc. v. Alfoccino, Inc.*,
311 F.R.D. 434 (E.D. Mich. 2015) .................................................................36

*Beattie v. CenturyTel, Inc.*,
511 F.3d 554 (6th Cir. 2007) ..............................................................24, 25, 26

*Bittinger v. Tecumseh Prods. Co.*,
123 F.3d 877 (6th Cir. 1997), *aff'd*, 201 F.3d 440 (6th Cir. 1999)....................................25

*Cmty. Refugee Immigr. Servs. v. Registrar, Ohio Bureau of Motor Vehicles*,
334 F.R.D. 493 (S.D. Ohio 2020) ...........................................................25, 26, 27

*Coop. Med. Health Care Corp., P.A. v. Med. Synergy, Inc.*,
No. 1:21-CV-00046-PAB, 2021 WL 3808939 (N.D. Ohio Aug. 26, 2021)....................35

*Davidson v. Henkel*,
302 F.R.D. 427 (E.D. Mich. 2014) ................................................................18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)..............................................................................29

*Farm Lab. Org. Comm. v. Ohio State Highway Patrol*,
184 F.R.D. 583 (N.D. Ohio 1998) ................................................................19

*Griffin v. Breckenridge*,
403 U.S. 88 (1971).................................................................................29

*Ham v. Swift Transp. Co.*,
275 F.R.D. 475 (W.D. Tenn. 2011) .............................................................18, 19

*Hicks v. State Farm Fire & Cas. Co.*,
No. 14-CV-00053-HRW, 2019 WL 846044 (E.D. Ky. Feb. 21, 2019),
*aff'd and remanded*, 965 F.3d 452 (6th Cir. 2020).............................................33

*Hicks v. State Farm Fire & Cas. Co.*,
    965 F.3d 452 (6th Cir. 2020) .................................................................. *passim*

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tn. v. Momenta Pharms., Inc.*,
    333 F.R.D. 390 (M.D. Tenn. 2019) .................................................................. 30

*Lozada v. Dale Baker Oldsmobile, Inc.*,
    197 F.R.D. 321 (W.D. Mich. 2000) .................................................................. 19

*Malam v. Adducci*,
    475 F. Supp. 3d 721 (E.D. Mich. 2020) .................................................................. 24

*Martin v. Behr Dayton Thermal Products*,
    896 F.3d 405 (6th Cir. 2018) .................................................................. 35

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016) .................................................................. 35

*Peña-Rodriguez v. Colorado*,
    137 S. Ct. 855 (2017) .................................................................. 1

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*,
    501 F.3d 592 (6th Cir. 2007) .................................................................. 29

*Ramirez v. Webb*, No. 85-1102,
    1986 WL 16752 (6th Cir. Mar. 3, 1986) (TABLE) .................................................................. 22

*Riley v. Hamilton Cnty. Gov't*,
    No. 1:19-CV-304, 2021 WL 4714635 (E.D. Tenn. Oct. 8, 2021)
    (McDonough, J.) .................................................................. 16, 18, 36

*Rios v. Marshall*,
    100 F.R.D. 395 (S.D.N.Y. 1983) .................................................................. 31

*Robinson v. Purkey*,
    326 F.R.D. 105 (M.D. Tenn. 2018) .................................................................. 20, 21

*Rodriguez v. BerrybrookFarms, Inc.*,
    672 F. Supp. 1009 (W.D. Mich. 1987) .................................................................. 18

*Roman v. Korson*,
    152 F.R.D. 101 (W.D. Mich. 1993) .................................................................. 18

*Rosiles-Perez v. Superior Forestry Serv., Inc.*,
    250 F.R.D. 332 (M.D. Tenn. 2008) .................................................................. 23, 35

Case 3:19-cv-00062-TRM-CHS   Document 731   Filed 08/02/22   Page 4 of 45
PageID #: 11581

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*,
    863 F.3d 460 (6th Cir. 2017) ............................................................17

*In re Se. Milk Antitrust Litig.*,
    No. 2:07-CV-208, 2010 WL 3521747 (E.D. Tenn. Sept. 7, 2010)....................................22

*Senter v. Gen. Motors Corp.*,
    532 F.2d 511 (6th Cir. 1976) ............................................................25

*Snead v. CoreCivic of Tenn., LLC.*,
    No. 3:17-cv-0949, 2018 WL 3157283 (M.D. Tenn. June 27, 2018) ...................20, 23, 24

*Sterling v. Velsicol Chem. Corp.*,
    855 F.2d 1188 (6th Cir. 1988) ............................................................21

*Taylor v. CSX Transp., Inc.*,
    264 F.R.D. 281 (N.D. Ohio Sept. 28, 2007) .........................................20, 26, 27

*Thompson v. City of Oakwood, Ohio*,
    307 F. Supp. 3d 761 (S.D. Ohio 2018), *modified on other grounds*,
    *Thompson v. City of Oakwood, Ohio*, No. 3:16-CV-169,
    2018 WL 9944970 (S.D. Ohio Apr. 4, 2018) ....................................................27

*Tipton v. CSX Transp., Inc.*,
    No. 3:15-cv-311-TAV-CCS,
    2017 WL 11493745 (E.D. Tenn. July 11, 2017) ............................................24

*Vakilian v. Shaw*,
    335 F.3d 509 (6th Cir. 2003) ............................................................22

*Wallace v. Carlton*,
    No. 2:07-CV-246, 2010 WL 1957492 (E.D. Tenn. May 13, 2010) ...............................30

*Wallace v. Powell*,
    288 F.R.D. 347 (M.D. Pa. 2012)..........................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...........................................................20, 23, 33

*Webb v. United States*,
    789 F.3d 647 (6th Cir. 2015) ............................................................30

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ................................................... *passim*

*Woodall v. Wayne Cnty.*,
    No. 20-1705, 2021 WL 5298537 (6th Cir. Nov. 15, 2021) ...............................................17

*Zelaya v. Hammer*,
    516 F. Supp. 3d 778 (E.D. Tenn. 2021) ........................................................15, 16, 29, 34

**AUTHORITIES**

Fed. R. Civ. P. 23(a)(2) ............................................................................................................20

Fed. R. Civ. P. 23(a)(3) ............................................................................................................23

Fed. R. Civ. P. 23(b)(3) ...........................................................................................17, 26, 28, 33

Fed. R. Civ. P. 23(g) ................................................................................................................27

This proposed class action arose from a workplace raid (the "Raid") planned and executed by federal officers from the Department of Homeland Security ("DHS") and the Internal Revenue Service ("IRS") (collectively, the "Federal Officers"), working closely with state and local law enforcement, at the Southeastern Provision meatpacking plant in Bean Station, Tennessee (the "Plant") on April 5, 2018.  Defendants—which include officers from DHS, the IRS, and the United States[1]— targeted and seized approximately 100 Latino workers.  Proposed class representatives Maria del Pilar Gonzalez Cruz and Catarino Zapote Hernández (the "Proposed Class Representatives") ask this Court to certify a class of "All Latino[2] individuals working in the Plant on April 5, 2018 who were detained." (the "Class").[3]  Ms. Gonzalez Cruz and Mr. Zapote Hernández seek to serve as class representatives on Counts IV and V of Plaintiffs' complaint for civil rights violations under 42 U.S.C. §§ 1985(3) and 1986.[4]

This action should be certified as a class action because Plaintiffs meet the requirements for Rule 23(a) and (b)(3).  The number of putative class members is approximately 100; joinder is impracticable because of class members' status as low-income, limited English-proficient individuals, many of whom are non-citizens; the class claims arise out of a singular plan executed during the course of a one-day Raid and present numerous common questions that predominate over individual issues; the named Plaintiffs' claims are typical of those of the Class; and the class vehicle is a superior method of adjudication given the characteristics of the Class members and that the costs of litigation might outweigh any future recovery.  Ms. Gonzalez Cruz and Mr. Zapote

---

[1]    The Federal Tort Claims Act (FTCA) claims against the United States are not class claims.

[2]    The term "Latino" refers to the race/ethnicity of Southeastern Provision employees. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017); *see also* Doc. 396 at 3 n.2.

[3]    Fourth Amended Complaint (Doc. 396 ¶ 113) (hereinafter "FAC" or the "Complaint").

[4]    The Complaint also asserted *Bivens* claims as class claims in Counts I, II, and III, but this Court dismissed those claims. (Doc. 380)  Plaintiffs reserve all rights with respect to those dismissed Counts, including all appeal rights.

Hernández are adequate class representatives, and Plaintiffs' counsel should be designated as class counsel. The requirements for class certification are therefore satisfied.

## STATEMENT OF FACTS

### A.    The Plan.

Defendants, along with law enforcement officers from the Tennessee Highway Patrol ("THP") and the Morristown Police Department ("MPD"), implemented a plan to target and arrest approximately 100 Latino workers on April 5, 2018, resulting in the largest immigration raid in the United States in the decade that preceded it.  A year earlier, the lead Case Agents on the investigation – IRS Special Agent Nick Worsham, ICE-Homeland Security Investigations (HSI) Special Agents Trevor Christensen and Travis Carrier, and THP Trooper Tim Southerland (the "Case Agents") – began a criminal investigation into the financial crimes of the Plant owner, James Brantley.  The investigation revealed nothing about any worker's immigration status.  It only led to the generalized information that the Plant workers were mostly Hispanic/Latino and that all Plant workers, regardless of immigration status, were paid in cash.  Despite knowing that ethnicity cannot be the sole factor supporting reasonable suspicion for a detention, and officers cannot target a group for enforcement based on their ethnicity, the Case Agents proceeded to plan for the mass detention and arrest of the Plant's Latino workers.  This plan was well-documented and approved by supervisory officials at DHS and IRS, including the Acting Resident Agent in Charge of HSI Knoxville Ronald Appel, the Assistant Special Agent in Charge of HSI Tennessee Robert Hammer, the HSI Nashville Group Supervisor Dennis Fetting, and IRS supervisors Rich Nelson and Carilyn Peters.  (Ex. 5 (Fetting Dep.) at 138:20-139:4)[5]  The Case Agents and supervisors

---

[5]    All exhibits are attached to the Transmittal Affidavit of Jeremy A. Berman in Support of Plaintiffs' Opening Memorandum Of Law In Support Of Class Certification, and are cited herein as "Ex. __"

communicated the plan to the over 100 agents who participated in the Raid. On April 5, 2018, Defendants executed the plan in coordinated fashion, forcibly detaining and arresting the Plant's Latino workers, including those with proof of lawful immigration status, and transporting them across county lines to a Tennessee National Guard Armory (the "Armory").

Beginning around May 2017, the Case Agents initiated the investigation into the financial crimes of Plant owner James Brantley. The investigation eventually concluded with the issuance of the IRS Search Warrant (the "IRS Warrant") on April 2, 2018, which gave the officers authority to seize documents related to Brantley's alleged financial crimes. (Doc. 396-2) During the nearly one-year investigation of the Plant, Defendants did not obtain any individualized facts or evidence that any specific Plant worker was in the United States in violation of immigration laws. (Ex. 6 (Christensen Dep.) at 126:24-127:1 ("Q. You didn't have reasonable suspicion as to any specific individual worker at Southeastern Provision? A. Not a specific individual."); Ex. 7 (Appel Dep.) at 70:22-24 ("I don't think, on this case, we knew individual names or anything ahead of time.")) Defendants had numerous investigative techniques at their disposal to attempt to obtain evidence of the workers' immigration status, but they did not utilize the vast majority of those tools. (Ex. 6 at 89:22-93:19 (confirming the Case Agents did not use a number of available investigative techniques to attempt to secure individualized evidence of immigration status during the investigation)) Defendants obtained only generalized and unverified information about the workers from a THP Confidential Informant (the "CI") and personnel from the Plant's bank: The Plant workers were Latino, several unidentified Latino workers had been fired from another company for use of fraudulent documents, and the workers were paid in cash. (FAC ¶¶ 8, 9) None of this information was tied to a specific worker nor was it probative of the immigration status of the Plant workers as group. (*See, e.g.*, Ex. 8 at 71:24-72:22 (Carrier Dep.) (testifying that the CI

3

did not provide the names of any workers))  Additionally, Defendants believed – as early as June 2017 – that the Plant's cash wage payments were not unique to the Latino workers because the Plant paid all workers in cash, regardless of race or immigration status.  (*See* Ex. 6 at 87:16-18 ("Q. There were White workers who were paid in cash? A. Yes, ma'am."); Ex. 9)  Tellingly, a mere six weeks before the Raid, Defendant Christensen informed his supervisor, Defendant Appel, that he did not "feel comfortable" stating in an internal ICE document that the Case Agents had "positively identified" any Plant worker as "illegal."  (Ex. 10)  Nevertheless, the Case Agents, with supervisor approval, proceeded to plan and execute the mass detention and arrest of the Plant's Latino workers during the execution of the IRS Warrant.

Throughout the planning stages, Defendants routinely conflated Hispanic ethnicity with unlawful immigration status.  (*See* Ex. 11, US-005345 (describing targets of Raid as "40-50 Hispanics and possibly ½ illegal" and referring to the processing of "hispanics"); Ex. 12 (referring to workers as ½ "Suspected Illegal Aliens" and "Hispanics"); Ex. 13 (same); Ex. 14 (email referencing a "Hispanic" Car Crash); Ex. 15 (email on processing of "hispanics"); Ex. 16, US-005693 (anticipating to find "40 illegal Hispanics"; Ex. 17, US-011062-64 (Defendant Worsham email noting that: "I am not familiar with the proper name of the documents the Hispanics, illegals, undocumented, etc. would have."))  In one instance, Defendant Christensen asked Defendant Worsham to substitute "Hispanic" with "suspected illegal alien" in one of the versions of what Defendants called "the Great 'Steak' Out" PowerPoint—a half-correction that underscores that Defendants regarded the two categories as essentially interchangeable.  (Ex. 13, US-004409)  This racial stereotype – that Hispanic ethnicity is a proxy for unlawful status – motivated the Defendants' plan to target only the Latino workers for detention and arrest.  (*See* Ex. 6 at 105:17-22 ("Q. Okay.  So my question is, based on your investigation, you anticipated that any civil

4

immigration arrests of workers would be of Hispanic workers? MR. LITTLE: Object to form. A. Yes, ma'am."); Ex. 8 at 90:5-11 ("Q. Was the expected ethnicity of the employees to be arrested Hispanic? A. The ones suspected of being in the country illegally working there undocumented, yes."); Ex. 8 at 118:10-119:20 (acknowledging a separate process and set of questions for "anyone suspected of being undocumented" and confirming that the people suspected of being undocumented were Hispanic); Ex. 18 (Worksite Enforcement 14-day Checklist noting the "Expected Nationalities" of anticipated arrestees as "Mexico, Guatemala, and other Central American countries")) Defendants crafted this plan despite knowing that ethnicity alone cannot provide reasonable suspicion for a detention and officers cannot target individuals for enforcement because of their ethnicity. (*See, e.g.*, Ex. 6 at 48:7-11 ("Q. Is it appropriate to use race or ethnicity when making a reasonable suspicion or probable cause determination to detain or arrest someone? A. That cannot be the sole factor on any reasonable suspicion or probable cause."); Ex. 8 at 42:16-18 ("Q. Is it ever okay to target someone for enforcement based on their race or ethnicity? A. No."); Ex. 7 at 60:22-61:7 ("[Y]ou shouldn't use somebody's race to base an arrest off of."))

Although neither the IRS Warrant nor the affidavit in support of the IRS Warrant (the "Affidavit") mention that federal and state agents would conduct mass arrests on April 5, 2018, Defendants and their co-conspirators planned for those arrests during numerous planning meetings.[6] (Doc. 396-2) From May 2017 until the Raid, Defendants Worsham, Carrier, and Christensen attended, either together or separately, approximately 15 meetings with Defendants

---

[6] The Case Agents have stated they received advice from the U.S. Attorney's Office for the Eastern District of Tennessee that the Rule 41 criminal warrant meant that government agencies did not an need an additional civil warrant for the detention and arrest of workers on civil immigration violations. Without conceding the merits of that advice, there is no indication that the advice altered the Case Agents' existing plans for the Raid, including the plan to target only the Plant's Latino workers for arrest.

5

from all federal agencies involved in this case, as well as officers in state and local agencies, to plan for the Raid. (Ex. 7 at 146:3-13 and 158:2-12 (describing roles of various agencies); Ex. 6 at 158:7-158:10 ("Q. And do you recall that the Morristown Police Department was also present in some of those meetings -- . . . -- to plan for the raid? A. Yes, ma'am."); Ex. 8 at 46:22-47:20 (testifying about planning meetings in May 2017); *id.* 53:15-25 (explaining that the purpose of planning meetings with the IRS and THP was to prepare for the Raid); Ex. 19 (THP document listing meetings)) Additional Defendants, including Dennis Fetting, Ronald Appel, and IRS Supervisory Agents Rich Nelson and Greg Martin also participated in meetings to plan the Raid, alongside the THP and MPD. (Ex. 20, US-002960; Ex. 5 at 99:25-100:5; Ex. 7 at 115:18-116:6; Ex. 8 at 125:12-15) Defendants Robert Whited and David Vicente Pena from ICE-Enforcement and Removal Operations ("ERO") also participated in a planning meeting at the U.S. Attorney's Office in February 2018. (Ex. 21 (Pena Dep.) at 98:13-101:25)

Defendants secured vans, bags of plastic zip ties, aerial support, and the use of the Armory to process large numbers of arrestees. (FAC ¶¶ 1, 5, 139); (*see also* Ex. 6 at 110:19-22 ("Q. At this point in February, you were anticipating processing any workers arrested at Southeastern Provision that day at the armory? A. Yes, ma'am."); Ex. 22 (Southerland Dep.) at 63:15-18; Ex. 23 (Hammer Dep.) at 223:17-19 ("If there were 50 arrests, then we would -- I would anticipate that we would have flex cuffs there."); Ex. 18 (Worksite Enforcement 14-day Checklist anticipating approximately 50 arrests and noting use of Armory to process arrestees)) Defendants prepared a press release prior to the Raid that described the anticipated immigration arrests, with no mention of James Brantley, the ostensible target of the investigation. (Ex. 24) Defendants also created template arrest narratives for the individuals they expected to arrest on civil immigration charges. Those narratives were later copied and pasted verbatim into the Forms I-213 (the standard

6

DHS form for noncitizens processed for removal from the United States) for the individuals arrested and processed at the Armory after the Raid, with no individualized information about how, by whom, or the manner in which those individuals were arrested. (Ex. 5 at 165:21-22; 169:14-22 (testifying that boilerplate narratives "that would likely fit the encounters or arrests of individuals" were put into the I-213s)) Defendants' readiness for the mass civil arrests was so important that the IRS, at the behest of HSI, delayed the execution of the IRS Warrant for a month to allow HSI to obtain the resources needed to process the arrested workers. (*See* Ex. 8 at 94:10-94:15 ("Q. And because HSI needed to obtain necessary items to process all the employees expected to be encountered, the date of the operation was going to have to be moved back to April 5th; correct? MR. HATMAKER: Object to the form. A. Yes, ma'am."); Ex. 25 (Peters Dep.) at 68:10-69:5; Ex. 26)

The Case Agents drafted "Operations Plans" for HSI and IRS to establish a unified set of instructions for law enforcement officers who would participate in the Raid. (Ex. 27 (transmitting HSI Ops Plan and IRS Ops Plan)) Those Operations Plans memorialized the plan for the mass detention and arrests that the Defendants and co-conspirators had crafted. The Operations Plans were finalized by late March 2018 and included in their directives:

- Operational objectives that included "interview/identify suspected illegal employees and hiring officials" (Ex. 27) (the "HSI Ops Plan");
- "Raid gear" and "tactical dress" would be worn (*id.*);
- THP units would block roads "to prevent individuals from entering and exiting the area" (Ex. 27) (the "IRS Ops Plan");
- Perimeter teams (consisting of THP and MPD officers) "will surround the processing and block all exits to prevent anyone from fleeing the building" (*id.*);
- "All employees will be temporarily detained until they can be properly identified and processed" (*id.*); and
- After the Plant was secured, "the employees will be taken outside and handed off to members of the employee control team" who would then take employees to "triage areas where the employees will be identified and processed." (*Id.*)

7

Defendants further organized a pre-operation briefing that took place on April 4, 2018 at the Marriott Hotel in downtown Knoxville for the federal, state, and local law enforcement officers participating in the next day's Raid. (Ex. 28) During the April 4 briefing a PowerPoint presentation with HSI, IRS, and THP insignia on the cover was shown. (Ex. 29) The PowerPoint presentation instructed law enforcement personnel to "keep moving" after entering the Plant, allowed them to "temporarily detain" workers until identified," and noted that "employees inside the buildings will be kept inside until they are handed off to the employee control team." The PowerPoint also provided a link to the HSI and IRS Operation Plans. The April 4 briefing and the PowerPoint ensured that all officers participating in the Raid were "on the same page" about the plan to be executed the following day. (Ex. 21 at 11:19-12:3; Ex. 30 (T. Francisco Dep.) at 131:14-131:21 ("Q. Was the purpose of the briefing to ensure that all the law enforcement personnel participating in the operation were on the same page about what would happen the next day? A. That is the standard objective of having a briefing, is to make sure that everybody is on the same sheet of music and are aware of their responsibilities and duties."); Ex. 31 (Ayala Dep.) at 151:6-151:10 ("Q. After the April 4th briefing, did you agree with how the raid was going to be executed? MR. HARVEY: Object to the form. A. Yes."))

## B. The Raid.

On the day of the Raid, over 100 federal, state and local officers descended on the Plant. (FAC ¶ 1) They surrounded the location, blocked the public road and the exits, took over the parking lot, and surveilled the premises from above with a helicopter. (*Id.* ¶¶ 168-70, 286, 316); (Ex. 8 at 97:12-100:13) While heavily armed THP and MPD "strike teams" guarded the perimeter, the Federal Officers, alongside approximately 23 THP troopers, burst into the Plant. (FAC ¶ 171); (*see also* Ex. 32, US-000315; Ex. 33 at US-011689-93) The Federal Officers – armed and wearing bulletproof vests – yelled at the workers to stop moving and forced them to line up. (FAC ¶¶ 176,

8

177)  The Federal Officers did not verbally identify themselves by name, nor did they wear visible name badges.  (*Id.* ¶ 175); (*see also* Ex. 34 (B. Smith Dep.) at 247:1-5)  The aggressiveness of the entry led workers to believe the officers were terrorists.  (Ex. 35 (Guerrero Dep.) at 50:14-17 ("At that moment when the officer hit me, I thought immigration doesn't do that.  So I thought it was terrorists who had come in."))  Defendants claim that they detained all workers in the Plant upon entry for safety reasons. To the extent that they initially conducted a Plant-wide detention for purported safety reasons, the nature of the detention quickly diverged with respect to the Latino and non-Latino workers.

The Raid itself was conducted in an unnecessarily violent, humiliating, and demeaning manner toward Latino workers.  During the Raid, Defendant HSI Agent John Witsell struck Plaintiff Geronimo Guerrero in the face.  (Ex. 36 (Downey Dep.) at 314:6-13; Ex. 35 at 58:15-18)  Defendant Witsell also put his foot on the neck of another worker who was prostrate and restrained, an act that other agents have described as "excessive" and a use of "deadly force".  (Ex. 31 at 239:11-240:10; Ex. 36 at 322:6-324:7)  Latino workers were singled out for full body frisks while non-Latino workers were not searched at all.  (Ex. 30 at 178:21-179:1 ("Q. Did you frisk any individuals who -- any non-Hispanic individuals? A. I did not. Q. Did you observe any other agents or officers frisking non-Hispanic individuals? A. I did not."); *id.* at 189:23-190:7; 190:16-194:12)  Another officer joked in Spanish in front of the detained Latino workers that a dog seen near the Plant was also from Mexico.  (*See* Ex. 37 (Zapote Hernández Dep.) at 115:6-12)  ERO Officer Ayala admitted that he used the word "fucker" several times to describe a Latino worker within earshot of other workers.  (Ex. 31 at 247:1-8; *id.* at 245:3)  Defendant Ayala also instructed the terrified, arrested Latino workers who were crowded in a van to "get tight . . . get [] in . . . get closer to each other." "[D]on't grab each other, don't kiss each other[.]"  (*Id.* at 271:15-272:19)  A

federal officer directed the Spanish word "cabrón" at one of the workers, which, according to another agent, meant "fucker, get over here" in English. (*Id.* at 217:10-24) HSI Agent Bobby Smith admitted to using his government-issued cell phone to take—without permission—a picture of all the workers he was transporting to the Armory on two separate trips, despite being instructed in a pre-Raid briefing, "don't be taking any pictures, just do your job." (Ex. 34 at 190:14-193:14, 195:11-197:25) This behavior was directed exclusively at the Latino workers; there is no evidence that any Defendant frisked, struck, tackled, or directed abusive or humiliating language at any of the non-Latino workers present during the Raid—including at any of the Plant management who were under criminal investigation.

Defendants detained all the Latino workers and moved them to pre-staged locations at the Plant's exits purportedly to question them about their immigration status. (Ex. 6 at 168:20-169:4 (confirming, per the IRS Ops Plan, that the plan was to secure the location, take the employees outside, hand them to members of the employee control team, and then identify and question employees)) Only the Latino workers were subjected to this intrusive, prolonged detention and interrogation, which extended far beyond any protective sweep incident to the execution of the IRS Warrant. (*See* Ex. 34 at 181:21-182:1 ("Q. Okay. How would you describe the skin color of the people who were in those lines? A. Predominantly they were Hispanics. Q. Anyone not Hispanic? A. I don't remember seeing anybody that wasn't."; Ex. 38 (Zelaya Dep.) at 79:8-9 ("Q. What happened with the whites? A. They let them be."); Ex. 35 at 251:17-24 ("What I saw was agents who let white people go like nothing. They only tied the hands of Latino people and they put -- they put only them in the van. But the white people were left alone. They did nothing, nothing to them. They could walk around. They were there -- they were there like nothing."); Ex. 39 (Pulido Dep.) at 271:1-7 ("Q. When the officers came to SEP were any of the white employees or

management detained? A. When we were outside they also exited but very separate from us. Q. And did you see what happened to them? A. They were talking amongst themselves. Smoking."); Ex. 40 (Gonzalez Cruz Dep.) at 255:7-9 (regarding a White individual who was seated outside while Latino workers were told to line up: "They spoke to him in a much calmer way . . . compared with the way they spoke to us. They didn't speak to us that way.")) This targeted detention was pre-planned to allow the officers the opportunity to develop probable cause to make arrests of Latino workers. (*See* Ex. 7 at 109:10-13 ("Q. So the plan was to develop probable cause with respect to individual workers at the plant? A. Yes. "); Ex. 8 at 119:21-120:13 (confirming that officers were to develop probable cause through questioning); *id.* at 118:10-119:20 (acknowledging a separate process and set of questions for "anyone suspected of being undocumented" and confirming that the people suspected of being undocumented were Hispanic); *id.* at 116:19-22 ("Is it your understanding that the individuals could not be released from that detention until they proved their legal status? A. Yes.")) As the government admits, the Federal Officers determined who to detain for purposes of this interrogation on the basis of their race and ethnicity. (Doc. 329 at 34-35, 40)

Defendants arrested only Latino workers on April 5, loading them on to vans to be transported to the Armory. (*See* Ex. 8 at 178:9-11 ("Q. Were any white workers arrested on April 5th, 2018, at the Southeastern Provision plant? A. No. "); Ex. 41 (Cannon Dep.) at 207:4-208:2 (noting that workers transported to the Armory were restrained with flex cuffs, whereas White workers were unrestrained and smoking in the staging area)) As a result of the agents' blanket targeting of every individual who appeared Latino, even workers with proof of lawful status were

11

arrested.[7] One of these individuals was Plaintiff Isabel Zelaya, who showed his identification and work authorization card to ICE agents at the Plant, but was still handcuffed, arrested, and transported to the Armory. (Ex. 38 at 214:4-217:2) Multiple Defendants testified that other individuals with lawful immigration status and even a U.S. citizen were arrested and taken to the Armory. (*See* Ex. 31 at 286:11-287:11 (testifying that he talked to a Latino woman who "was really mad" because she was arrested and transported to the Armory despite being a U.S. Citizen."); Ex. 6 at 231:22-232:3 ("Q. So to your knowledge, two people who were authorized to be present in the United States were arrested that day and transported to the armory? A. That is my understanding."); Ex. 23 at 321:4-19 (same); Ex. 42 at Response 6 ("One of the individuals detained [at the Armory] was determined to be authorized to be in the United States, and Defendant drove the individual back to Southeastern Provision so the individual could retrieve her vehicle."))

The non-Latino workers, by contrast, were either not detained or questioned at all or were subject only to a brief, non-intrusive detention. Likewise, unlike the Latino workers with proof of lawful status, who were handcuffed, arrested, and transported to the Armory, any non-Latino workers who were asked to provide proof of documentation to the officers were free to leave. (Ex. 8 at 178:9-178:11 ("Q. Were any white workers arrested on April 5th, 2018, at the Southeastern Provision plant? A. No."); Ex. 25 at 214:9-219:17 (describing a White Plant employee who was

---

[7]    Though Defendants allegedly intended to question the Latino workers about their immigration status at the Plant, there is no evidence in the record that every worker was in fact questioned. Defendant Fetting, the agent who allegedly designed the plan for entry into the Plant, expressed concern the day of the Raid as to whether U.S. Citizens were being loaded on to the vans without knowing why. (*See* Ex. 5 at 312:9-313:23; *id.* 138:20-139:4) Defendants have also admitted that they did not have the capability to conclusively assess immigration status at the Plant, and that they intended to transport workers to the Armory for that reason. (Ex. 7 at 181:6-7 ("A. They [the mobile biometric devices] were incapable of being used at the plant."); Ex. 21 at 191:3-8 ("Q. Did you use any ICE databases at the plant to verify individuals' identities? A. Not that I remember."); Ex. 30 at 202:16-203:5)

released without being escorted to the employee control team); Ex. 30 at 186:5-190:7; 190:16-194:12 (describing video that shows White workers not patted down and exiting the Plant on their own volition, while Latino workers were lined up and given full-body pat downs))  Notably, the targets of the IRS Warrant – the Plant owner and managers, who are all White – were asked to provide consensual interviews the day of the Raid, after which they were free to leave.  (*See* Ex. 6 at 230:4-230:19 (confirming targets of the warrant were all White and were all free to leave that day); Ex. 8 at 170:24-171:16 ("Q. Was Mr. Brantley free to leave when you were interacting with him? A. At the time of the interview, yes. Q. What about Priscilla Keck? Was she free to leave at the time you were interviewing her? MS. TAYLOR: Objection to form. A. Yes. Q. What about Carl Kinser? Was he free to leave at the time you were interviewing him? A. Yes. MS. TAYLOR: Objection to form. Q. What about Jason Kinser? Was he free to leave at the time you interviewed him? MS. TAYLOR:  Objection to form. A. Yes."))

### C.    The Aftermath Of The Raid.

In total, ICE arrested approximately 100 workers during the Raid. *See ICE Worksite Enforcement Investigations in FY18 Surge*, https://www.ice.gov/news/releases/ice-worksite-enforcement-investigations-fy18-surge (Dec. 11, 2018) (Ex. 43)  The actual number is the subject of dispute because Defendants have indicated that they do not have records of all the individuals transported from the Plant to the Armory, and their lists of arrestees reflect only those who were "processed for removal," *i.e.*, determined to be potentially removable from the United States. Accordingly, these lists would omit individuals who—despite having legal status—were arrested, loaded into vans, and taken to the Armory (but later released when Defendants realized their error). (*See* Ex. 23 at 317:18-21 (confirming 104 people were brought to Armory but only 97 were processed); *id.* at 274:5-14 (stating that not all individuals taken to Armory were included in the

agency's final number of arrestees); Ex. 44 (Lund Dep.) at 287:5-18 (stating that no manifest of individuals transported from Plant to Armory was created))

The Raid received national recognition from DHS officials, and the HSI Case Agents were recognized with an award for their participation in the case. (Ex. 45) The number of civil immigration arrests was a critical element of the perceived success of the operation. (*See* Ex. 6 at 288:4-290:10) Following the Raid, Defendants exchanged congratulatory and celebratory messages about the Raid, and joked about the response from the community members who had been affected. (Ex. 46 (agent text messages joking about donating to fund for families of Raid victims); Ex. 6 at 282:8-282:10 ("Q. Did you donate to this fundraising site for families affected by the raid? A. No, ma'am. I was being sarcastic."); Ex. 47 (agent text message chain joking about Asian-owned restaurants in the Morristown community being closed day after the Raid)) In recognition of the integral role that the THP and MPD played in the operation, HSI recommended asset sharing for the seized funds in the amount of 40% for THP and 30% for MPD. (Ex. 32 ("Since the inception of this investigation, THP-CID Trooper Tim Southerland was an integral part of the case . . . . participat[ing] in every operational component and coordination meeting."); Ex. 48; Ex. 49)

D. **The Proposed Class Representatives.**

Plaintiff Catarino Zapote Hernández was working at the Plant on April 5, 2018. (FAC ¶ 18). He is Latino. (*Id.*) He was detained on April 5, 2018 at the Plant by Federal Officers. Defendants detained him without any information about his identity or immigration status. (Ex.

37 at 107:17-22, 109:3-18)  He was zip-tied, arrested, and transported to the Armory.  (*Id.* at 113:25-114:5; 125:7-10)

Plaintiff Maria del Pilar Gonzalez Cruz was working at the Plant on April 5, 2018.  (FAC ¶ 17).  She is Latina.  (*Id.*)  She was detained on April 5, 2018 at the Plant by Federal Officers. Defendants detained her without any information about her identity or immigration status.  (Ex. 40 at 131:23-132:2)  She was zip-tied, arrested, and transported to the Armory.  (*Id.* at 145:7-9; 151:17-19)

## PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on February 21, 2019 (Doc. 1) and the operative Fourth Amended Complaint on May 5, 2021.  (Doc. 396)  On January 31, 2021, the Court granted in part and denied in part the motions to dismiss the Third Amended Complaint.  *See Zelaya v. Hammer*, 516 F. Supp. 3d 778 (E.D. Tenn. 2021).  The Order permitted the 42 U.S.C. § 1985(3) and § 1986 claims to proceed, along with two *Bivens* claims for excessive force and the FTCA claims.[8]  On January 26, 2022, this Court denied motions to dismiss and a motion for judgment on the pleadings filed by certain newly added defendants.  (Doc. 575)  In permitting Plaintiffs' § 1985(3) and § 1986 claims to proceed, the Court quoted from its earlier opinion, accounting for pleadings that federal agents and THP officers planned and participated in the Raid, and that they

---

[8]    The FTCA claims are false arrest, battery, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress.

"intentionally used the search warrant as a pretext to target Latino workers for illegal arrests." (Doc. 575 at 17-18); *Zelaya*, 516 F. Supp. 3d at 806.

This Court further held that it is "reasonable to infer from the facts alleged that the raid was planned to be executed in the way described, as opposed to dozens of officers coincidentally executing it in the same manner." *Zelaya*, 516 F. Supp. 3d at 806.

The Proposed Class Representatives bring this action on behalf of themselves and a group of similarly situated Latino workers who were detained during the Raid to recover damages arising from violations of their rights under 42 U.S.C. § 1985(3) and § 1986. (FAC ¶ 7) The Proposed Class Representatives assert these claims on behalf of a class defined as "All Latino individuals working in the Plant on April 5, 2018 who were detained." (FAC ¶ 113)

## ARGUMENT

## I.       STANDARD FOR CLASS CERTIFICATION.

"To proceed as a class under Rule 23(a), the parties seeking class certification must show that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class."

*Riley v. Hamilton Cnty. Gov't*, No. 1:19-CV-304, 2021 WL 4714635, at *3 (E.D. Tenn. Oct. 8, 2021) (McDonough, J.). Additionally, in an action for monetary damages, the Proposed Class Representatives must also show that the action satisfies the requirements of Rule 23(b)(3). Under Rule 23(b)(3), a party must show that "the questions of law or fact common to class members

16

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017). To be ascertainable, the "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 464 (6th Cir. 2020) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012)).

All six named Plaintiffs, including the Proposed Class Representatives, have been deposed. Their testimony, along with that of certain Defendants, documentary and video evidence, and the pleadings allow this Court to "conduct a 'rigorous analysis' to determine if the movant has shown that the action satisfies all the prerequisites of Rule 23." *Woodall v. Wayne Cnty.*, No. 20-1705, 2021 WL 5298537, at *3 (6th Cir. Nov. 15, 2021) ("A district court must determine the permissibility of class certification based upon information other than that which is in the pleadings although it may do so based on the pleadings alone where they set forth sufficient facts.").

Permissible inquiry into the merits of the plaintiffs' claims at the class certification stage is limited: "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013));

*accord Riley*, 2021 WL 4714635, at *2. As explained further below, the proposed class satisfies the class action requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3).

## II. THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED.

### A. The Proposed Class Is So Numerous That Joinder Of All Members Is Impracticable.

Under Rule 23, the numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class of 40 or more is generally sufficiently large to satisfy Rule 23(a)'s numerosity requirement. *Davidson v. Henkel*, 302 F.R.D. 427, 436 (E.D. Mich. 2014) (citing *Afro American Patrolmens League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974)); *see also Roman v. Korson*, 152 F.R.D. 101, 105-06 (W.D. Mich. 1993); *Rodriguez v. Berrybrook Farms, Inc.*, 672 F. Supp. 1009, 1013 (W.D. Mich. 1987); *Allard v. SCI Direct, Inc.*, No. 16-CV-1033, 2017 WL 3236448, at *3 (M.D. Tenn. July 31, 2017) (noting modern trend for meeting the numerosity factor is to require at a minimum "between 21 and 40" class members).

Here, according to their own news release, Defendants arrested approximately 104 workers during the Raid. *See ICE Worksite Enforcement Investigations in FY18 Surge,* https://www.ice.gov/news/releases/ice-worksite-enforcement-investigations-fy18-surge (Dec. 11, 2018) (Ex. 43) Discovery in the case confirms that around 100 putative class members were arrested. (*See* Ex. 50, US-002206 ("102 aliens transported to processing center . . . 5 aliens released as being in legal status . . . Remaining 97 aliens deemed to be illegal and processed for NTAs"); Ex. 51, US-014289 ("federal officials arrested 97 immigrants"))

"Apart from class size, factors relevant to the joinder impracticability issue include judicial economy arising from avoidance of a multiplicity of actions, geographic dispersion of class members, size of individual claims, financial resources of class members, [and] the ability of claimants to institute individual suits." *Ham v. Swift Transp. Co.*, 275 F.R.D. 475, 483 (W.D.

18

Tenn. 2011); *Rodriguez*, 672 F. Supp. at 1014 (citations omitted) ("Factors such as geographical dispersion, lack of sophistication, and reluctance to sue individually may also be considered in determining impracticality."); *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 184 F.R.D. 583, 586 (N.D. Ohio 1998) (finding joinder impractical, citing factors such as judicial economy through avoiding multiple lawsuits, geographical dispersion of class members, feasibility of identifying and locating class members, financial resources of class members, ability or motivation of class members to institute individual suits). Courts have also recognized that joinder is impracticable if the putative class members have "limited or nonexistent English skills and knowledge of legal system." *Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321, 328 (W.D. Mich. 2000) (citations omitted).

The characteristics of the Class members here, including their limited English proficiency, lack of familiarity with the U.S. court system, limited financial resources, and possible geographic dispersion in the years since the Raid make joinder impracticable. Members of the Class were born and raised outside of the United States. (Ex. 40 at 26:14-15) Most are unfamiliar with the U.S. legal system, and many of the proposed Class members do not speak English. (Exs. 52 & 53, Responses to Interrogatory No. 22; Ex. 40 at 9:4-10 (confirming lack of English proficiency)) Joinder is further impracticable because ICE processed for removal from the United States most of the individuals arrested that day, raising the possibility of geographic dispersion among Class members.[9] Furthermore, proposed class members also lack financial resources to bring individual cases of their own. (Exs. 52 & 53, Responses to Interrogatory No. 22).

---

[9] The United States has a list of and contact information for most of the individuals who were arrested and processed at the Armory the day of the Raid, recorded in the DHS Forms I-213 and entered into DHS databases. Notably, however, Defendants claim to not have records of *all* the individuals who were arrested and transported to the Armory but who were not processed for removal. The evidence to date suggests that 5 to 7 individuals may have been

*(cont'd)*

19

Given the number of putative Class members and their geographic dispersion, limited English proficiency, and limited financial resources, joinder would be impractical and inefficient. As such, certifying the proposed class would save judicial resources. *See Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 288 (N.D. Ohio Sept. 28, 2007) (considering, among others, relevance of judicial economy, geographical dispersion and the financial resources of class members).

### B.     The Class Members Share Common Questions Of Law And Fact.

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see also Hicks*, 965 F.3d at 458 (commonality asks "whether a common question is capable of classwide resolution"). A common question is one for which the answer "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality is not a heavy burden: the Sixth Circuit requires "only one single issue that is common to all members of the class, not multiple issues," to satisfy Rule 23(a)(2). *Snead v. CoreCivic of Tenn., LLC.*, No. 3:17-cv-0949, 2018 WL 3157283, at 13 (M.D. Tenn. June 27, 2018) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) (same)); *see also Wal-Mart*, 564 U.S. at 359 ("[F]or purposes of Rule 23(a)(2) even a single common question will do." (internal quotation marks and alterations omitted)).

Minor factual differences among plaintiffs or the existence of individualized claims do not defeat commonality, so long as there is at least "a single issue common to all members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996); *see also Robinson v. Purkey*,

---

arrested who do not appear in any lists created by ICE personnel that day. (*See* Ex. 23 at 317:18-21 (confirming 104 people were brought to Armory but only 97 were processed); *id.* at 274:5-14 (stating that not all individuals taken to Armory were included in the agency's final number of arrestees))

20

326 F.R.D. 105, 167 (M.D. Tenn. 2018) ("[V]ariation in the ancillary details of the class members' cases is insufficient to defeat certification, as long as '[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue.'" (quoting *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004))). Indeed, "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

The proposed Class satisfies the commonality requirement. The Class claims arise out of a common set of facts and are based on the same series of events directed, carried out, and overseen by the Defendants during a single day operation in which all Class members were arrested. Here, Defendants and third-party co-conspirators operated from a common set of instructions—the HSI and IRS "Operations Plans" that were developed in the weeks leading up to the Raid by several of the Case Agents and other supervisors. Defendants conferred for months before the Raid in a series of meetings with the THP and MPD to develop and refine the plan to arrest and transport dozens of Latino workers under the guise of the IRS Search Warrant for documents. The information in the Operations Plans was communicated jointly to all the individual Defendants during a pre-operation briefing on the day before the Raid and was crystallized in a PowerPoint that was intended to ensure that all law enforcement officers present the day of the Raid were on the "same page" about the operation. DHS' records of arrestees reflect identical language—preplanned, pre-drafted, and copied/pasted into workers' arrest records—about how workers were encountered by law enforcement. (*See also infra* Part III.A (discussing claim elements amenable to common proof)).

21

A claim under § 1985(3) requires a showings of "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518-19 (6th Cir. 2003) (citation omitted); *see also Ramirez v. Webb*, No. 85-1102, 1986 WL 16752, at *3 (6th Cir. Mar. 3, 1986) (TABLE). These elements can be proven by reference to common proof that focuses on Defendants' conduct. "In general, conspiracy claims deal with common legal and factual questions about the existence, scope, and effect of the alleged conspiracy." *In re Se. Milk Antitrust Litig.*, No. 2:07-CV-208, 2010 WL 3521747, at *5 (E.D. Tenn. Sept. 7, 2010). Plaintiffs' § 1985(3) claims arise from the same "nucleus of operative facts and involve the same legal theories" against Defendants, including whether they acted in conspiracy with the THP and MPD to deprive Plaintiffs and class members of equal protection of the laws. *Wallace v. Powell*, 288 F.R.D. 347, 362 (M.D. Pa. 2012) (citation omitted) (certifying a settlement class for claims arising out of conspiracy to deprive juveniles of constitutional rights).

Similarly, the § 1986 claim will rise or fall on common proof focusing on Defendants' action. 42 U.S.C. § 1986 establishes a cause of action against individuals "who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." Resolution of this claim will focus on the knowledge among Defendants of the plan, whether they had the ability to stop it from being carried out, and what steps, if any, they took to prevent its execution.

The legal questions that can be answered for the Class as a whole in a single stroke include:

1. Did the individual Defendants conspire with members of the THP and MPD to violate the rights of the Class under the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, in violation of 42 U.S.C. § 1985(3)?

2. Did the individual Defendants target members of the Class for adverse treatment in planning and conducting the Raid?

3. Were members of the Class subjected to seizure and arrest by the individual Defendants based solely on race or ethnicity?

4. Did the individual Defendants treat members of the Class differently than non-Latino workers at the plant?

5. Did the individual Defendants violate the Fourth Amendment by seizing and arresting Plaintiffs without reasonable, articulable suspicion or probable cause that each or any Class Member had violated U.S. immigration laws or any other U.S. criminal law?

6. Did the individual Defendants' pre-planning conduct or conduct at the Raid with the THP and/or MPD constitute a conspiracy?

7. Did the individual Defendants have knowledge of the conspiracy to violate Class members' civil rights, and did the individual Defendants willfully or negligently fail to prevent such wrongful acts, in violation of 42 U.S.C. § 1986?

The §§ 1985(3) and 1986 claims present common questions of fact and law in abundance. Commonality is therefore satisfied.

## C.     The Named Plaintiffs' Claims Are Typical Of The Class Claims.

Rule 23(a)(3) requires that the claims of the class representative plaintiffs are typical of the claims of the class as a whole.  Fed. R. Civ. P. 23(a)(3)  Typicality is satisfied if each of the class claims "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Am. Med. Sys.*, 75 F.3d at 1082 (citation omitted).  "[T]o be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Rosiles-Perez v. Superior Forestry Serv., Inc.*, 250 F.R.D. 332, 341 (M.D. Tenn. 2008) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976)).  "[T]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 564 U.S. at 349 n.5.

The test for typicality, like commonality, is not demanding.  *See Snead*, 2018 WL 3157283, at *13 ("Like the test for commonality, the test for typicality is not demanding and the interests

23

and claims of the various plaintiffs need not be identical." (quoting *Reese v. CNH Am., LLC*, 227 F.R.D. 483, 487 (E.D. Mich. 2005))). Individual factual nuances as to named plaintiffs or possible class members do not destroy overriding common threads when claims arise from the same event and are based on the same legal theory. For example, in *Beattie*, the Sixth Circuit found typicality satisfied when the class members' claims all centered around the same deceptive billing practices, even though those practices caused some class members to enroll in a repair service while others did not. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 562 (6th Cir. 2007); *see also Malam v. Adducci*, 475 F. Supp. 3d 721, 735-38 (E.D. Mich. 2020) (finding typicality met when class members all alleged the same harm through a Fifth Amendment due process claim for conditions of detention, even though class members had different risk profiles, posed different flight risks, and faced differing conditions); *Tipton v. CSX Transp., Inc.*, No. 3:15-cv-311-TAV-CCS, 2017 WL 11493745, at *11-12 (E.D. Tenn. July 11, 2017) (finding that differences in whether class members owned versus rented their property and whether they sheltered in place or evacuated following a hazardous crash site did not defeat typicality, as those facts went to damages).

The Proposed Class Representatives' claims each arise from a single, discrete event—the Raid—and a common fact pattern underlies each of the Class claims. Like all Class members, the Proposed Class Representatives (a) are Latino (Ex. 40 at 286:25-287:3) and (b) were targeted by the Defendants' conspiracy to detain all the Latino workers because of their ethnicity or race and without reasonable suspicion, probable cause, or any lawful authority. (FAC ¶ 309) (Ex. 40 at 193:2-7 ("[B]ecause of the way we were treated and the fact that we were given no explanation . . . of our arrest.")

Like the other Class members, the Proposed Class Representatives were detained on discriminatory and unlawful bases. The Proposed Class Representatives and each member of the

proposed Class were all similarly deprived of equal protection of the law and injured by Defendants' misconduct. (FAC ¶ 115(3)); (Ex. 40 at 253:22-257:12, 193:4-7, 254:20-22 ("[B]ecause there were other people who were white who weren't treated the same way that they were treating us."), 257:11-12 ("[T]he rest of us who were not white we were taken outside."), 286:9-10 ("[T]hey went through the same discrimination that I experienced."); Ex. 37 at 96:15-18 ("Q. What claims are you alleging as a representative plaintiff in this lawsuit? A. The emotional and physical damages suffered by the coworkers on that occasion."))

Because they and the members of the Class share a common legal injury arising out of the same event and course of conduct, the Proposed Class Representatives have satisfied typicality. *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997) ("Rule 23(a) simply requires *a* common question of law or fact.") (emphasis in original), *aff'd*, 201 F.3d 440 (6th Cir. 1999); *Am. Med. Sys.*, 75 F.3d at 1082 (same).

### D. The Named Plaintiffs And Class Counsel Will Fairly And Adequately Protect The Interests Of The Class.

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." The Sixth Circuit considers two criteria for determining adequacy of representation: "1) the representatives must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976).

Fundamentally, the "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *See Cmty. Refugee Immigr. Servs. v. Registrar, Ohio Bureau of Motor Vehicles*, 334 F.R.D. 493, 505 (S.D. Ohio 2020) (internal citations omitted). Generally, class members must not have interests that are antagonistic to one another. *See Beattie*, 511 F.3d at 562-63. The interests of a class are not antagonistic when

there is evidence that the representative plaintiffs will vigorously prosecute the interests of the class. *Beattie*, 511 F.3d at 562-63. Finally, the absence of a conflict of interest is sufficient to show there is no conflict, and there is no requirement to prove the negative further. *See id.* at 563 (finding that the district court's conclusion that the "the interests of the named plaintiffs were not antagonistic to those of the class members" is supported by the facts "because there is no indication of a conflict of interest between the named plaintiffs and the class members").

Here, the Proposed Class Representatives will vigorously protect the interests of the Class. (*See, e.g.*, Ex. 52, Response 23); Ex. 53 (same); Ex. 40 at 93:21-24, 105:2-10, 192:11-193:7, 210:20-24, 284:5-6 ("I'm representing the hundred people who went through the same thing in the raid."), 286:7-287:3 ("Q. How would you define that group? A. . . . [T]hey went through the same discrimination that I experienced."); Ex. 37 at 91:6-7, 92:19-20 ("Q. What is your role in this lawsuit? A. Represent the other coworkers."), 96:15-18 ("Q. What claims are you alleging as a representative plaintiff in this lawsuit? A. The emotional and physical damages suffered by the coworkers on that occasion.")) All class members have the same interest in obtaining declaratory and monetary relief against Defendants for violations of their established rights pursuant 42 U.S.C. §§ 1985(3) and 1986. (FAC ¶ 7) The claims of the Proposed Class Representatives mirror those of the Class they seek to represent: they are based on the same conduct and seek the same form of relief for similar harm. *See Beattie*, 511 F.3d at 562 ("The interests in this case, while of varying degrees, seem to all focus in the same direction.") (citation omitted).

The Proposed Class Representatives must have sufficient involvement in the matter to encourage them to vigorously prosecute the interests of the class. *See Cmty. Refugee Immigr. Servs.*, 334 F.R.D. at 506. This is a low burden: "The adequacy requirement places only a modest burden on a class representative to demonstrate an understanding of the basic facts underlying the

claims, some general knowledge, and a willingness and ability to participate in discovery." *Taylor*, 264 F.R.D. at 291 (citation omitted) (rejecting defendants' claim that a class representative was unfamiliar with the lawsuit, noting that plaintiff is "not required to have a detailed and scholarly understanding of the case"); *Thompson v. City of Oakwood, Ohio*, 307 F. Supp. 3d 761, 783 (S.D. Ohio 2018), *modified on other grounds*, *Thompson v. City of Oakwood, Ohio*, No. 3:16-CV-169, 2018 WL 9944970, at *1 (S.D. Ohio Apr. 4, 2018) ("[Plaintiffs] engaged counsel experienced with these types of matters and participated in the discovery process."). The Proposed Class Representatives have met their burden. Along with the other Plaintiffs, they have participated in the discovery process by producing more than 2,000 pages of documents, responding to interrogatories, and sitting for lengthy depositions at which highly intrusive and intimidating personal questions were posed; they are knowledgeable about this action and remain engaged in all steps of litigation.[10] (Ex. 52, Responses 17-23; Ex. 53 (same); Exs. 54 & 55, Response 18; Ex. 40 at 93:21-24, 192:11-193:7, 283:24-284:6, 286:2-287:3; Ex. 37 at 92:19-20, 91:6-8, 96:15-18)

Finally, the Proposed Class Representatives' counsel can fairly and adequately represent the class. *See* Fed. R. Civ. P. 23(g). The Proposed Class Representatives must have adequate resources and legal representation, and counsel "must be qualified, experienced, and generally able to conduct the litigation." *See Cmty. Refugee Immigr. Servs.*, 334 F.R.D. at 506 (finding that counsel is qualified because of their relevant substantive experience, years of practice, and professional credentials). The Proposed Class Representatives' counsel includes two well-established public interest organizations—the National Immigration Law Center and the Southern Poverty Law Center—as well as Tennessee-based counsel from Sherrard Roe Voigt & Harbison,

---

[10] Moreover, Plaintiff Zapote Hernández readily participated in his deposition from Mexico, which shows his current location outside of the United States is not a barrier to him prosecuting the class claims.

PLC, who are joined by pro bono counsel with extensive, nationwide complex civil litigation experience. (*See* Exs. 1-4) Together, the Proposed Class Representatives' attorneys are experienced in class actions and complex litigation, including litigation arising under violations of constitutional rights. *Id*. Further, counsel have invested significant time in identifying and investigating potential claims in this action, have engaged in extensive discovery to date, and are committed to advancing the costs of this litigation. *Id.*

## III. THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED.

In addition to the prerequisites of Rule 23(a), a class must also meet the requirements for one of the types of classes under Rule 23(b). *See* Fed. R. Civ. P. 23. Here, Plaintiffs move to certify a class under Rule 23(b)(3). To satisfy the requirements of this Rule, the Proposed Class Representatives must show "the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Here, common questions predominate, and class treatment is the superior method of litigating the claims.

### A. Common Questions Stand At The Heart Of Plaintiffs' §§ 1985(3) And 1986 Claims, Which Can Be Proven Through Common Evidence.

Both the Supreme Court and the Sixth Circuit have recognized that "the predominance inquiry must focus on common questions that can be proved through evidence common to the class." *In re Whirlpool*, 722 F.3d at 858 (citing *Amgen Inc.*, 568 U.S. at 467-68). "Rule 23(b)(3) does not mandate that each element of the claim is susceptible to classwide proof." *In re Whirlpool*, 722 F.3d at 859. Instead, "[t]o meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate

28

over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (citation omitted). Predominance is satisfied when questions common to the class stand "at the heart of the litigation." *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007).

### 1. Common issues predominate the § 1985(3) claim.

The first step in analyzing whether common questions predominate is considering "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The underlying cause of action here is conspiracy under 42 U.S.C. § 1985(3), which requires a showing that Defendants did:

> (1) 'conspire . . .' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of (the) conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'

*Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). The conspiracy must be "motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus,' 'though the class 'must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender.'" *Zelaya*, 516 F. Supp. 3d at 802. While Plaintiffs need not show that every element of their §1985(3) claim is susceptible to common proof, *Whirlpool*, 722 F.3d at 858, this case presents common questions in abundance, *see supra* Section II.B, which are subject to common proof and predominate over issues affecting only individual class members.[11]

To establish a conspiracy, Plaintiffs must show that there was a meeting of the minds between the Federal Officers and state and local law enforcement of the THP and MPD as to one

---

[11] The Class, by its definition, consists of members of a "discrete or insular minority" who are of Latino race or ethnicity.

plan. *See Wallace v. Carlton*, No. 2:07-CV-246, 2010 WL 1957492, at *5 (E.D. Tenn. May 13, 2010). This element depends on common questions and can be proved through common evidence because it relates to actions of the *Defendants* in conspiring to deprive the Class of its civil rights, based solely on Class members' race and ethnicity. *See Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tn. v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 407 (M.D. Tenn. 2019) ("Determination of the conspiracy issue will focus on the conduct of the Defendants, not the individual class members. . . .The existence of a conspiracy is central to the claims of all putative class members and thus is appropriate for resolution generally on a class-wide basis."). The common proof that can be used to support a finding of conspiracy includes the multiple meetings and communications between the Federal Officers and their THP and MPD counterparts in planning the Raid (including a preoperational briefing with all the participants the day before the Raid); the integral role played by the THP and MPD in the planning and execution of the Raid, as evidenced by documents seeking asset sharing by the THP and MPD; and common operational plans and a PowerPoint presentation communicated to the Federal Officers and THP and MPD officers that provided uniform instructions for the Raid. (*See supra* Facts)

The second element of the § 1985(3) claim requires that the conspiracy be "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws." *Webb v. United States*, 789 F.3d 647, 671-72 (6th Cir. 2015) (citation omitted). This element likewise raises common questions and can be resolved through evidence common to the Class. Here, again, the Class must demonstrate "purpose" *by Defendants* in depriving the Class members of their civil rights, which involves no individualized determinations. Defendants' common purpose was to violate the rights of the Class via a pre-planned targeting of Latino workers for detention and arrest on the basis of their ethnicity

and without any individualized suspicion as to any specific worker.  The relevant inquiry for a § 1985(3) claim is "defendants' intent or motivation in *effecting the alleged conspiracy* rather than defendants' intent vis-a-vis each member of the plaintiff class."  *Rios v. Marshall*, 100 F.R.D. 395, 409 (S.D.N.Y. 1983) (emphasis added).  As such, proof of Defendants' common purpose will be identical for all class members.

Some examples of the common evidence demonstrating that Defendants had a common purpose to target Latinos based on their ethnicity, which was motivated by discriminatory animus, include:

1. Evidence confirming the Case Agents and their supervisors knew they did not have reasonable suspicion or probable cause as to any individual Plant worker, but they nevertheless planned and executed the mass detention and arrest of the Latino workers. *See supra* Facts at 3-4.

2. Multiple planning documents and communications demonstrating the Federal Officers and the co-conspirators regarded "Hispanic" ethnicity as a proxy for unlawful presence in the United States.  *See supra* Facts at 4-5.

3. Evidence that Defendants planned to target the Latino workers for intrusive and prolonged detentions and interrogations for the purpose of obtaining probable cause to arrest them.  *See supra* Facts at 11.

4. Evidence demonstrating Defendants worked in concert with co-conspirators to secure the necessary resources to conduct the pre-planned mass arrests of Latino workers, including securing the Armory, bags of zip ties, and multiple vans to transport individuals from the Plant to the Armory where they "anticipate[d] working late into the evening processing the Hispanics."  *See supra* Facts at 6, 7; Ex. 15.

5. Evidence that Defendants created stock language to be inserted into for the class members' arrest narratives on the DHS Form I-213, reflecting that Defendants intended the Class members to be targeted in a similar way.  *See supra* Facts at 7.

6. Evidence—including video evidence from surveillance cameras and MPD body-worn cameras—that Defendants' treatment of the Latino workers as a group the day of the Raid was far more intrusive, abusive, and aggressive than their treatment of the non-Latino workers.  The non-Latino workers were not zip tied, frisked, arrested, taken to the Armory, tackled, punched or spoken to with humiliating and derogatory language. *See supra* Facts at 9-10, 11, 12.

7. Evidence that Defendants arrested Latino workers with lawful status the day of the Raid, whereas no non-Latino workers were arrested.  *See supra* Facts at 10, 11-12.

The third element of a § 1985(3) claim, an act in furtherance of the conspiracy, also depends on questions common to the Class and can be proved using common evidence. Similar to the first two elements, this element rests solely on actions by Defendants, not Class members, and requires no individualized determinations. Proof of Defendants' actions in furtherance of the conspiracy applies to the class as a whole. Some examples of the common evidence that establishes Defendants' overt acts in furtherance of the conspiracy include certain Defendants' participation in multiple planning meetings prior to the Raid, steps taken to prepare for the mass arrests ICE planned to conduct, and all Defendants' participation in the pre-operation briefing on April 4, 2018 (alongside THP and MPD officers). *See supra* Facts at 5-8. Participation in the Raid itself constitutes an act in furtherance of the conspiracy. Defendants' overt acts in furtherance may also be shown with testimony from various Defendants saying they agreed with the plan and that it was important to have a common understanding of that plan. *See supra* Facts at 8. Likewise, common evidence and testimony, including video footage from surveillance cameras and MPD body-worn cameras the day of the Raid, will establish that Defendants' actions taken on the day of the Raid were consistent with the plan. *See supra* Facts at 10-11, 14.

The injury prong of § 1985(3) also focuses on common questions that can be resolved through evidence common to the class; namely, whether the Class members were deprived of equal protection of the law and subjected to racial discrimination because Defendants targeted them for detention and disparate treatment based on their ethnicity. Common evidence includes videos, Defendant testimony, and representative Plaintiff testimony that shows Class members were subjected to a detention that was more intrusive, aggressive, prolonged, and humiliating in nature than the treatment afforded to the non-Latino workers. For example, common evidence will show that all Latinos were detained the day of the Raid; only Latinos were zip tied, frisked, arrested, and

32

transported to the Armory; and only Latinos were subjected to adverse treatment, including being tackled, punched, and spoken to with humiliating and derogatory language. *See supra* Facts at 9-10, 11, 12. Common evidence will also establish that Latino workers with lawful status were transported to the Armory. *See supra* Facts at 11-12. The Class experienced similar events the day of the Raid and share these common injuries.

As in any class litigation, there may be some individualized damages determinations, but this does not defeat predominance. "'[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.'" *Hicks v. State Farm Fire & Cas. Co.*, No. 14-CV-00053-HRW, 2019 WL 846044, at *5 (E.D. Ky. Feb. 21, 2019) (citation omitted), *aff'd and remanded*, 965 F.3d 452 (6th Cir. 2020) (citations omitted); *see also In re Whirlpool*, 722 F.3d at 858 ("[I]n 'the mine run of cases, it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members.'"); *see also id.* ("A plaintiff class need not prove that each element of a claim can be established by classwide proof."). Here, Defendants' liability can be determined through common evidence on a classwide basis and common questions relating to liability predominate over hypothetical individualized damages determinations.[12]

Thus, questions of law or fact common to the Class "predominate over any questions affecting only individual members", and the court can determine Plaintiffs' conspiracy claim "in one stroke." *Wal-Mart*, 564 U.S. at 350, 362; Fed. R. Civ. P. 23(b)(3).

---

[12] Damages models that apply classwide are also available and to the extent that any individualized issues arise with regard to damages, they can be addressed at a later stage.

### 2. Common questions stand at the heart of Plaintiffs' § 1986 claim and the claim can be proven through common evidence.

Plaintiffs' § 1986 claim likewise presents common issues that predominate. That claim establishes liability against "anyone 'having knowledge that any of the wrongs conspired to be done [as described in § 1985]' and [who] 'having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.'" *Zelaya*, 516 F. Supp. 3d at 806-07 (quoting *Thurmond v. Cnty. of Wayne,* 447 F. App'x 643, 650 (6th Cir. 2011)). Evidence needed to establish this claim again turns on the acts of Defendants; namely, whether they were aware of a conspiracy and in a position to prevent or aid in preventing the deprivation of Class members' equal protection rights but failed to do so. As with the elements of the § 1985(3) claim, the § 1986 claim turns on common evidence that includes, *inter alia*, the pre-Raid planning; the common Operations Plans and instructions; video evidence of how the Raid was conducted; and knowledge, training, and instruction common across Defendants. Additional evidence common to the class that will be used to evaluate the § 1986 claim includes Defendants' awareness of the plan and any steps taken or neglected to be taken to prevent the deprivation of Class members' rights. Whether this evidence establishes that Defendants had the power to prevent or aid in preventing violations of § 1985(3) but failed to do so is a legal question that will rise or fall across the class. *See Whirlpool*, 722 F.3d at 859 (finding predominance where the class claim "will prevail or fail in unison.") (quoting *Amgen*, 568 U.S. at 460)). These questions hinge on common evidence and do not require individualized inquiries. As such, the § 1986 claim meets the predominance requirement.

### B. Class Treatment Is Superior To Individual Litigation.

Fed. R. Civ. P. 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23 is geared toward ensuring that the benefits of using a class action outweigh the costs: in other words, the class action is

34

superior to available alternatives. "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Coop. Med. Health Care Corp.*, 2021 WL 3808939, at *7-8 (quotations and citation omitted).

The low-income status of the Class favors superiority, as low-income individuals do not have means to litigate on their own. For example, in *Martin v. Behr Dayton Thermal Products*, a toxic tort action brought by property owners around a hazardous building location, the Sixth Circuit found superiority was met because properties at issue were in a low-income neighborhood, meaning that "class members might not otherwise be able to pursue their claims." 896 F.3d 405, 416 (6th Cir. 2018); *see also Pelzer v. Vassalle*, 655 F. App'x 352, 366 (6th Cir. 2016) (noting the limited resources of plaintiffs weighed toward superiority); *Rosiles-Perez*, 250 F.R.D. at 348 (finding superiority satisfied because plaintiffs are "vulnerable workers with extremely limited resources rendering separate actions unlikely" and the putative class members were indigent foreign nationals "whose lack of understanding of the English language and the laws of the United States pose substantial barriers to individual actions").

Furthermore, superiority is also found where, as here, the costs of litigation might outweigh any future recovery. *See In re Whirlpool*, 722 F.3d at 854, 861 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)) ("Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery."); *accord Hicks*, 965 F.3d at 464. In addition, "[c]ases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Hicks*, 965 F.3d at 464 (quoting *Powers*, 501 F.3d at 619). That is obviously the case here.

35

Finally, "the desirability or undesirability of concentrating the litigation of the claims in the particular forum" is also considered. *Riley*, 2021 WL 4714635, at *2. Here, judicial economy is served by concentrating the litigation in the Eastern District of Tennessee, where a large number of the Class members reside and all of the Defendants are subject to personal jurisdiction.

### C.     The Class Is Ascertainable.

"Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Hicks*, 965 F.3d at 464 (quoting *Sandusky*, 863 F.3d at 466). This requires that a "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Hicks*, 965 F.3d at 464 (citations omitted). The Class here is clearly ascertainable: "All Latino individuals working in the Plant on April 5, 2018 who were detained" is sufficiently definite that the Court can determine an individual's membership in the class by reference to objective criteria. The arrest records maintained by the United States identify the vast majority of class members, and for those for whom ICE may have failed to maintain a record of arrest, it is nonetheless *administratively* feasible to determine their class membership. *See Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 442 (E.D. Mich. 2015) ("Rule 23 does not require that all members of the class be instantly determinable without any individual examination. Instead, it must merely be "administratively feasible for the court to determine whether a particular individual is a member of the proposed class." (quoting *Young*, 693 F.3d a 537-38). Accordingly, the Proposed Class here is readily ascertainable.

### CONCLUSION

For all of the foregoing reasons, (1) Plaintiffs' Motion for class certification should be granted for Counts IV and V; (2) Ms. Gonzalez Cruz and Mr. Zapote Hernández should be deemed adequate class representatives; (3) Plaintiffs' counsel identified in Plaintiffs' Motion for Class

Certification should be designated as class counsel; and (4) the Court should order notice of this action be provided to the Class.

DATED: May 31, 2022

/s/ Meredith B. Stewart
Meredith B. Stewart (admitted *pro hac vice*)
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
T: (504) 486-8982
F: (504) 486-8947
meredith.stewart@splcenter.org

Norma Ventura
Julia Solórzano
Sharada Jambulapati
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
T: (404) 521-6700
F: (404) 221-5857
norma.ventura@splcenter.org
julia.solorzano@splcenter.org
sharada.jambulapati@splcenter.org

Araceli Martínez-Olguín
Facundo Bouzat
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108 – 62
Los Angeles, CA 90010
T: (213) 639-3900
F: (213) 639-3911
martinez-olguin@nilc.org
bouzat@nilc.org

Arthur R. Bookout
Andrew D. Kinsey
Stefania A. Rosca
One Rodney Square
920 N. King Street

/s/ Michelle Lapointe
Michelle Lapointe (admitted *pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 247
Decatur, GA 30031
T: (213) 279-2508
F: (213)-639-3911
lapointe@nilc.org

/s/ Jeremy A. Berman
Jeremy A. Berman (admitted *pro hac vice*)
One Manhattan West
New York, NY 10001
T: (212) 735-2032
F: (917) 777-2032
Jeremy.Berman@probonolaw.com

Eben P. Colby
500 Boylston Street
Boston, MA 02116
T: (617) 573-4855
F: (617) 305-4855
Eben.Colby@probonolaw.com

Felix A. Montanez
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33131
T: (561) 590-1646
F: (850) 521-3001
felix.montanez@splcenter.org

Joanna Elise Cuevas Ingram
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 170392
Brooklyn, NY 11217

37

Wilmington, DE 19801
T: (302) 651-3026
F: (302) 434-3026
Art.Bookout@probonolaw.com
Andrew.Kinsey@probonolaw.com
Stefania.Rosca@probonolaw.com

T: (213) 377-5258
F: (213) 377-5258
cuevasingram@nilc.org

William L. Harbison (No. 7012)
Phillip F. Cramer (No. 20697)
John L. Farringer IV (No. 22783)
SHERRARD ROE VOIGT & HARBISON,
PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
T: (615) 742-4200
F: (615) 742-4539
bharbison@srvhlaw.com
pcramer@srvhlaw.com
jfarringer@srvhlaw.com

*Counsel for Plaintiffs*

38

## <u>CERTIFICATE OF SERVICE</u>

I, Jeremy A. Berman, hereby certify, that on May 31, 2022, a true copy of Plaintiffs' Opening Memorandum of Law in Support of Class Certification and Exhibits 1-55 were served by email upon the following counsel:

| | |
|---|---|
| J. Ford Little | flittle@wmbac.com |
| J. Chadwick Hatmaker | chatmaker@wmbac.com |
| Kaitlyn E. Hutcherson | khutcherson@wmbac.com |
| Laura Day Rottenborn | laura.rottenborn@usdoj.gov |
| Krista Consiglio Frith | krista.frith@usdoj.gov |
| Jimmie C. Miller | jmiller@hsdlaw.com |
| Stephen M. Darden | sdarden@hsdlaw.com |
| Joseph B. Harvey | jharvey@hsdlaw.com |
| Stephen M. Darden | sdarden@hsdlaw.com |
| Charles K. Grant | cgrant@bakerdonelson.com |
| Clarence Risin | crisin@bakerdonelson.com |
| Savannah D. McCabe | smccabe@bakerdonelson.com |
| Chelsea N. Hayes | cnhayes@bakerdonelson.com |
| Donald J. Aho | don.aho@millermartin.com |
| Bradford G. Harvey | brad.harvey@millermartin.com |
| Zachary H. Greene | zac.greene@millermartin.com |
| Mary Ann Stackhouse | mstackhouse@lewisthomason.com |
| Lynn C. Peterson | lpeterson@lewisthomason.com |
| Lawrence F. Giordano | giordano@lewisthomason.com |
| Terry Mitchell Panter | mpanter@lewisthomason.com |
| Kari Kristina Munro | kari.munro@usdoj.gov |
| Thomas J. Aumann | taumann@bakerdonelson.com |
| Lynsey M. Barron | lynsey.barron@millermartin.com |
| David J. Cantrell | dcantrell@wmbac.com |
| Alexander C. Vey | alex.vey@millermartin.com |
| Russ Swafford | russ.swafford@millermartin.com |
| Daphne Bugelli | dbugelli@bakerdonelson.com |
| Chibogu Nneka Nzekwu | chibogu.n.nzekwu@usdoj.gov |
| David G. Cutler | david.g.cutler@usdoj.gov |

Dated: May 31, 2022

*/s/ Jeremy A. Berman*

Jeremy A. Berman (admitted *pro hac vice*)