# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| ISABEL ZELAYA, et al., | ) | |
| | ) | Case No. 3:19-cv-62 |
| *Plaintiffs*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| ROBERT HAMMER, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## MEMORANDUM OPINION

---

Before the Court is Plaintiffs' motion for class certification of their putative class claims brought pursuant to 42 U.S.C. §§ 1985(3) and 1986 against the Individual Defendants (Doc. 637). For the reasons below, the motion is **GRANTED**.

## I.    BACKGROUND

On April 5, 2018, more than one hundred law enforcement agents raided the Southeastern Provisions Plant ("the Plant") in Morristown, Tennessee, with a plan to arrest upwards of 100 Latino workers. (Doc. 732-18, at 3.) These agents—members of the Morristown Police Department ("MPD"), Tennessee Highway Patrol ("THP"), United States Department of Homeland Security ("DHS") and its subdivisions, and Internal Revenue Service ("IRS")—did not have reasonable suspicion that any specific individual working at the Plant had committed a crime, other than the suspected financial misconduct by the Plant's white owner, James Brantley. (Doc. 723-6, at 3.) At least one agent from the IRS confirmed that the Raid was not supposed to be an immigration-enforcement action. (Doc. 659-9, at 8 (acknowledging the investigation was centered on tax fraud and that the warrant was issued to gather documents).) Those involved in

the Raid, dubbed by some "The Great 'Steak' Out," a reference to the Plant's business butchering cattle, nonetheless knew that one of the Raid's purposes was to find and detain undocumented immigrants.  (Doc. 732-12, at 2.)  Indeed, the DHS Homeland Security Investigation's ("HSI") Operations Plan stated that the objective of the Raid was to: "[i]nterview/identify suspected illegal employees . . . [a]dministrative arrests will be processed for removal."  (Doc. 671-12, at 3.)  While HSI contemplated getting an administrative warrant for the immigration violations, it ultimately chose not to seek such a warrant and instead entered the facility pursuant to the IRS's criminal warrant.  (Doc. 659-3, at 25; Doc. 659-4, at 7.)

Agents developed the plan for the Raid nearly a year in advance of its execution.  (Doc. 659-3, at 6.)  Officers from DHS, IRS, THP, and MPD began investigating and planning in May 2017 after receiving a tip that Brantley's managerial employees were making substantial cash withdrawals from bank accounts each week to avoid paying payroll taxes and overtime.  (Doc. 671-12, at 9; Doc. 659-9, at 5.)  The primary case agents were Nicholas Worsham (IRS), Trevor Christenson (HSI), Travis Carrier (HSI), and Tim Southerland (THP).  (Doc. 732-27, at 18; Doc. 732-29, at 3.)  Agents from the IRS and HSI repeatedly met at the THP offices in the Tri-Cities area for planning meetings, in which MPD officers also participated.  (Doc. 732-5, at 1; Doc. 732-8, at 5–6; Doc. 732-19; Doc. 732-20.)  Agents from the same agencies also met with Assistant United States Attorneys in Greeneville, Tennessee, on at least one occasion.  (Doc. 732-7, at 8.)  According to HSI, THP and MPD were "integral" to the operation.  (Doc. 732-32.)

In the run-up to the Raid, case agents frequently discussed arresting Hispanic[1] workers and conflated Hispanic ethnicity with illegal status.  During the initial planning stages, agents estimated that "40-50 Hispanics" were working at the Plant, "possibly ½ illegal."  (Doc. 732-11,

_____

[1] The Court uses the terms "Latino" and "Hispanic" interchangeably throughout this Order.

at 2.)  The IRS, in requesting manpower from THP, stated that "there may be as many as 40 illegal Hispanics at the business when the warrant is executed."  (Doc. 732-16, at 6.)  One of the case agents from ICE, Christenson, stated that he anticipated "any civil immigration arrests would be of Hispanic workers."  (Doc. 732-6, at 10.)  Another case agent, Travis Carrier, stated that Hispanic individuals were "suspected of being in the country illegally working [at the Plant] undocumented."  (Doc. 732-8, at 9, 17.)  The initial plan for the Raid indicated that "Hispanics will be processed through HSI/ERO procedures," and that HSI "anticipate[d] working late into the evening processing the Hispanics the day of the warrant."  (Doc. 732-11, at 3; Doc. 732-15, at 2.)  At one point, Christenson requested a change to the Operations Plans:  "One good suggestion from my boss.  Can you please change it from 50% Hispanic employees to suspected illegal alien employees?"  (Doc. 732-13, at 2.)  In another email thread, Worsham, the IRS case agent, indicated he did not know what documents "the Hispanics, illegals, undocumented, etc. would have."  (Doc. 732-17, at 1.)  Even though the agents knew that white workers were also paid in cash, their planning seemed to single out Hispanic individuals for detention.  (*See* Doc. 659-9, at 22.)

A pre-Raid, all-personnel briefing was held on April 4, 2018, at the Knoxville Marriott.  (Doc. 732-27, at 13; Doc. 532-28, at 3–4; Doc. 732-42, at 5.)  During this briefing, the case agents worked to get all agents on the same page and discussed the Operations Plans.  (Doc. 732-30, at 3; Doc. 732-31, at 3; Doc. 659-3, at 29; Doc. 659-7, at 2; Doc. 659-8, at 5–6.)  Worsham communicated the twin purposes of the Raid:  to gather documents and to "process and identify employees to determine legal status."  (Doc. 659-9, at 27.)

So, after a year of planning, agents invaded the Plant pursuant to an IRS-obtained search warrant predicated on Brantley's—not the employees'—actions.  (Doc. 659-2, at 19; Doc. 659-9,

at 2 ("The IRS does not participate in immigration enforcement.").)  During the Raid, agents treated the Latino employees with varying degrees of dignity.  Some Latino workers were lined up and frisked by agents while white workers were allowed to leave.  (*Dep. Ex. 321*, at 00:00–00:41; Doc. 732-30, at 14; Doc. 659-13, at 5–6; Doc. 659-15, at 9; Doc. 659-19, at 26; *MPD 0144*, at 0:00–1:38.)  Others sat outside with their hands zip-tied while agents asked them questions.  (Doc. 732-37, at 9; Doc. 732-40, at 9–10.)  Some were told where to walk without physical contact or coercion.  (*See Defs.' Video Ex. 1, Footnote 4*, at 00:00–00:58.)  In one instance, a Latino employee was punched in the face.  (Doc. 732-35, at 4; Doc. 732-36, at 4; Doc. 659-14, at 9.)  In another instance, an HSI agent stood on the neck of a prone employee.  (*Ayala Arrest*, at 00:54–01:20; Doc. 732-31, at 5.)  Agents detained the Latino employees—even those who asserted they had valid work authorizations—and transported them to the Morristown Armory on vans.  (Doc. 732-34, at 5; Doc. 732-40, at 10; Doc. 732-41, at 3; Doc. 732-44, at 3; Doc. 659-15, at 13.)  At the Armory, agents questioned and processed individuals for removal proceedings.  (Doc. 723-39, at 3; Doc. 732-42; Doc. 659-4, at 5.)

No white workers were arrested on the day of the Raid.  (Doc. 732-6, at 17; Doc. 732-8, at 22.)  The individuals arrested that day and transported to the Armory were uniformly Hispanic.  (Doc. 732-6, at 17.)  And the individuals originally suspected of criminal wrongdoing—Brantley and his managerial employees—were not arrested, either.  (*Id.*; Doc. 732-8, at 21.)  At least two of the Hispanic workers were detained at the Armory, only to be released hours later when agents discovered they had legal status in the United States.  (Doc. 732-6, at 18–19.)  In all, 104 Hispanic individuals were arrested and taken to the Armory; ninety-seven of those individuals were processed for immigration violations.  (Doc. 732-23, at 5; Doc. 732-50.)

In 2019, Plaintiffs filed the instant suit on behalf of themselves and those similarly situated, asserting various class and individual claims against the Individual Defendants—agents of ICE, DHS, HSI, DHS Enforcement Removal Operations ("ERO"), DHS Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP")—and the United States. (*See* Doc. 1.) Following motions to dismiss, only individual excessive-force claims brought pursuant to *Bivens*, individual claims against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq*., and class claims brought pursuant to 42 U.S.C. §§ 1985(3) and 1986 remain. (*See* Doc. 380.) Plaintiffs now seek class certification on their claims brought pursuant to 42 U.S.C. §§ 1985(3) and 1986 and propose that Plaintiffs Catarino Zapote Hernandez and Maria Del Pilar Gonzalez Cruz (the "Named Plaintiffs") be appointed as class representatives (Doc. 637). The motion has been fully briefed and is ready for the Court's review.

## II.    STANDARD OF LAW

Federal Rule of Civil Procedure 23 allows "members of a class" to sue or be sued "on behalf of all members" of the class. Fed. R. Civ. P. 23(a); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." (citation and internal quotation marks omitted)). To proceed as a class under Rule 23, the parties seeking class certification must show that:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

5

Fed. R. Civ. P. 23(a); *see also Dukes*, 564 U.S. at 349 (describing these requirements as "numerosity, commonality, typicality, and adequate representation").

After satisfying Rule 23(a), the parties seeking certification must also satisfy one of three paths under Rule 23(b). The path in Rule 23(b)(3) requires (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members"—predominance—and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"—superiority. Fed. R. Civ. P. 23(b)(3). In determining whether the named plaintiffs have satisfied the predominance and superiority requirements, the Court should consider:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

*Id.*

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Rather, the burden is on the party seeking certification to "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* Often, the "rigorous analysis" required of courts at the class-certification stage "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. However, Rule 23 does not give courts "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citing *Dukes*, 564 U.S. at 351 n.6). "Merits questions may be

6

considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Dukes*, 564 U.S. at 351 n.6); *see also In re Whirlpool Corp.*, 722 F.3d 838, 851 (6th Cir. 2013); *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012).

## III.    ANALYSIS

Plaintiffs seek to certify a Rule 23(b)(3) class composed of those Latino employees detained on the day of the Raid.  (Doc. 637.)  Consequently, they must satisfy numerosity, commonality, typicality, adequacy, predominance, and superiority.  *See* Fed. R. Civ. P. 23.

### A.    Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that "the class be so numerous that joinder of all members is impracticable." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  The Court does not apply a "strict numerical test" when assessing whether numerosity is satisfied; rather, "substantial numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006).  Further, impracticality of joinder need not mean impossibility, as "a showing that plaintiff[s] will suffer a strong litigational [sic] hardship or inconvenience if joinder is required" is typically sufficient. *Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 288 (N.D. Ohio 2007).  And while the "sheer number of potential litigants in a class . . . can be the only factor needed to satisfy 23(a)(1)," *Bacon v. Honda of America Manufacturing, Inc.*, 370 F.3d 565, 570 (6th Cir. 2004), district courts in this circuit consider a variety of non-numerical factors when evaluating the impracticality of joinder, including putative class members' geographic dispersion, lack of resources or English-language proficiency, and potential reluctance to sue individually. *See, e.g., Rodriguez by Rodriguez v. Berrybrook Farms,*

*Inc.*, 672 F. Supp. 1009, 1014 (W.D. Mich. 1987); *Ham v. Swift Transp. Co.*, 275 F.R.D. 475, 483 (W.D. Tenn. 2011).

This case satisfies the numerosity requirement. By their own admission, Defendants detained 104 individuals during the Raid. *See ICE worksite enforcement investigations in FY18 surge*, https://www.ice.gov/news/releases/ice-worksite-enforcement-investigations-fy18-surge (Dec. 11, 2018); (Doc. 732-50). Furthermore, many class members have been deported to other countries, including Mexico, and do not speak English as a first language. The number of class members, combined with their geographic dispersion, limited English proficiency, and modest financial resources, make joinder impracticable, if not impossible.

Defendants seem to argue that because class members can be identified and located, joinder is possible and numerosity unsatisfied. (Doc. 659, at 15–16.) However, "[s]atisfaction of the numerosity requirement does not require that joinder is impossible." *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 63 (S.D. Ohio 1991). Given the number of class members and the hardship that joinder would impose in this case, the Court finds that Plaintiffs have satisfied the numerosity requirement.

### B.    Commonality

Plaintiffs contend that there are abundant common issues in this case rendering it suitable for class treatment. "Although Rule 23(a)(2) refers to common questions of law or fact, in the plural, there need only be one question common to the class—though that question must be a common issue[,] the resolution of which will advance the litigation." *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) (internal citation and quotation marks omitted). In other words, it is not so much the presence of a common question that warrants class treatment, but the potential for the generation of common answers that advance each class member's case in equal measure. *See*

*Dukes*, 564 U.S. at 350 (noting that the key question is whether the class action proceeding has the capacity to "generate common answers apt to drive the resolution of the litigation"); *see also Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015) (". . . named plaintiffs must show that their claims depend on a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." (internal citation omitted)).

To evaluate commonality, the Court must first look to *what* questions need to be answered. Title 42 U.S.C. § 1985(3) "creates a cause of action for a conspiracy between two or more persons to deprive another of equal protection of the laws." *Zelaya v. Hammer*, 516 F. Supp. 3d 778, 802 (E.D. Tenn. 2021) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019)) (internal quotation marks omitted). To succeed on a claim under § 1985(3), a plaintiff must demonstrate: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971).

"A § 1985(3) plaintiff must prove that the conspiracy was motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus," though the class must possess the characteristics of a discrete and insular minority, such as a race, national origin, or gender. *Haverstick Enters., Inc v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 993 (6th Cir. 1994); *United Brotherhood of Carpenters & Joinders of Am. v. Scott*, 463 U.S. 825, 829 (1983))

(internal quotation marks omitted). Section 1986 "establishes a cause of action against anyone having knowledge that any of the wrongs conspired to be done as described in § 1985 and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so." *Thurmond v. County of Wayne*, 447 F. App'x 643, 650 (6th Cir. 2011) (citing 42 U.S.C. § 1986) (cleaned up).

There are at least two legal questions that can be established through common evidence in this case: (1) Did Individual Defendants conspire with THP and MPD officers to target Latino workers, in violation of the Due Process Clause and in violation of § 1985(3)? and (2) Were Individual Defendants aware that the Raid would violate the class members' civil rights, yet willfully or negligently fail to act, in violation of § 1986? Plaintiffs have submitted evidence suggesting that each class member was allegedly harmed through the execution of a single plan orchestrated by the IRS and DHS, which is memorialized in "Operations Plans" prepared by both agencies. These plans constituted a common set of instructions and were carried out against the class members in equal measure by Defendants. All class members are Latino and were, according to Plaintiffs, targeted for that reason. They were all detained and taken to the Armory for processing; ninety-seven were identified as undocumented and placed in immigration-removal proceedings. If a jury found this evidence credible, a finding of liability in favor of a single plaintiff for a violation of § 1985(3) or § 1986 as to any of the Individual Defendants would result in a finding of liability for the class. *See In re Milk Antitrust Litig.*, Lead No. 2:08-MD-1000, 2010 WL 3521747, at *5 (E.D. Tenn. Sept. 7, 2010) ("In general, conspiracy claims deal with common legal and factual questions about the existence, scope, and effect of the alleged conspiracy.").

Defendants seek to escape this result by claiming that Plaintiffs must show why these actions occurred—which, Defendants assert, is an individual-specific inquiry—and by asserting that Plaintiffs must first show a Fourth Amendment violation, followed by discriminatory animus. (Doc. 659, at 19.) Defendants' focus, however, is misplaced: as stated previously, conspiracy claims focus not on the conduct of the victims, but on the actions of the conspirators. And the crux of this case is not the Fourth Amendment violation, but a "race-based deprivation of equal protection," facilitated through a plan "to stop, detain, search, seize, and/or arrest" the class members solely based on their race and ethnicity. (Doc. 380, at 30.) The Court need not inquire as to whether every class member was seized and by whom; rather, the focus is on *Defendants'* conspiratorial actions and intent in planning and executing the Raid.

Additionally, Defendants argue that the officers acted with discretion, which, according to them, defeats commonality and demands that the instant motion be denied. (Doc. 659, at 25.) It is true that in *Dukes*, managers' discretion proved to be the death knell for commonality. *See Dukes*, 564 U.S. at 355–56. However, in that case, there was substantial variations among stores, among managers, among the availability of women, among reasons that individuals may have not been promoted. *See id.* at 356–57. Dispersion of discretion was the primary issue, and the presence of discretion fundamentally defined the class member's injuries. In this case, though, the officers were all trained on the *same policy and plan*, and all class members were subject to the *same treatment according to this plan*. The planning and decision-making were far from dispersed; rather, control and order were substantially centralized, and Plaintiffs have provided evidence that the plan was executed class-wide with consistency.

This is especially true considering that several officers have indicated that they did not have discretion to refrain from detaining individuals on the day of the Raid. The DHS-HSI

Operations Plan states that "*All* employees will be escorted from the building and controlled by an Employee Control Team until they can be properly identified and processed." (Doc. 671-12, at 13.) Defendant Blache stated during his deposition that the point of the warrant was to "remove everybody from the premises for officer safety." (Doc. 677-6, at 2.) Defendant Ayala testified that he was not instructed to question any workers during the Raid. (Doc. 677-7, at 3–4.) Defendant Cannon said he simply moved through the building detaining "any human beings inside the plant that were not law enforcement." (Doc. 677-10, at 5.) Finally, Defendant Appel, one of the Raid's primary planners, testified that "everyone present at the location would be identified and treated the same." (Doc. 677-9, at 3.) By the time the putative class members, all of whom are Hispanic, were questioned regarding their immigration status, they had already been detained. (Doc. 677-8, at 3.) To assert discretion, Defendants rely on a pre-Raid Powerpoint stating that "[a]ll employees will be handled as deemed appropriate by agents," but this does not reflect the reality of what was planned for and what happened during the Raid. (*See* Doc. 639-13, at 13.)

Finally, regardless of the fact that there are many Individual Defendants in this case, much of the proof will be common to Defendants, such as what they were told, what the saw and heard prior to the Raid, and how they worked in groups during the Raid. Plaintiffs point to evidence in the record that demonstrates many, if not most or all, of the Defendants participated in a pre-Raid planning meeting with THP and MPD. (Doc. 732, at 4–5.) As a result, the Court finds that the commonality requirement is satisfied.

### C. Typicality and Adequacy

Next, Rule 23(a)(3) requires that the plaintiffs' claims be "typical" of the class. Fed. R. Civ. P. 23(a)(3). "Typicality is met if the class members' claims are 'fairly encompassed by the

named plaintiffs' claims.'" *In re Whirlpool*, 722 F.3d at 852 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). Conversely, the typicality requirement "is not satisfied when a plaintiff can prove his own claim but not necessarily have proved anyone else's claim." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beattie*, 511 F.3d at 562. "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (quoting *Amchem*, 521 U.S. at 625–26). And class certification is inappropriate when there "is evidence that the representative plaintiffs appear unable to vigorously prosecute the interests of the class." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1083).

The adequacy and typicality inquiries "tend to merge" with the commonality inquiry because all three "'serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *In re Whirlpool*, 722 F.3d at 853 (quoting *Dukes*, 564 U.S. at 378 n.5); *Gooch*, 672 F.3d at 429.

In this case, the law and facts relating to the claims of the class members are nearly identical and are fairly encompassed in Zapote Hernandez and Gonzalez Cruz's claims. Plaintiffs have provided evidence that Zapote Hernandez, Gonzalez Cruz, and the putative class members were all targeted and detained by Defendants pursuant to a common set of instructions from agency planners. Consequently, the Court finds that the typicality requirement is also met. And, as for adequacy, Zapote Hernandez and Gonzalez Cruz have suffered the same injury as the

putative class members. There is no evidence that they have interests that are antagonistic to the rest of the class, and they appear to be adequate representatives who have every incentive to vigorously prosecute these claims on behalf of the putative class. To this point, both Zapote Hernandez and Gonzalez Cruz have participated in the discovery process and have been fully deposed.

Defendants nonetheless argue that the Zapote Hernandez and Gonzalez Cruz are not typical of the class or adequate representatives for two reasons: (1) they were, or are, in the United States without legal status, and (2) they assert individual claims alongside the class claims. (Doc. 659, at 32.) While immigration status is a relevant issue in this case, it does not render the Named Plaintiffs' claims atypical or inadequate. The class claims involve intentional targeting because of race and ethnicity, not necessarily because of immigration status, although Plaintiffs allege that the officers conflated the two. The fact that both Named Plaintiffs do not have legal status in the United States perhaps renders them *more* typical of the class members, as DHS placed *ninety-seven* of the individuals making up the putative class in removal proceedings. (Doc. 732-23, at 5; Doc. 732-50.) Furthermore, as Plaintiffs point out, the Named Plaintiffs' location on April 5, 2018, is the only relevant consideration when it comes to typicality and adequacy. Any individual's deportation to Mexico or elsewhere may be relevant to damages, but not to liability. Finally, the fact that various Plaintiffs assert other claims against the United States and individual officers does not change the Court's analysis, as these claims do not produce any conflict of interest between the Named Plaintiffs and the putative class members at this point in the litigation.

Because the Named Plaintiffs must "act through class counsel, adequacy of representation turns in part on the competency of class counsel." *Int'l Union, United Auto.,*

*Aerospace, and Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 626 (6th Cir. 2007) (internal quotation marks and citation omitted). Rule 23(g) instructs the Court to consider the following factors: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class."

Here, the proposed class counsel consists of two capable public-interest law firms, joined by various pro bono counsel and local counsel. (Doc. 632, at 28.) The National Immigration Law Center ("NILC") has litigated various class-action suits dealing with immigration matters over the last thirty-five years and has worked on this case since its inception. (*See* Doc. 732-1, at 1–3.) The NILC attorneys on this case—Michelle Lapointe, Araceli Martinez-Olguin, Facundo Bouzat, and Joanna Elise Cuevas Ingram—have substantial experience in litigating immigrant-rights claims and the Court harbors no concerns regarding their representation of the class. (*See generally* Doc. 732-1.)

Likewise, the Southern Poverty Law Center ("SPLC") has been deeply involved in complex civil-rights cases, including immigration cases through its Immigrant Justice Project. (Doc. 732-2, at 1.) SPLC has been deemed by numerous courts to be adequate class representation. (*Id*. at 1–2.) The SPLC attorneys working on this case—Meredith Stewart, Felix Montanez, Julia Solorzano, Sharada Jambulapati and Norma Ventura—have all worked on complex civil rights and employment cases. (*See id*.) The Court is similarly unconcerned about their capacity to vigorously litigate the claims in this case.

Additionally, the other pro bono counsel on this case—Eben Colby, Art Bookout, and Jeremy Berman—have no conflicts of interest that would disqualify them from representation,

have experience representing clients in class actions, and have substantial resources they can bring to bear on the present matter. (*See* Doc. 732-4.) As with SPLC and NILC, the Court deems the additional pro bono counsel to be adequate representatives of the class. Finally, Sherrard Roe Voigt & Harbison, PLC, serves as Plaintiffs' local counsel in this case. (Doc. 732-3, at 1–2.) The firm frequently serves as local counsel on complex and class-action matters, and the Court sees no reason why they would not be adequate representatives for the class. Because both the Named Plaintiffs and class counsel are adequate representatives of the interests of the class members, the Court finds that the representation in this case is adequate.

### D. Predominance and Superiority

Plaintiffs must satisfy two additional requirements for their motion to succeed: predominance and superiority. Rule 23(b)(3) is "framed for situations in which class-action treatment is not as clearly called for as it is in Rule 23(b)(1) and (b)(2) situations." *Zehentbauer Fam. Land, LP v. Chesapeake Expl., LLC*, 935 F.3d 496, 503 (6th Cir. 2019) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997)) (internal quotation marks omitted). To be certified under 23(b)(3), a district court "must find that questions of law or fact common to class members predominate over any questions affecting only individual members." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 452 (2016) (citing Fed. R. Civ. P. 23(b)(3)).

To evaluate predominance, "a court must first characterize the issues in the case as common or individual and then weigh which predominate." *Martin v. Behr Dayton Thermal Prods., LLC*, 896 F.3d 405, 413 (6th Cir. 2018). The Court must ask "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Bouaphakeo*, 577 U.S. at 453. "A class may be certified based on a predominant common issue even though other important matters will have to

be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (internal quotation marks and citation omitted); *see also Bouaphakeo*, 577 U.S. at 453.

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). To succeed on their § 1985(3) claim[2], Plaintiffs must first demonstrate the existence of a conspiracy, an element that is highly susceptible to common proof because it relies exclusively on Defendants' actions and has little to do with any individual class member. *See Hosp. Auth. of Metro. Gov't v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 407 (M.D. Tenn. 2019) ("[D]etermination of the conspiracy issue will focus on the conduct of the Defendants, not individual class members. . . . The existence of a conspiracy is central to the claims of all putative class members and therefore appropriate for resolution generally on a class-wide basis."). The Sixth Circuit has stated in antitrust-conspiracy cases that "proof of the conspiracy is a common question that is thought to predominate over the other issues of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008).

The Court sees no reason that the same logic should not apply in a civil-rights conspiracy such as this one—indeed, the proof relating to the conspiracy will involve pre-Raid meetings between the federal and state officers, the presentation of operations plans, the involvement of state officers in the planning, and other similar evidence. None of this evidence varies from class

---

[2] To succeed on a claim under § 1985(3), a plaintiff must demonstrate: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian*, 335 F.3d at 518; *see also Griffin*, 403 U.S. at 102–03.

member to class member. Additionally, Plaintiffs must also demonstrate that Defendants were motivated by invidious class-based discrimination. *See Webb v. United States*, 789 F.3d 647, 671–72 (6th Cir. 2015). "The class must be based upon race or other inherent personal characteristics." *Id*. at 672 (internal quotation marks and citation omitted). This element also relies on common proof, as it focuses on the Defendants' "intent or motivation in effecting the alleged conspiracy rather than defendants' intent vis-à-vis each member of the class." *Rios v. Marshall*, 100 F.R.D. 395, 409 (S.D.N.Y. 1983). Plaintiffs have identified several potential pieces of common evidence: (1) evidence confirming that agents and planners knew that they did not have reasonable suspicion as to any specific employee at the Plant; (2) planning documents demonstrating that agents used Hispanic identity as a proxy for illegal immigration status; (3) evidence revealing a plan to target Hispanic workers and detain and interrogate them to develop probable cause for their arrests; (4) pre-scripted narratives to input into arrest and processing forms, indicating that all class members were to be treated and classified in the same manner; (5) video evidence indicating that Hispanic workers were, in fact, treated differently than white workers. (Doc. 732, at 31.)

The only individualized inquiry regarding Plaintiffs' § 1985(3) claim is damages, which Defendants argue is sufficient to defeat class certification. (Doc. 659, at 36–37.) While damages may vary among class members, the Sixth Circuit has "never required a precise mathematical calculation of damages before deeming a class worthy of certification." *In re Scrap Metal*, 527 F.3d at 535; *see also Olden v. Lafarge Corp.*, 383 F.3d 495, 508–10 (6th Cir. 2004) ("[Defendants] may suggest that individual damage determinations might be necessary, but the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole."). Consequently, the Court finds that

common questions as to liability and proof predominate over any question of damages regarding Plaintiffs' § 1985(3) claim.

Common issues also predominate in Plaintiffs' § 1986 claim. As with the conspiracy claim, the inquiry regarding the § 1986 claim focuses not on individual class members, but rather Individual Defendants' knowledge of the purposes of the conspiracy. Common evidence will be relevant to this claim, as well, including details of the pre-Raid operations meetings and communications, the Operations Plans, and evidence of how the Raid was conducted. (Doc. 732, at 34). Furthermore, whether Defendants had the power to prevent the civil-rights violations underpinning the § 1985(3) claim but failed to do so will be the same for all class members. *See In re Whirlpool*, 722 F.3d at 859. Consequently, common issues predominate over individual ones with regard to Plaintiffs' § 1986 claim, as well.[3]

Predominance alone, however, is not enough to obtain class certification under Rule 23(b)(3). Plaintiffs must also demonstrate that the class mechanism is superior to other methods of resolving the litigation. *See* Fed. R. Civ. P. 23(b)(3). The superiority requirement asks whether the class mechanism will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Martin*, 896 F.3d at 415 (citing *Amchem*, 521 U.S. at 615). A district court "should consider the difficulties of managing a class action" before finding superiority, in addition to "the value of individual damages awards, as small awards

---

[3] Defendants repeat their misguided arguments regarding the need to individually investigate every single search or seizure. The Court rejects this argument for the same reasons as previously discussed. The focus of the § 1985(3) claim is the conspiracy, not the individualized encounters between class members and officers. *See supra,* Section III.B.

weigh in favor of class suits." *Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 630–31 (6th Cir. 2011).

As for superiority, the class mechanism is likely the *only* way that individuals injured during the Raid could bring these claims. The putative class members are low income and geographically dispersed across the United States and South and Central America, and many do not possess the English skills necessary to navigate the American legal system. (Doc. 732-52, 44; Doc. 732-53, at 43.) While Defendants argue that the potential recoveries in this case are substantial enough to incentivize individuals to bring suit, the Court disagrees. Many of the class members are likely only to recover on the §§ 1985(3) and 1986 claims, if at all, and the Court finds it difficult to believe that the damages in this case would be so large as to influence deported and affrighted individuals to come forward, locate counsel, and sue the appropriate parties.

Additionally, the class is not so large as to be unwieldy: the roughly one-hundred individuals comprising the class are easily identifiable and have suffered effectively identical injuries through their allegedly unlawful targeting and detention. And allowing class treatment in this case will save judicial resources through determining liability for all injured during the Raid in one action and could decrease the amount of discovery and motions practice required in this matter. Consequently, the Court finds that the class mechanism is a superior way of resolving this controversy.

## IV.    CONCLUSION

For the above reasons, the Court finds that Plaintiffs have satisfied all the requirements of 23(b)(3). Accordingly, the Court **GRANTS** Plaintiffs' motion for class certification (Doc. 637).

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**